**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TIFFANY TOTH, GEMMA LEE, JESSA
HINTON, BROOKE TAYLOR, JESSE
GOLDEN, LINA POSADA, SHEENA LEE
WEBER, HEATHER RAE YOUNG, RACHEL
KOREN, SABELLA SHAKE, URSULA
MAYES, and CARMEN ELECTRA,

Case No. 15-cv-8028 (NRB)

Plaintiffs,

- against -

59 MURRAY ENTERPRISES, INC., d/b/a
NEW YORK DOLLS GENTLEMEN'S CLUB,
BARRY LIPSITZ, AAM HOLDING
CORPORATION, d/b/a, PRIVATE EYES
GENTLEMEN'S CLUB, ANITA MICELI,
JAY-JAY CABARET, INC., d/b/a
FLASHDANCERS GENTLEMEN'S CLUB,
and MARSHA LIPSITZ,

Defendants.

## PLAINTIFFS' LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Federal Rule of Civil Procedure 56, and Local Rule 56.1, plaintiffs Tiffany

Toth, Gemma Lee (a/k/a Gemma Lee Farrell), Jessa Hinton, Jesse Golden, Lina Posada, Sheena

Lee Weber, Heather Rae Young, Rachel Koren, Sabella Shake, Ursula Mayes, and Carmen

Electra (collectively, "Plaintiffs"), hereby submit the following statement of undisputed material

facts in support of their motion for summary judgment against defendants  59 Murray

Enterprises, Inc., Barry Lipsitz, AAM Holding Corp., Anita Miceli, Jay-Jay Cabaret, Inc., and

Marsha Lipsitz (collectively, "Defendants"):

*Plaintiffs' Backgrounds and Careers*[1]

1.     Each Plaintiff is a professional model, actress and/or businesswoman who earns or has earned a living by promoting her image, likeness and/or identity (collectively, "Image") to select clients, commercial brands, and media and entertainment outlets.  Toth Decl., ¶¶ 2, 5; Farrell Decl.,¶¶ 2, 5 ; Hinton Decl., ¶¶ 2, 5;  Golden Decl., ¶¶ 2, 5;  Posada Decl., ¶ 2, 5;  Weber Decl., ¶¶ 2, 4;  Young Decl., ¶¶ 2, 5;  Koren Decl., ¶¶ 2, 4;  Shake Decl., ¶¶ 2, 5; Mayes Decl., ¶¶ 2, 4; Electra Decl., ¶¶ 2, 5.

2.     Each Plaintiff relies on her professional reputation for modeling, acting, hosting and other professional opportunities, has worked to establish herself as reliable, reputable, and professional, and has achieved celebrity status and fame in the modeling industry.  Toth Decl., ¶¶ 4, 6; Farrell Decl., ¶¶ 4, 6, ; Hinton Decl., ¶¶ 4, 6;  Golden Decl., ¶¶ 4, 6;  Posada Decl., ¶¶ 4, 6; Weber Decl., ¶¶ 3, 5;  Young Decl., ¶¶ 4, 6;  Koren Decl., ¶¶ 3, 5;  Shake Decl., ¶¶ 4, 6; Mayes Decl., ¶¶ 3, 5; Electra Decl., ¶ 4, 6.

3.     Each Plaintiff seeks to control the use and dissemination of her image, is consulted on and participates in the negotiation, vetting and selection of modeling, acting, brand spokesperson or hosting engagements, and each has been vigilant in building and protection her brand from harm, taint, or other diminution. Toth Decl., ¶¶ 7, 8; Farrell Decl., ¶¶ 7, 8, ; Hinton

---

[1] All documents referenced herein are attached as exhibits to the June 1, 2018 Declaration of John V. Golaszewski, Esq. ("JVG Decl."), submitted contemporaneously herewith, and respectfully incorporated by reference herein.  The declaration of plaintiff Tiffany Toth ("Toth Decl.") is annexed as Exhibit B thereto; the declaration of plaintiff Gemma Lee (a/k/a/ Gemma Lee Farrell ("Farrell Decl.") is annexed as Exhibit C thereto; the declaration of plaintiff Jessa Hinton ("Hinton Decl.") is annexed as Exhibit D thereto; the declaration of plaintiff Jesse Golden ("Golden Decl.") is annexed as Exhibit E thereto; the declaration of plaintiff Lina Posada ("Posada Decl.") is annexed as Exhibit F thereto; the declaration of plaintiff Sheena Lee Weber ("Weber Decl.") is annexed as Exhibit G thereto; the declaration of plaintiff Heather Rae Young ("Young Decl.") is annexed as Exhibit H thereto; the declaration of plaintiff Rachel Koren ("Koren Decl.") is annexed as Exhibit I thereto; the declaration of plaintiff Sabella Shake ("Shake Decl.") is annexed as Exhibit  J thereto; the declaration of plaintiff Ursula Mayes ("Mayes Decl.") is annexed as Exhibit K thereto, and; the declaration of plaintiff Carmen Electra ("Electra Decl.") is annexed as Exhibit  L thereto.

Decl., ¶¶ 7, 8;  Golden Decl., ¶¶ 7, 8;  Posada Decl., ¶¶ 7, 8;  Weber Decl., ¶¶ 6, 7;  Young Decl.,

¶¶ 7, 8;  Koren Decl., ¶ 6, 7;  Shake Decl., ¶¶ 7, 8; Mayes Decl., ¶¶ 6, 7;  Electra Decl., ¶¶ 7, 8.

    4.     In all instances of commercial marketing and promotion of her image, each

Plaintiff has negotiated and expressly granted authority for such use pursuant to agreed-upon

terms and conditions, and for agreed upon compensation. Toth Decl., ¶ 9; Farrell Decl., ¶ 9;

Hinton Decl., ¶ 9;  Golden Decl., ¶ 9;  Posada Decl., ¶ 9;  Weber Decl., ¶ 8;  Young Decl., ¶ 9;

Koren Decl., ¶ 8;  Shake Decl., ¶ 9; Mayes Decl., ¶ 8; Electra Decl., ¶ 9.

    5.     Defendants did not, at any time, seek or obtain permission or authority to use or

alter any Plaintiff's image to advertise, promote, market or endorse the Strip Clubs. Toth Decl., ¶

10; Farrell Decl., ¶ 10, ; Hinton Decl., ¶ 10;  Golden Decl., ¶ 10;  Posada Decl., ¶ 10;  Weber

Decl., ¶ 9;  Young Decl., ¶ 10;  Koren Decl., ¶ 9;  Shake Decl., ¶ 10; Mayes Decl., ¶ 9; Electra

Decl., ¶ 10.

    6.     As detailed immediately below, no Plaintiff has ever worked for Defendants in

any capacity, ever agreed to associate with Defendants, ever agreed to participate in Defendants'

advertising campaigns, ever agreed to endorse (and do not endorse or support) Defendants and

their stripper lifestyle generally or the full friction and full nudity lifestyle activities, and never

agreed (and would never agree) to appear at the activities being advertised at Defendants' strip

clubs, N.Y. Dolls, Flashdancers, and Private Eyes (collectively, the "Strip Clubs"),   Toth Decl.,

¶ 15; Farrell Decl., ¶ 15; Hinton Decl., ¶ 15;  Golden Decl., ¶ 15;  Posada Decl., ¶ 15;  Weber

Decl., ¶ 14;  Young Decl., ¶ 15;  Koren Decl., ¶ 14;  Shake Decl., ¶ 15; Mayes Decl., ¶ 14;

Electra Decl., ¶ 16.   *See also*, JVG Decl., Exhibit M, Transcript of September 28, 2017

Deposition of Barry Lipsitz, Jr. ("Lipsitz Jr. Tr.") at 109:16-20.

7.     No Plaintiff was ever offered, or paid, any compensation by Defendants for the use of her Image to advertise, promote, market, or endorse Defendants' Strip Clubs. Toth Decl., ¶ 16; Farrell Decl., ¶ 16; Hinton Decl., ¶ 16;  Golden Decl., ¶ 16;  Posada Decl., ¶ 16;  Weber Decl., ¶ 15;  Young Decl., ¶ 16;  Koren Decl., ¶ 15;  Shake Decl., ¶ 16; Mayes Decl., ¶ 15; Electra Decl., ¶ 17.

8.     Despite this, and as set forth in Exhibits A through O of the Second Amended Complaint ("SAC"), Defendants used one or more images of each Plaintiff to advertise and promote the Strip Clubs' commercial activities. *See* JVG Decl,, Exhibit A, SAC and Exhibits A-O thereto.

**Defendants' Misuse of Plaintiffs' Images**

9.     Toth is a professional model who was the September 2011 *Playboy* Playmate of the Month.   She has appeared in a variety of magazines including *Super Street Bike, Import Tuner, Sport Truck, Iron Man, Seventeen,* and *Maxim*, as well countless other catalogs and publications.  In addition to her modeling work, Toth also owns and maintains her own e-commerce site.  Toth currently has almost 4,000,000 Facebook followers, 1,100,000 Instagram followers, and over 200,000 Twitter followers. Toth Decl., ¶¶ 2-3.

10.     Without Toth's permission, Defendants used and altered her images, as reflected in Exhibit A of the SAC, to advertise and promote the stripper lifestyle generally or the full friction and full nudity lifestyle on the Defendants' premises, and to represent, suggest or imply that she worked for or is somehow affiliated with Defendants, agreed to participate in the advertising campaigns, endorsed 59 Murray Enterprises, Inc. ("59 Murray"), AAM Holding Corporation ("AAM Holding"),  and Jay-Jay Cabaret, Inc. ("Jay-Jay Cabaret") (collectively, the "Corporate Defendants"), and/or the Strip Clubs, and Defendants' full friction and full nudity

lifestyle activities, that she personally participated in the stripper lifestyle generally or the full friction and full nudity lifestyle activities, and/or that she may appear at the Strip Clubs.  Toth Decl., ¶ 13.

11.    All such representations, suggestions or implications are false. Toth Decl., ¶ 13.

12.    The image and likeness of Toth as depicted in the photograph that appears in pages 2 and 4 of Exhibit A of the SAC was originally shot for Mystery House Costumes sometime between 2012 and 2014.   Toth Decl., ¶ 14.

13.    The image and likeness of Toth as depicted in the photograph that appears in pages 3, and 6 through 8, of Exhibit A of the SAC was originally shot as a "Micro Bikini" advertisement for Roma Costumes sometime between 2008 and 2011.  Toth Decl., ¶ 14.   Beside this Image, Defendants wrote: "Who needs to leave anything to the imagination when the reality is even better?" SAC, Ex. A.

14.    Both Mystery House Costumes and Roma Costumes had limited permission and authorization to use Toth's image and likeness, and under no circumstances did they have authorization to use her image and likeness other than for the agreed-upon purpose. Toth Decl., ¶ 14.

15.    Farrell is a professional model, actress and the November 2013 *Playboy* Playmate of the Month (the first model from New Zealand to be so appointed.)  She has been modeling since she was 17 years of age and her modeling credits include Australian men's magazine *Ralph Magazine*, *Guitar World, Sports Illustrated*, and many others.   Farrell was crowned the first Miss Monster Energy Cup spokesmodel, and was named the face of the Playboy Club.   She has also been a reality television star in New Zealand, a client of Wilhelmina modeling agency, and a Healthy Brand lifestyle ambassador for Protein World and Skinny Bunny Teas.  Farrell currently

has over 1,100,000 Instagram followers and over 1,300,000 Facebook followers.  Farrell Decl., ¶¶ 2-3.

16.     Without Farrell's permission, Defendants used and altered her image, as reflected in Exhibit B and C of the SAC, to advertise and promote the stripper lifestyle generally or the full friction and full nudity lifestyle on the Defendants' premises, and to represent, suggest or imply that she works for or is somehow affiliated with Defendants, agreed to participate in the advertising campaigns, endorsed the Corporate Defendants and/or the Strip Clubs, and Defendants' full friction and full nudity lifestyle activities, that she personally participated in the stripper lifestyle generally or the full friction and full nudity lifestyle activities, and/or that she may appear at the Strip Clubs.  Farrell Decl., ¶ 13.

17.     All such representations, suggestions or implications are false.  Farrell Decl., ¶ 13.

18.     The Images of Farrell appear in Exhibit B and C of the SAC each appear on the "Employment Opportunities" sub-page of both the New York Dolls and Flashdancers websites, beside the Defendant-generated copy: "Would you like to work in New York City's most popular, established gentleman's club?"  *See* SAC, Ex. B and C.

19.     Farrell's image and likeness as depicted in the photograph that appears in Exhibit B and C to the SAC was originally shot for Dreamgirl, a lingerie company, between 2011 and 2013.  Dreamgirl had limited permission and authorization to use Farrell's image and likeness, and under no circumstances did they have authorization to use her image and likeness other than for the agreed-upon purpose. Farrell Decl., ¶ 14.

20.     Young is a professional swimsuit, glamour and lingerie model, who was also named the February 2010 *Playboy* Playmate of the Month.   Young has served as a spokesmodel for brands such as Captain Morgan, Smirnoff, Baileys, and Jose Cuervo, appeared in the 2010

6

Import Turner calendar, the 2011 Fast Dates calendar, was featured in an advertising campaign for the Affliction Clothing Line, and has modeled for such clients as Calao Swimwear, DSO Eyewear, Carrie Amber lingerie, Hustler Lingerie, Superstar Swimwear, and 7 Til Midnight Lingerie. Young has also made various television appearances, and currently has 427,000 Instagram followers and over 122,000 Twitter followers. Young Decl., ¶¶ 2-3.

21.     Without Young's permission, Defendants used and altered her image, as reflected in Exhibit D of the SAC, to advertise and promote the stripper lifestyle generally or the full friction and full nudity lifestyle on the Defendants' premises, and to represent, suggest or imply that she works for or was somehow affiliated with Defendants, agreed to participate in the advertising campaigns, endorsed the Corporate Defendants and/or the Strip Clubs, and Defendants' full friction and full nudity lifestyle activities, that she personally participated in the stripper lifestyle generally or the full friction and full nudity lifestyle activities, and/or that she may appear at the Strip Clubs.  Young Decl., ¶ 13.

22.     All such representations, suggestions or implications are false. Young Decl., ¶ 13.

23.     The Image of Young was used by Defendants on a New York Dolls 2014 Super Bowl Week advertisement published on both the New York Dolls website, and the New York Dolls Facebook page.  This is an image of Young in a football jersey, above the Defendant-generated copy: "come party with us all Super Bowl Week… Over 100 Entertainers Daily… Get ready for the big game with our gorgeous entertainers in their favorite football jerseys… We look forward to partying with you."  *See* SAC Exhibit D.

24.      Koren is a professional model who has walked runways for fashion shows, filmed for the travel TV show *Bikini Destinations* and shot for major campaigns in Los Angeles, California.  She has also appeared in films such as *Date Night*, *The Closer*, and many others. She

has likewise appeared in a variety of magazines including *Modern Solo Magazine, Cut & Dry Magazine, Esquire Magazine, Vogue Magazine, Rebel X Magazine, Viva Glam Magazine,* and *Maxim*, to name a few, as well countless other catalogs and publications. Koren has also appeared in campaigns for brands such as Nike, Reebok, Axe Body Spray, True Religion, Jessica Simpson Swimwear, Ed Hardy, Tommy Bahama, Fantasy Lingerie, So Cal Swimwear, American Honey and many more. In addition to her modeling work, Koren also owns her own company, Cashmere Hair Extensions. Koren Decl., ¶ 2.

25.     Without Koren's permission, Defendants used and altered her images, as reflected in Exhibit E of the SAC, to advertise and promote the stripper lifestyle generally or the full friction and full nudity lifestyle on the Defendants' premises, and to represent, suggest or imply that she works for or is somehow affiliated with Defendants, agreed to participate in the advertising campaigns, endorsed Corporate Defendants and/or the Strip Clubs, and Defendants' full friction and full nudity lifestyle activities, that she personally participated in the stripper lifestyle generally or the full friction and full nudity lifestyle activities, and/or that she may appear at the Strip Clubs.  Koren Decl., ¶ 12.

26.     All such representations, suggestions or implications are false.  Koren Decl., ¶ 12.

27.     Koren's image and likeness as depicted in the photograph that appears in Exhibit E of the SAC was originally shot for Fastdates.com in or around 2009.  Fastdates.com had limited permission and authorization to use her image and likeness, and under no circumstances did they have authorization to use her image and likeness other than for the agreed-upon purpose. Koren Decl., ¶ 13.

28.     Shake is a professional model who has modeled for brands such as Chica Rica, Cool Material, and Creative Recreations.   She has appeared in *Esquire Magazine*, and is the

8

current campaign model for Affliction Clothing.  As an actress, Shake has also appeared in national commercials for companies such as Party City, and in films, including *Shoot 'Em Up, Apostles,* and *Date Night*.  She has over 100,000 Instagram followers.  Shake Decl., ¶¶ 2-3.

29.    Without Shake's permission, Defendants used and altered her images, as reflected in Exhibit F of the SAC, to advertise and promote stripper lifestyle generally or the full friction and full nudity lifestyle on the Defendants' premises, and to represent, suggest or imply that she worked for or is somehow affiliated with Defendants, agreed to participate in the advertising campaigns, endorsed the Corporate Defendants and/or the Strip Clubs, and Defendants' full friction and full nudity lifestyle activities, that she personally participated in the stripper lifestyle generally or the full friction and full nudity lifestyle activities, and/or that she may appear at the Strip Clubs.  Shake Decl., ¶ 13.

30.    All such representations, suggestions or implications are false. Shake Decl., ¶ 13.

31.    Shake's image and likeness as depicted in the photograph that appears in Exhibit F of the SAC was originally shot for Fastdates.com on or about 2009.  Fastdates.com had limited permission and authorization to use Shake's image and likeness and under no circumstances did they have authorization to use her image and likeness other than for the agreed-upon purpose. Shake Decl., ¶ 14.

32.    Mayes is a professional model who has appeared in magazines such as *Maxim, Vogue, Elle, In Style, Cosmopolitan, Marie Claire*, and many other publications.   Mayes has also appeared on television shows such as *Deal or No Deal, Minute to Win It, The Tonight Show*, and *The Jay Leno Show*, and appeared in commercial campaigns for many companies, including Coronet Diamonds, Volkswagen, Subaru, and Bacardi.  Mayes was also the cover model and star of the video game, *Juiced 2: Hot Import Nights*.  Mayes Decl., ¶ 2.

33.     Without Mayes' permission, Defendants used and altered her image, as reflected in Exhibit G of the SAC, to advertise and promote the stripper lifestyle generally or the full friction and full nudity lifestyle on the Defendants' premises, and to represent, suggest or imply that she works for or is somehow affiliated with Defendants, agreed to participate in the advertising campaigns, endorsed the Corporate Defendants and/or the Strip Clubs, and Defendants' full friction and full nudity lifestyle activities, that Mayes personally participated in the stripper lifestyle generally or the full friction and full nudity lifestyle activities, and/or that she may appear at the Strip Clubs.  Mayes Decl., ¶ 12.

34.     All such representations, suggestions or implications are false.  Mayes Decl., ¶ 12.

35.     Mayes' image and likeness as depicted in the photograph that appears in Exhibit G of the SAC was originally shot for Dreamgirl sometime between 2005 and 2007. Dreamgirl had limited permission and authorization to use Mayes' image and likeness and under no circumstances did they have authorization to use her image and likeness other than for the agreed-upon purpose. Mayes Decl., ¶ 13.

36.     Hinton is a professional model, actress and was the July 2011 *Playboy* Playmate of the Month.  She has been active in the entertainment industry since the age of 16, and appeared in countless national commercial and television shows.  In 2010, Hinton became the face of the Palms Hotel & Casino's advertising campaign.  She has hosted the television show *Victory Poker,* has served as the interview personality for *Top Rank Boxing*, and became the centerpiece of an advertising campaign for Milwaukee's Best Beer in conjunction with Playboy Enterprises.  Hinton has also served as a spokes model for Affliction Clothing, Enzo, Milano Hair Products, REVIV Wellness Spa, Protein World, Rhonda Shear Shapewear, Leg Avenue and Roma Costume, and has been a featured cover model for magazines such as *FHM*, *Kandy*, *MMA*

*Sports*, *Guitar World*, and *Muscle & Fitness*. Hinton's images have likewise appeared on countless billboards, magazines, posters, and multiple forms of electronic media.  In addition, Hinton has been named Creative Director for MAJR Media, and also served as a guest host for the television station KTLA in Los Angeles, California.  Hinton has also earned an elite status as a social media celebrity, with more than 1,200,000 followers on Instagram, almost 3,000,000 followers on Facebook, and over 241,700 followers on Twitter. Hinton Decl., ¶ 2-3.

37.    Without Hinton's permission, Defendants used and altered her images, as reflected in Exhibit H and I of the SAC, to advertise and promote stripper lifestyle generally or the full friction and full nudity lifestyle on the Defendants' premises, and to represent, suggest or imply that Hinton works for or is somehow affiliated with Defendants, agreed to participate in the advertising campaigns, endorsed the Corporate Defendants and/or the Strip Clubs, and Defendants' full friction and full nudity lifestyle activities, that I personally participated in the stripper lifestyle generally or the full friction and full nudity lifestyle activities, and/or that she may appear at the Strip Clubs.  Hinton Decl., ¶ 13.

38.    All such representations, suggestions or implications are false.  Hinton Decl., ¶ 13.

39.    Hinton's image and likeness as depicted in the photographs that appear in both Exhibit H and I of the SAC were originally shot for Forplay, a costume and lingerie company, sometime between 2012 and 2014. Forplay had limited permission and authorization to use Hinton's image and likeness and under no circumstances did they have authorization to use her image and likeness other than for the agreed-upon purpose. Hinton Decl., ¶ 14.

40.    The Images of Hinton at Exhibits H of the SAC were prominently featured as the homepage banner of the Flashdancers website located at www.flashdancersnyc.com, and also

appeared on the Flashdancers Instagram page; they depict Hinton wearing a blue dress below the Defendant-generated copy: "Get in the blue and you'll know what's the #best in #NYC".   *See* SAC, Ex. H.

41.     The Images of Hinton at Exhibit I of the SAC were featured on the Private Eyes' social media pages beside the Defendant-generated copy: "#Welcome to #PrivateEyesClub, #whatever type of #girls you're looking for, we've got it for you!"  *See* SAC, Ex. I.

42.     Golden is a professional model, actress and businesswoman who has appeared in modeling campaigns for a variety of high profile clients, including Abercrombie & Fitch, Victoria's Secret, Lucy Sport, Coca-Cola, GAP, and Nike, and on the covers of numerous magazines, including the *New York Times*, *Fitness*, *Newport Beach Magazine*, *Yoga International*, and many others.  Golden has also appeared in dozens of commercials, television and film projects, and in addition maintains her own website, www.jessegolden.com, where she aims to empower people through the sharing of my "Golden Secrets" concerning health, wellness and yoga.  Golden also writes for a variety of other magazines and website, and has her own fitness and yoga brand and products which can be found on www.thegoldensecretsoil.com. These expanding business interests are in addition to Golden's continued work as a model for many notable fashion brands.   Golden currently has almost 200,000 Instagram followers. Golden Decl., ¶¶ 2-3.

43.     Without Golden's permission, Defendants used and altered her image, as reflected in Exhibit L of the SAC, to advertise and promote the stripper lifestyle generally, or the full friction and full nudity lifestyle on the Defendants' premises, and to represent, suggest or imply that she works for or is somehow affiliated with Defendants, agreed to participate in the advertising campaigns, endorsed the Corporate Defendants and/or the Strip Clubs, and

Defendants' full friction and full nudity lifestyle activities, that she personally participated in the stripper lifestyle generally or the full friction and full nudity lifestyle activities, and/or that she may appear at the Strip Clubs.  Golden Decl., ¶ 13.

44.     All such representations, suggestions or implications are false.  Golden Decl., ¶ 13.

45.     Golden's image and likeness as depicted in the photograph that appears in Exhibit L to the SAC was originally shot for Leg Avenue sometime between 2008 and 2012.  Leg Avenue had limited permission and authorization to use Golden's image and likeness and under no circumstances did they have authorization to use her image and likeness other than for the agreed-upon purpose.  Golden Decl., ¶ 14.

46.     Images of Golden appear at Exhibit L of the SAC, and include a Private Eyes Halloween party flyer depicting Golden in a Halloween costume beside the Defendant-generated copy "100 Entertainers in Costume," and "Join us for our annual Halloween Party on Friday October 25th." *See* SAC, Ex. L.

47.     Posada is a fashion model and a fashion designer, who is best known for her appearances in the Bésame and Espiral lingerie collection photo shoots.  Posada has also modeled for Paradizia Swimwear, Babalú Swimwear, Irgus Swimwear, Ujeans, as well as many others.  In addition, she has appeared as the main model in a number of music videos such as "Taboo" by Don Omar, which received almost 340,000,000 views on YouTube, and "Obsession" by Maluma, which received almost 182,000,000 views on YouTube.  Posada Decl., ¶2.

48.     Without Posada's permission, Defendants used and altered her image, as reflected in Exhibit M of the SAC, to advertise and promote the stripper lifestyle generally or the full friction and full nudity lifestyle on the Defendants' premises, and to represent, suggest or imply

that she works for or is somehow affiliated with Defendants, agreed to participate in the

advertising campaigns, endorsed the Corporate Defendants and/or the Strip Clubs, and

Defendants' full friction and full nudity lifestyle activities, that she personally participated in the

stripper lifestyle generally or the full friction and full nudity lifestyle activities, and/or that she

may appear at full friction and full nudity lifestyle activities at the Strip Clubs. Posada Decl., ¶

13.

49.     All such representations, suggestions or implications are false.  Posada Decl., ¶

13.

50.     Posada's image and likeness as depicted in the photograph that appears on pages

45 through 46, and 48 through 50 of Exhibit M of the SAC was originally shot for Bésame.

Posada's image and likeness as depicted in the photograph that appears on page 47 of Exhibit M

to the SAC was originally shot for Espiral between 2010 through 2012. Both Bésame and Espiral

had limited permission and authorization to use Posada's image and likeness, and under no

circumstances did they have authorization to use her image and likeness other than for the

agreed-upon purpose.  Posada Decl., ¶ 14.

51.     The Image at Exhibit M of the SAC was published on the Private Eyes website,

the Private Eyes Instagram page, and the Private Eyes Facebook page, and the Flashdancers

Instagram pag, and the Defendant-generated copy beside the Flashdancers Instagram

advertisement reads: "Ask me for a dance," while the the Defendant-generated copy beside the

Private Eyes Facebook and Instagram advertisements reads: "Private eyes, just for you."  *See*

SAC, Ex. M.

52.     Weber is a professional and internationally known model, who is likewise an

honors graduate from the Art Institute of Dallas, and who currently serve as the Director of

Business development for Harmony Medcare.  Weber was a *Playboy* Cybergirl of the Month, and has also appeared in magazine editions of *Maxim, People*, and *Street Customs Magazines*. She has also appeared on the television show *The Reality of Speed*, and likewise served as the SSI spokesmodel "Silspect Shari". Her acting credits include *Harold and Kumar 2* and *The Pool Boys*, among others. Weber Decl., ¶ 2.

53.     Without Weber's permission, Defendants used and altered her images, as reflected in Exhibit N of the SAC, to advertise and promote the stripper lifestyle generally or the full friction and full nudity lifestyle on the Defendants' premises, and to represent, suggest or imply that she works for or is somehow affiliated with Defendants, agreed to participate in the advertising campaigns, endorsed the Corporate Defendants, and/or the Strip Clubs, and Defendants' full friction and full nudity lifestyle activities, that she personally participated in the stripper lifestyle generally or the full friction and full nudity lifestyle activities, and/or that she may appear at the Strip Clubs. Weber Decl., ¶ 12.

54.     All such representations, suggestions or implications are false.  Weber Decl., ¶ 12.

55.     Weber's image and likeness as depicted in the photograph that appears in Exhibit N of the SAC was originally shot for her own website in or around 2005 by the photographer Johnny Crosslin.  Mr. Crosslin had limited permission and authorization to use Weber's image and likeness and under no circumstances did he have authorization to use her image and likeness other than for the agreed-upon purpose. Weber Decl., ¶ 13.

56.     The Images of Weber found at Exhibit N to the SAC appeared on the Private Eyes Facebook and Instagram page, beside the Defendant-generated copy: "Lingerie that looks so good it's almost a shame she has to take it off (Almost)."  *See* SAC, Ex. N.

57.     Electra is a professional model, actress, recording artist and entrepreneur, whose first self-titled album was produced by Prince on his Paisley Park record label.  Electra started acting in regular roles on *Baywatch* and MTV's *Singled Out*, and then began acting in films with starring roles in hits such as *Scary Movie, Dirty Love, Cheaper by the Dozen 2*, and *Meet the Spartans*.   Electra won the role as the face of MAX Factor and in 2006 became a published author with the release of her book, "How to be Sexy".  She thereafter formed the famous dance troupe, The Bombshells, and released a fitness DVD series, *Carmen Electra's Aerobic Striptease*.  In 2009, she appeared live on stage in the MGM Grand Vega's Crazy Horse Burlesque Show to sold-out audiences; in 2010 she stared in the film, *Oy Vey, My Son is Gay*, and in 2011 she starred in the film *2-Headed Shark Attack*.  She has also served as a guest judge on *Britain's Got Talent*, and made recurring guest appearances on CW's hit show, *90210*.  In 2012, she released my return-to-music-single, "I Like it Loud," featuring Grammy-nominated producer Bill Hamel, which hit the number 25 spot on Billboard's Dance Club Play Chart.  She is also the host of WEtv's reality docu-series "Ex Isle".  In addition, Electra has earned an elite status as a social media celebrity, with more than 775,000 followers on Instagram, over 3,000,000 followers on Facebook, and over 390,000 followers on Twitter.  Electra Decl., ¶¶ 2-3.

58.     Without Electra's permission, Defendants used and altered her images, as reflected in Exhibit O of the SAC, to advertise and promote the stripper lifestyle generally or the full friction and full nudity lifestyle on the Defendants' premises, and to represent, suggest or imply that she works for or is somehow affiliated with Defendants, agreed to participate in the advertising campaigns, endorsed the Corporate Defendants and/or the Strip Clubs, and Defendants' full friction and full nudity lifestyle activities, that she personally participated in the

stripper lifestyle generally or the full friction and full nudity lifestyle activities, and/or that she may appear at the Strip Clubs. Electra Decl., ¶ 13.

59.     All such representations, suggestions or implications are false.  Electra Decl., ¶ 13.

60.     Electra's image and likeness as depicted in the photograph that appears in Exhibit O to the SAC was originally shot during the promotional campaign for a film in which she appeared called *I Want Candy.*  To the best of Electra's recollection, the image at Exhibit O was first published in a British magazine called *Loaded*, in either 2006 or 2007.  The magazine had limited permission and authorization to use her image and likeness and under no circumstances did they have authorization to use her image and likeness other than for the agreed-upon purpose. Electra Decl., ¶ 14.

61.     Subsequent to the publication of that image in *Loaded*, Electra and her representatives secured the rights to the image at Exhibit O, and it was used in the promotion of what is referred to as the "Electra Pole", which is a spinning/aerobic pole used in conjunction with Electra's Aerobic Strip Tease series DVDs.  Neither Electra nor her representative ever gave permission to Defendants to use the Image at Exhibit O for the promotion of the Strip Clubs.  Electra Decl., ¶ 15.

62.     Defendants published this Image of Electra beside Defendant-generate copy which reads: "Can you handle a triple threat?"  *See* SAC, Ex. O.

**Defendants' Strip Clubs and Advertising**

63.     Defendant 59 Murray owns and operates New York Dolls, located in Manhattan, New York, where, *inter alia*, it engages in the business of selling alcohol in an atmosphere were nude and/or semi-nude women entertain the business' clientele, and in that capacity controls the

17

New York Dolls website and social media accounts, including the New York Dolls Twitter, Instagram and Facebook accounts.   *See* JVG Decl., Exhibit N, September 27, 2018 Deposition of Barry Lipsitz, Sr. ("Lipsitz Sr. Tr."), at 11:23-12:13.

64.     As set forth above, 59 Murray has used, advertised, created, printed and distributed the Images of Toth, Farrell, Young, Koren, Shake, Mayes, and Electra in its advertising. *See* SAC, Exs. A, B, D, E, F, G, and O.

65.     Defendant AAM Holding owns and operates Private Eyes, located in Manhattan, New York, where, *inter alia*, it engages in the business of selling alcohol in an atmosphere were nude and/or semi-nude women entertain the business' clientele, and in that capacity controls the Private Eyes website and social media accounts, including the Private Eyes Twitter, Instagram and Facebook accounts.   *See* Lipsitz Sr. Tr. at 12:25-26:2.

66.     As set forth above, AAM Holding has used, advertised, created, printed and distributed the Images of Hinton, Golden, Posada, and Weber in their advertising. *See* SAC, Exs. I, L, M, N.

67.     Defendant Jay-Jay Cabaret owns and operates Flashdancers, located in Manhattan, New York, where, *inter alia*, it engages in the business of selling alcohol in an atmosphere were nude and/or semi-nude women entertain the business' clientele, and in that capacity controls the Flashdacners website and social media accounts, including the Flashdancers Twitter, Instagram and Facebook accounts.   *See* JVG Decl., Exhibit O, DEFENDANTS000007.

68.     Jay-Jay Cabaret has used, advertised, created, printed and distributed the Images of Farrell and Hinton.  *See* SAC, Exs. C and H.

69.      The Defendants were at all times aware that they had no contract with any Plaintiff, that no Plaintiff was ever affiliated with or employed by any Defendant or their Strip

Clubs, and that no Defendant or Strip Club had any release or license which would give Defendants the authority to publish Plaintiffs' Image for commercial, or any other, purpose. *See* Lipsitz Jr. Tr. at 109:16-20.

70.     Defendant Barry Lipsitz, Sr. ("Lipsitz Sr."), who served as each of the Corporate Defendants' corporate representative, testified an individual named Paul Brown ("Brown") had the ability and authority to directly post advertisements on the Strip Clubs' websites and social media accounts.  Lipsitz Sr. Tr. at 36:3-24.

71.     Defendants have enlisted services of Paul Brown and his companies for approximately twenty (20) years.  Lipsitz Sr. Tr. at 43:13-44-10.

72.     Lipsitz Sr. testified that one of Paul Brown's companies was Internet Management Corp. ("IMC").  Lipsitz Sr. Tr. at 55:15-21.

73.     Brown has provided website and social media advertising services to Defendants pursuant to an oral agreement, or series of oral agreements, with Defendants over the course of their relationship.  Lipsitz Sr. Tr. at 47:19-48:10.

74.     It was Lipsitz Sr.'s understanding that it was Brown and IMC which had the authority and exclusive ability to publish advertisements on the Strip Clubs' websites and social media sites. Lipsitz Sr. Tr. at 55:22-56:8.

75.     It was Lipsitz Sr.'s understanding that it was Brown and IMC which was responsible for publishing the Images at issue in this lawsuit. Lipsitz Sr. Tr. at 55:15-21.

76.     Lipsitz Sr. acknowledged that no Defendant ever negotiated or contracted with any model to appear in any advertisements for the Strip Clubs' social media sites. Lipsitz Sr. Tr. at 70:24-71:23.

77.     On or about July 15, 2016 Defendants filed a third-party complaint against

Brown's company, IMC, and another entity, Melange Media Group, LLC ("Melange"), asserting claims for negligence, breach of implied warranty, breach of implied covenant, indemnification and contribution.  *See* JVG Decl., Exhibit P, Defendants' Third-Party Complaint, ¶¶ 21-44; Lipsitz Sr. Tr. at 37:20-38:2.

78.    Neither IMC nor Melange answered the Third-Party Complaint or appeared, and on or about September 12, 2016 Defendants' requested that the Clerk of Court enter a default against both entities.  JVG Decl. Exhibit Q, Defendants' Request for Entry of Default.

79.    Lipsitz Sr.'s understanding was the Image of Carmen Electra at issue in this lawsuit was published by Melange, but that all other Images came from IMC.  Lipsitz Sr. Tr. at 79:14-80:25.

80.    Though Lipsitz Sr. believed that IMC and an entity known as Forplay Lingerie had an agreement permitting IMC to use Forplay images, he never saw such agreement.  Lipsitz Sr. Tr. at 74:7-77:11.

81.    Lipsitz Sr. testified that Brown provided the copy beside or within all of the advertisements at issue in this litigation. Lipsitz Sr. Tr. at 86:4-24.

82.    Lipsitz Sr., on behalf of and as the representative of the Corporate Defendants, testified that his son, Barry Lipsitz, Jr., a/k/a Barry Albert ("Lipsitz Jr."), would have more information concerning the Corporate Defendants and the Strip Clubs' website and social media advertising.  Lipsitz Sr. Tr. at 90:14-21.

83.    Although Lipsitz, Jr. testified that Brown "always told us" that he had the right to use certain Images, he could not recall any specific conversations wherein Brown informed Defendants of that.  Lipsitz Jr. Tr. at 22:18-25:21.  Defendants were aware, however, that it was important that they have the rights to images that they were going to use in advertising:

> Q:    So in light of Mr. Brown's representations to you, you understood
>        that it was important that either the clubs or some third party
>        actually had rights to the imagery?
>
> A:    Absolutely.

Lipsitz Jr. Tr. 21:16-20.  *See also*, *Id.*, 22:18-23:8 (wherein Lipsitz, Jr. confirms that he

understood "that it was important that either the clubs or the third party had the rights to certain

imagery that was posted on the club's website….").

84.    Lipsitz Jr. testified that he occasionally provided copy for certain of the

advertisements at issue in this litigation.  Lipsitz Jr. Tr. at 43:13 – 45:22.

85.    Lipsitz Jr. confirmed that Brown and his companies "had full administrative

capabilities; they posted everything," and also testified that Brown would usually just post

advertisements without getting prior approval from Defendants, because, having relied on him

for approximately 20 years, Defendants' trusted him.  Lipsitz Jr. Tr. at 46:24-47:19.

86.    As Lipstiz Jr. specifically testified:

> Q:    Was it a common practice for Mr. Millman or anyone at Paul Brown's
>        companies to send you imagery for approval?
>
> A:    Usually they would just post without saying anything. Usually if there is
>        some sort of party coming up, they would just put the words, verbiage
>        together and put it on the site.  I could have approved it but I really don't
>        know.  Usually it was up to them.

Lipsitz Jr. Tr. at 55:18-56:2.

87.     Lipsitz Jr. recalled no occasion in which he instructed Brown or his company to

remove or change an image or advertisement posted on one of Defendants' websites.  Lipsitz Jr.

Tr. at 92:3-13.

88.    Defendants were on a "faith basis" with Brown, and thus never asked him for any

written confirmation that he or his company at the rights to use imagery posted on Defendants'

websites.  Brown was "a guy that [Defendants] trusted for two decades." Lipsitz Jr. Tr. at 95:24-96:19.

89.     Defendants never asked Brown for any evidence that he received any images at issue in this litigation from Forplay, or what if anything he paid Forplay for the alleged right to use any images. Lipsitz Jr. Tr. at 108:23-109:15; 115:11-25.

90.     Brown was unable to locate any release he had from Forplay granting him or his companies the right to use any Forplay images.  JVG Decl., Exhibit R, Transcript of December 15, 2017 Deposition of Paul Brown ("Brown Tr.") at 14:4-18:2.

91.     Though Brown believed that all images at issue in this lawsuit, except that of Carmen Electra, came from IMC, he testified that he "couldn't put a lot of weight in that though because some of these images I don't recognize.  I would have no idea." Brown Tr. at 26:8-10.

***As Intended, Defendants' Misuse Of Plaintiffs' Images Created Confusion***

92.     By using each Plaintiff's image in one or more advertisements for the Strip Clubs, Defendants confused and deceived consumers and potential consumers into believing that Plaintiffs knowingly permitted and consented to having their images used, were likely to appear as strippers at one of the Strip Clubs, and/or agreed to endorse Defendants' business.  *See* JVG Decl., Exhibit S, May 29, 2018 Declaration of Martin Buncher ("Buncher Decl."), and Exhibit A thereto, Expert Report of Martin Buncher ("Buncher Report"), at Section 5, pp. 12-14.

93.     So pervasive was the confusion and deception created by Defendants' advertisements that, according to a consumer survey conducted by Plaintiffs' marketing survey expert:

>   a.  96% of the survey respondents thought the Images of Plaintiffs were important in attracting attention to the advertising;
>
>   b.  93% of the survey respondents thought the models played a noteworthy role in

motivating people to learn about the Strip Clubs, with 80% believing that
Plaintiffs played a "major role," and 13% believing they played a minor role;

   c.  92% of the survey respondents felt Plaintiffs had agreed to promote the Strip
Clubs;

   d.  96% of the survey believed that Plaintiffs had agreed to be in the advertising;

   e.  87% of the survey  felt the Plaintiffs represent the lifestyle to which the Club is
oriented;

   f.  86% felt the Plaintiffs might participate in some of the events described in the
advertising;

   g.  95% percent of the survey thought it was likely "that these models were used to
make them think they represented the kind of women they would expect to see at
the clubs, including 75% who felt it was "Extremely likely" and 20% who felt it
was "Somewhat likely";

   h.  93% percent of the survey indicated the ads with the models would be more likely
to have interested them to consider the possibility of patronizing the clubs than
having the same ads shown without the models but telling them about the events
at the club prior to any attendance.

Buncher Report, Section 5, at 12-14.  As detailed therein, and at Exhibit 5 thereto, the survey

respondents were male residents of the New York metropolitan area, over the age of 21, who had

patronized a strip club in the past two (2) years.  Buncher Report, Exhibit 5.

     94.    Though Defendants had ample opportunity to do so during discovery, they

declined to offer any competing marketing survey as contrary evidence, or to rebut the findings

set forth in the Buncher Report.

     95.    Though Defendants offered a so-called "expert" to attack Buncher's survey

methodology, Defendants proffered no evidence, whatsoever, which would establish that the

level of deception and confusion caused by Defendants' publication of Plaintiffs' images was

lower than determined by Buncher and set forth in the Buncher Report.  *See generally*, Exhibit T,

to JVG Decl., Rebuttal Report of Robert Klein ("Klein Report").

*Damages*

96.     Because no Strip Club had the authority or permission to use or alter any Plaintiff's Image for advertising, or any other, purpose, and each Plaintiff is entitled to compensation at least equivalent to the fair market value of their Imagery, Plaintiffs' hired a valuation expert, Stephen Chamberlin, to retrospectively estimate the fair market value of use of each Plaintiffs' images, and issue a report. *See* JVG Decl., Exhibit U, May 30, 2018 Declaration of Stephen Chamberlin ("Chamberlin Decl."), and Exhibit A thereto, the Expert Report of Stephen Chamberlin ("Chamberlin Report").

97.     As set forth in the Chamberlin Report, the fair market value of Defendants' many uses of Plaintiffs' Images is at least $1,420,000. *See* Chamberlin Report, ¶ 6.

98.     Based on each Plaintiff's respective experience in the modeling and entertainment industries, and extensive experience participating in negotiations over contracts, each Plaintiff has reviewed and agreed that the fair market valuation range proffered by Plaintiffs' expert aligns with that they would each value the use of their own images in light of the theft by Defendants. *See* Toth Decl., ¶¶ 18-19; Farrell Decl., ¶¶ 18-19, ; Hinton Decl., ¶¶ 18-19; Golden Decl., ¶¶ 18-19; Posada Decl., ¶¶ 18-19; Weber Decl., ¶¶ 17-18; Young Decl., ¶¶ 18-19; Koren Decl., ¶¶ 17-18; Shake Decl., ¶¶ 18-19; Mayes Decl., ¶¶ 17-18; Electra Decl., ¶¶ 19-20.

99.     Defendants do not challenge the valuation methodology set forth by Chamberlin, but rather have engaged a modeling industry veteran who has agreed with and endorsed Chamberlin's methodology. *See* JVG Decl., Exhibit V, Excerpts from the Transcript of the February 6, 2018 Deposition of Joseph Hunter ("Hunter Tr."), at 189:21-190:5.

100.    Hunter is a former partner at Ford Models and Karin Models. Hunter Tr. at 15:10-24.

101.    Hunter agreed with Chamberlin's statement in the Chamberlin Report that if a model appears in a strip club advertisement, it could potentially serve as a deterrent for commercial brands to affiliate with her.  Hunter Tr. at 184:6-20.

102.    He also agreed with Chamberlin's statement in the Chamberlin Report that a model having her image used in a way that would appear to endorse a strip club would "damage, harm and devalue" the model's career. Hunter Tr. at 184:21-9.

103.    Hunter also testified as follows, when read a portion of the Chamberlin Report:

> Q:    Okay. Thank you.  [Reading from Chamberlin's Report]: "Experientially, I recall no instance in my more than 26 years working as an agent where I or any other legitimate agent or agency would have booked a model of the caliber of the models [*i.e.,* the Plaintiffs] for this type of client."  Do you see that?
>
> A:    Yes.
>
> Q:    Okay.  Do you agree with that statement?
>
> A:    I agree.

Hunter Tr. at 185:10-21.

104.    Hunter also agreed that all of the factors Chamberlin stated a reputable agent would rely on when negotiating a modeling contract, and which Chamberlin himself relied on in formulating valuations in the Chamberlin Report, were accurate. Hunter Tr. at 186:3-18.

105.    Hunter also agreed that all of the different and separate usages that Chamberlin set forth in the Chamberlin Report were in fact the different usages a modeling agent would consider when negotiating a contract.  Hunter Tr. at 186:19-187:12.

106.    Hunter has never been asked to provide his opinion in a situation, as here, in which a model is alleging her image was misappropriated, and there was no release or contract to rely on:

25

> Q:     You've been asked to give an expert opinion in cases in which a model had a contract with a company for, let's say, a year term, and then the company kept using it for longer than that term, fair?
>
> A:     Yes.
>
> Q:     And you've been asked to opine on what the value of the additional usage is, correct?
>
> A:     Correct.
>
> Q:     In this case the allegations are that Defendants stole these images and published them.  I'm not asking you your opinion about that.  Have you ever been asked to give an opinion in that situation, when there was no initial contract or release, the image was misappropriated, and now you have to come up with a number of how much the model would have charged in the first instance?
>
> A:     No, I believe most of mine were expired, done with a release, and used without permission.
>
> Q:     So you understand there's a difference between those cases and the case that Plaintiffs' allege here, correct?
>
> A:     Of course.

Hunter Tr. at 187:15-188:19.

107.     Hunter endorsed and agreed with the valuation methodology Chamberlin applied in retrospectively valuing Plaintiffs' Images:

> Q:     With that said, my only question is: The methodology that Mr. Chamberlin used here, and with the understanding that you've never engaged in such a calculation, do you have any issues with the steps he took to try to value the image?
>
> A:     Well, I believe he took the right steps.

Hunter Tr. at 189:21-190.

26

Dated:  New York, New York
          June 1, 2018

**THE CASAS LAW FIRM, P.C.**

By: /s/ John V. Golaszewski
    John V. Golaszewski, Esq.
    1745 Broadway, 17th Floor
    New York, New York
    T: 646.872.3178
    F: 855.220.9626

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 1st day of June, 2018, the foregoing was electronically filed with the U.S. District Court Clerk, Southern District of New York, by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.


/s/ John V. Golaszewski


John V. Golaszewski, Esq.
Casas Law Firm, P.C.
1745 Broadway, 17th Floor
New York, New York 10019
Tel: (646) 872-3178
john@casaslawfirm.com

*Attorneys for Plaintiffs*