Page 73

1  T. TOTH
2  or what I post.
3  Q  So I'm trying to understand the range of
4  what you're making off of ServeSpring, okay.
5      So to date, what's the maximum monthly
6  income you've received form ServeSpring because of
7  your posts?
8  A  ▮
9  Q  And you said that's per month, correct?
10 A  Mm hm.
11     MR. GOLASZEWSKI:  You have to say yes.
12 A  Oh, yes.
13 Q  When did you start posting on behalf
14 ServeSpring?  Do you recall when?
15 A  I don't remember.  I've worked with other
16 companies too, so.
17 Q  Just focusing on ServeSpring for a moment.
18 A  Okay.
19 Q  Has it been less than a year?
20 A  I don't know.  I'm pretty sure it's over a
21 year.  But I don't want to say for sure.
22 Q  All right.  Now just focusing solely on
23 companies that have you posting photographs of
24 yourself to promote that brand.
25     Over the last month, have you worked with

Page 74

1  T. TOTH
2  any companies to do that?
3  A  For Facebook?
4  Q  Yes.  Just focusing on Facebook.
5  A  Okay.  Posted a picture of something?
6  Q  Where you're in the picture?
7  A  I don't think so.  Not for Facebook.
8  Q  What about Instagram?
9  A  Instagram, I probably have.
10 Q  Do you recall what companies you did that
11 on behalf of?
12 A  Yeah, there's been quite a few of them,
13 and a lot of them have since been deleted.  So I
14 can't think off the top of my head of my head right
15 now.
16 Q  What about your over the past week.
17    Any companies that you posted your own
18 photos or photos you've taken in the past to promote
19 that company?
20 A  I can't think right now.
21 Q  Okay.  So besides posting on your own
22 social media pages, do companies ever republish your
23 own photos and videos to promote their brand, with
24 the caveat, on their own website or social media
25 page?

Page 75

1  T. TOTH
2  A  Well, if I post something on social media
3  and they're tagged in it and it's something like
4  we've agreed on, you can repost, yes.  And then
5  also, a lot of times websites will have where their
6  Instagram shows up on their website.  So yes, it
7  would be on there kind of automatically.
8  Q  So just focusing on those types of
9  publications, the ones you post, and someone is
10 reposting.
11     Have you had any company repost your image
12 over the past week where you've received
13 compensation for their reposting?
14 A  Compensation for their reposting?  No,
15 because that's kind of already in.  If they're
16 paying you, then they can repost it.  So it wouldn't
17 be like a separate thing.
18 Q  Right.  So a company contracts with you
19 that they can repost your post that's promoting
20 their brand, correct?
21 A  Yeah.
22 Q  So what companies do you have that
23 agreement with, currently?
24 A  I mean, I don't know like how I can say
25 currently, because it's been -- I've done it for

Page 76

1  T. TOTH
2  years.  I don't remember ever single person I've --
3  Q  I'm talking about at the moment.
4     Are you contracted with any company to
5  have that arrangement where they could repost your
6  post and they pay you for that?
7  A  Not contracted, no.
8  Q  Do you have any agreement with any company
9  where they can repost your post and then compensate
10 you about posting about them?
11 A  I mean, usually if you post for someone,
12 you're compensated.  But since you're doing that,
13 it's kind of like an agreement that they can repost
14 it if they want.  A lot of times they don't, but
15 they can if they want to because they've been tagged
16 in it, because when you tag them, it shows up on
17 their profiles anyways.
18 Q  Let me try it this way:  When was the last
19 time you were paid by a company for them to repost
20 something you posted on social media?
21 A  I'd have to look back or think.
22 Q  Was it in the past month?
23 A  Yes.
24 Q  Do you recall what company that was for?
25 A  Gosh, I can't even -- I mean, I've done so



Page 77

T. TOTH
many. It could have been a book, an app. Like I can't think off the top of my head right now.
 Q  Do you recall how much you were compensated for that repost by that company?
 A  It's different. It depends on if it was like five hours, two days, a week. Everybody is different. So sometimes they can come to you and present a rate and you say yes or no, or you can give them a rate. It depends on if it's something you want to do, or something you don't want to do. Something you want to receive the product and get paid. It's really case by case. It's really hard to give you a straight answer.
 Q  Sure. Do you command a certain rate for the reposting?
     For example, you said before, it could be for five hours. So do you command that that company pays you X number of dollars for five hours of the repost?
 A  No, because I would already have that in mind in the rate, because I'm tagging them. So they are allowed to repost.
 Q  So what rate do you usually get for five hours of posting?

Page 78

T. TOTH
 A  [redacted]
 Q  Okay. Do you currently do that type of arrangement with Spicy?
 A  No.
 Q  Do you have that kind of arrangement with Roma?
 A  No. Some companies do, but.
 Q  What do you mean by some companies do?
 A  Some companies will pay you extra to post for them. If they have a specific -- for example, in the pictures that I posted, it's not necessarily since it wasn't paid, I can post whatever I want. I don't have to tag them. I don't have to hashtag specific things. So if a company pays you, they tell you what to tag and what to advertise. But I'm free to post like whatever lingerie pictures.
 Q  Right. Because you're paid per post, right, so it's up to you, correct?
     So if you post on behalf of a company where you give them a shoutout, that's how you are compensated by that company?

Page 79

T. TOTH
 A  If I post specifically what they want me to post or tag their companies or certain hashtags, yeah.
 Q  Okay. So you can you name here today, just one company that you've done that are for in March of 2017?
 A  In March for lingerie?
 Q  Any company that you've posted for social media in. Even -- let me rephrase this.
     Can you name one company that you've done this reposting for in March of 2017?
 A  I don't know if it was March exactly. I think there was like a book I advertised. There was an app, like a travel app. I'd have to go through e-mails and look, because stuff gets deleted.
 Q  Understood. The book that you reposted, do you recall what book that was?
 A  It was -- I'd have to look back through my pictures.
 Q  Do you recall what you were paid to post for the book?
 A  I think it was a thousand. I think.
 Q  Do you recall when you posted about that book?

Page 80

T. TOTH
 A  No.
 Q  Do you recall the last time --
 A  It was only a few hours.
 Q  Do you recall the last time you posted a picture of yourself in lingerie on behalf of a company?
 A  Well, I have a lot of companies send me stuff, so.
 Q  What do you mean by send you stuff?
 A  If I have a shoot that like I want to do and it's for something -- like it's a fun shoot that I want to do and I need lingerie for it, companies will send me lingerie if I tag them.
 Q  So you get lingerie for free?
 A  Sometimes, yes. Sometimes they'll still send you product and pay you because they want a specific post, like in a specific outfit, a certain time, certain hashtags. But other times, they'll let me go on the website and pick out anything I want, and I can use it in a shoot as long as I tag them.
 Q  Do you recall the last time you were paid money to post yourself on social media in lingerie.
 A  I don't remember. Not in the past month.


Page 81

1  T. TOTH
2  Q  Okay. Are you aware of any fake --
3  MR. SPIEGEL: Off the record.
4  (Whereupon, an off-the-record
5  discussion was held at this
6  time.)
7  (At this time, Attorney Peter
8  Shapiro has entered the
9  deposition.)
10  Q  Are you familiar with any fake Facebook or
11  Instagram profiles that were made -- strike that.
12  Are you familiar with any fans who have
13  created fake Facebook profiles of you?
14  A  I don't know if they're fans or not. But
15  yes, fake profiles.
16  Q  Okay. Is this on Facebook and Instagram,
17  or just on one social media platform?
18  A  I've seen them on Instagram too and
19  Facebook.
20  Q  Just focusing in 2017.
21  How many fake profiles have you found?
22  A  I counted like over 40.
23  Q  Just in 2017?
24  A  Yes.
25  Q  Do you take any actions to try to take

Page 82

1  T. TOTH
2  these profiles down?
3  A  Yes.
4  Q  What do you do?
5  A  First step is you report them to Facebook,
6  and Facebook will ban them and take them down.
7  Q  These are people who did not ask your
8  permission to post your photos, correct?
9  A  Correct.
10  Q  Were any of these photos manipulated by
11  these uses?
12  A  Sometimes.
13  Q  In what way?
14  A  I don't go through every photo. But I
15  have seen them manipulated by -- I can't remember
16  one specific. I mean, there are so many.
17  Q  So when you contact Facebook and ask them
18  to take down these profiles, they usually comply?
19  A  Yes, because they're against Facebook
20  standards.
21  Q  And before, we were discussing your own
22  personal website.
23  I think it was TiffanyToth.net, correct?
24  A  Yeah. Or OfficialTiffanyToth.com.
25  Q  Do you sell merchandise on that website?

Page 83

1  T. TOTH
2  A  Yes.
3  Q  What do you sell?
4  A  My signed Playboy issue, headshots, and
5  some other photos.
6  Q  Your sign Playboy issue, that's from
7  September 2011?
8  A  Yes.
9  Q  And what do you sell that for?
10  A  I don't know what it is. I'd have to
11  look.
12  Q  And your headshots, do you know what you
13  sell that for?
14  A  No.
15  Q  Do you know what you sell any of the
16  photos for, like how much?
17  A  It could be -- well, it's for the print.
18  So I mean, it's like ▇▇▇▇▇ But I can't be sure.
19  I'd have to look.
20  Q  Specifically talking about these items
21  that you sell on your website, do you know how much
22  money you brought in from sales in 2016?
23  A  I do not.
24  Q  Do you know on average how much you sell
25  in merchandise per month?

Page 84

1  T. TOTH
2  A  No, I don't.
3  Q  What's your highest level of education?
4  A  Some college.
5  Q  Where did you go to college?
6  A  Santiago Canyon College.
7  Q  Do you have any other type of education or
8  training?
9  A  No.
10  Q  Besides modeling, are you currently
11  working in any other industry?
12  A  I do photography and makeup. But that's
13  kind of like a thing on the side.
14  Q  So your main source of income comes from
15  the modeling?
16  A  Modeling, yes.
17  Q  How did you get started in modeling?
18  A  I did a shoot for Playboy.
19  Q  How old were you?
20  A  Nineteen.
21  Q  And how did you come to find Playboy, or
22  how did Playboy find you?
23  A  I went to, I think, it was like a casting,
24  and I went to their main offices and they did like
25  Polaroids, and then called me back to do a shoot.



Page 85

1  T. TOTH
2  Q  At the time, were you represented by any
3  agents or modeling agencies?
4  A  I don't believe so.
5  Q  I'm sorry, what is your agent's name, your
6  current agent?
7  A  Which one?  There was three.
8  Q  Your press agent?
9  A  Print agents?
10  Q  Yes, print agent.
11  A  There's Carol.
12  Q  What's Carol's last name?
13  A  Scott.
14  Q  Who else?
15  A  And then there's Teresa Otto.
16  Q  And what's Teresa's last name?
17  A  That's Otto, O-T-T-O.
18  Q  And she's the one who works for Otto
19  Company, correct?
20  A  Mm hm.
21    MR. SPIEGEL:  Can we take a break for a
22  couple of minutes off the record?
23    MR. GOLASZEWSKI:  Sure.
24    (Whereupon, an off-the-record
25    discussion was held at this

Page 86

1  T. TOTH
2    time.)
3  Q  So where we left off, you were saying that
4  your first entrance into modeling was Playboy,
5  correct?
6  A  Yes.
7  Q  Were you contacting agents prior to
8  working with Playboy?
9  A  I don't remember if I did or not.
10  Q  Were you trying to break into modeling
11  prior to Playboy?
12  A  I had just wanted to be a Playmate.
13  Q  Do you recall after you signed with
14  Playboy and were featured in their issue, the first
15  agency you signed with?
16  A  I'm sorry, what?
17  Q  After you shot for Playboy, do you recall
18  the first agency you ended up signing with?
19  A  I don't remember at the time who it was.
20  Q  Talking about your modeling now, when you
21  do a photo shoot.
22    You said you have three different agents,
23  correct?
24  A  Yes.
25  Q  Two for print, and one for commercials,

Page 87

1  T. TOTH
2  correct?
3  A  Yes.
4  Q  So how does it work now, if you're going
5  to do a shoot for somebody, they can either contact
6  you directly or contact your agent who contacts you;
7  is that right?
8  A  Not everything is exclusive.  So not
9  everything is through the agency.  I mean, now
10  because of social media and just being online,
11  people can contact you through all social media
12  platforms.  They can contact you through your
13  website, get referred by other models,
14  photographers.  It's pretty easy to get in touch
15  with us to book us for a job.
16  Q  [redacted]

Page 88

1  T. TOTH
2  A  [redacted]
14  Q  Okay.  I'm going to show you what's marked
15  as TT17.
16    (Whereupon, a sample release
17    form was marked as Exhibit TT17
18    for Identification.)
19  Q  For the record, this is a sample release.
20  You are not the party to this release, okay.
21  A  Okay.
22  Q  I'm just showing this to you to see if you
23  recognize the language of what this release is.
24  A  Okay.  This isn't a release that I've
25  signed?



Page 89

1  T. TOTH
2  Q  This isn't a release that you've signed,
3  and as far as I know, not a company that you have
4  worked for.
5  A  Okay.
6  Q  I just want to show you a sample release,
7  that is TT 17.
8      Have you ever seen a release that looks
9  like that?
10     MR. GOLASZEWSKI:  Take a minute and look
11 it over.
12 A  This doesn't look like one I've signed.
13 But I have seen parts of this.
14 Q  It doesn't look like a typical contract
15 release?
16 A  This looks like it's an exclusive for this
17 company.
18 Q  Okay.  So what's the difference between
19 this contract release that you're looking at, and
20 one that you've signed this the past?
21 A  This one says that they cannot for work or
22 competing lingerie companies.
23 Q  Is that the only difference you see?
24     MR. GOLASZEWSKI:  Objection.
25 A  That, and I've never signed one that says

Page 90

1  T. TOTH
2  that they can use my name to promote like in the
3  release.
4  Q  If you would, look at the last page which
5  is Exhibit B of the contract.
6      Does that look like typical release
7  language you've seen?
8      MR. GOLASZEWSKI:  It's the appendix page.
9  A  What did you ask?
10 Q  Does that look like typical release
11 language you've seen in the contracts?
12     MR. GOLASZEWSKI:  I'm just going to object
13 to the question.
14 A  It looks similar.  But in my releases,
15 now -- I mean, I don't know what I started -- but I
16 have a little clause at the end that says I still
17 own my likeness, and that, say this happens, someone
18 steals my image, I have a right to my likeness.
19 Q  But you don't recall when you started to
20 add that into the releases?
21 A  I don't recall that, but I do have that
22 now.
23 Q  Okay.  I'm not sure if I asked this
24 question before.  So I'm going to re-ask it.
25 A  Okay.

Page 91

1  T. TOTH
2  Q  When we looked at Exhibit A of complaint
3  which is marked as TT1, do you recall what company
4  you took the first image of those images for?
5      MR. GOLASZEWSKI:  Objection.
6  A  Yes.
7  Q  What company was that?
8  A  Mystery House.
9  Q  Mystery House.  You did say that before,
10 right.
11 A  Yes.
12 Q  And then the second photo, who did you say
13 you took this photo for?
14     MR. GOLASZEWSKI:  Objection.
15     You can answer.
16 A  Roma.
17 Q  Yet you currently do not work for Mystery
18 House or Roma anymore, correct?
19 A  I don't know if Mystery House is still
20 around or not.
21 Q  Okay.  So if it's not around, you wouldn't
22 be working for them, correct?
23 A  Well, they started doing, I think, it was
24 like -- what is that, like shape wear or something I
25 did a shoot for some time last year.  But I don't

Page 92

1  T. TOTH
2  know like their current statute.  Like they're
3  currently working, but I don't know if they're still
4  doing costumes.
5  Q  Like body shapers, you mean?
6  A  Yeah.
7  Q  Do you recall when you started to work
8  with Mystery House?
9  A  It was a long time ago.
10 Q  Before 2010?
11 A  Yeah.
12 Q  And what about Roma.
13     Do you recall when you started to work
14 with them?
15 A  It could have been 2000 -- it could have
16 been 2007, 2008.  I can't be sure, but somewhere
17 around that time.
18 Q  Is it fair to say that when you first
19 started to work with Mystery House and Roma, you
20 didn't have that clause in it saying that you owned
21 your likeness?
22 A  It could have been in if it was already on
23 there.  Not my specific clause, but I'd have to find
24 or ask them.
25 Q  Do you have a copy of the contracts that



Page 93

1  T. TOTH
2  you had with Mystery House and Roma?
3  A   I'm sure I do somewhere.
4      MR. SPIEGEL:  On the record, I would ask
5  that you produce copies of those contracts.
6      MR. GOLASZEWSKI:  To the extent I'm going
7  to produce, we certainly will.
8      MR. SPIEGEL:  And on the record, that's
9  any contract you've had over the past 10 years
10 with Mystery House or Roma.
11     THE WITNESS:  Okay.
12 Q   And I think we might have been a little
13 bit confused before, because you were Playmate of
14 the month in 2011, you said, correct?
15 A   Yes.
16 Q   But that's not when you first started to
17 work with Playboy, right?
18 A   Right.
19 Q   So do you recall what year was the first
20 year you were featured in Playboy?
21 A   It was an online future in 2005, I
22 believe.
23 Q   All right.  So let's talk about the
24 edition where you were Playmate of the month.
25     From what I could tell from looking at

Page 94

1  T. TOTH
2  your tax returns, is that you were paid $[redacted] for
3  that photo shoot, correct?
4  A   Yes.
5  Q   As far as compensation-wise, is that the
6  biggest job you've done for modeling?
7  A   I believe so.
8  Q   That's most lucrative?
9      Is the most amount of money you've been
10 compensated for a photo shoot [redacted]?
11 A   Yes.
12 Q   And then when you're selected as Playmate
13 of the month, what else is entailed with that honor?
14 A   That I'm required or that you get as like
15 a benefit?
16 Q   That you're required pursuant to your
17 agreement with them?
18 A   That I'm required.  I mean, I'm not really
19 required to do anything besides just not posing nude
20 for competitors.
21 Q   Okay.  So is that edition of Playboy where
22 you're featured as Playmate of the month, you were
23 fully nude?
24 A   Yes.
25 Q   Have you posed fully nude for anyone else?

Page 95

1  T. TOTH
2  A   No.
3  Q   Before or after this edition?
4  A   Oh, wait.
5  Q   Have you posed nude for anyone else
6  besides Playboy ever in your career?
7  A   No.
8  Q   Did you consider the [redacted] you were
9  compensated adequate compensation for this job?
10     MR. GOLASZEWSKI:  Objection.
11 A   What do you mean, like for the --
12 Q   Sorry.  For being selected Playmate of the
13 month and receiving [redacted], did you feel like that
14 was a good amount of money to be paid?
15     MR. GOLASZEWSKI:  Objection.
16 A   Yeah, because it was a job that I had
17 wanted to do, and also just the benefits of being
18 part of Playboy.  I mean, I got to travel and work
19 quite a few jobs.
20 Q   Where was the photo shoot, where did it
21 takes place for when you were selected as Playmate
22 of the month?
23 A   At the studio.
24 Q   Where is the studio?
25 A   At the time, it was Santa Monica.

Page 96

1  T. TOTH
2  Q   Did they pay for your lodging in Santa
3  Monica?
4  A   Well, I was technically like a local
5  Playmate.  So I would just stay the night at the
6  guest house at the mansion.
7  Q   Do you recall how many day of photo shoots
8  that were entailed in that Playmate of the month
9  spread?
10 A   That shoot, I believe it was just one day.
11 Q   When you say "one day," are we talking
12 about eight hours in a day or longer or less?
13 A   I don't remember how many hours it was.
14 Usually, just until we got the shot that we liked.
15 Q   So if you know, what was the second most
16 amount of money that you've ever been paid for any
17 company?
18 A   I don't remember.
19 Q   Would it be more than [redacted]?
20 A   It might have been.  I don't know.  I only
21 remember Playmates specifically, because it's like
22 such a public knowledge that you get.
23 Q   Are you familiar with the term Playboy
24 Fresh Face?
25 A   Yes.



Page 97

1  T. TOTH
2  Q  What is a Playboy Fresh Face?
3  A  I think it was one of their -- it was like
4  back in the day, it was like one of their other
5  websites that they had, like when they used to do
6  like -- I mean, I'm not familiar with it now. But
7  they would have like wives of Playboy or like
8  college girls of Playboy, Fresh Faces. There was
9  like a bunch of different stuff affiliated with
10 them. I'm not really familiar with it now.
11 Q  From the information we've received, it
12 looks as though you were featured three times as a
13 Playboy fresh face; does that sound right?
14 A  No, not three times.
15 Q  How many times were you featured?
16 A  I think just once, but you would shoot
17 like multiple looks that day.
18 Q  So could it be possible that you had three
19 different pictures from one shoot?
20 A  Yes.
21 Q  Okay. Do you recall when you were
22 featured as the Playboy fresh face?
23 A  That would have been when I was like 19
24 years old. So I don't know.
25 Q  Is this when you were talking about the

Page 98

1  T. TOTH
2  first job did you with Playboy?
3  A  It was around that time, yes.
4  Q  Besides photos that were taken, were there
5  any videos taken and posted?
6  A  Yes.
7  Q  There was a video posted online?
8  A  On their website.
9  Q  Do you recall what you were paid for both
10 the photos and the videos?
11 A  I don't remember.
12 Q  What about Playboy Cybergirl.
13    It looks as though you were featured
14 November 2005; does that sound correct?
15 A  Yes, that was the first shoot.
16 Q  How many times were you featured as a
17 Playboy Cybergirl?
18 A  Well, you can only be featured once. So
19 there would be Cybergirl of the week, so you only
20 have one week, and then they vote for who they
21 choose as Cybergirl of the month, and then you would
22 have one month.
23 Q  So were you featured both Cybergirl of the
24 week and Cybergirl of the month?
25 A  Correct.

Page 99

1  T. TOTH
2  Q  Do you recall how much you were paid for
3  being featured as Cybergirl of the month?
4  A  I don't remember at the time. It was a
5  long time ago.
6  Q  And what about a blogger for Playboy
7  called Playboy Blogger?
8  A  I don't know what that is.
9  Q  What about a Playboy radio host or for a
10 guest appearance on Playboy Radio?
11 A  Yes.
12 Q  When did you do that?
13    MR. GOLASZEWSKI: Objection.
14 A  It probably would have been 2011 when I
15 was Playmate.
16 Q  Was that part of your contract, that you
17 would go on their radio show?
18 A  It wasn't required.
19 Q  Were you paid to appear on the radio show?
20 A  I don't know if I was paid or not, or if
21 it was just something I wanted to do. I don't
22 remember exactly. But it wasn't required.
23 Q  You said 2011.
24    Do you recall how many times you appeared
25 on air?

Page 100

1  T. TOTH
2  A  Probably I think it was once.
3  Q  Were there any photos or videos taken from
4  that?
5  A  Not that I remember. If there was, it
6  would have been me taking them. But to be honest,
7  it was really bad light in there, so I wouldn't have
8  taken a photo.
9  Q  Now, outside the brand ambassador or
10 promoter of Playboy we discussed before, I think,
11 you said it was called Blackheart Rum promoter?
12 A  It's a rum company, yes.
13 Q  Do you recall when that was, when you were
14 brand ambassador for Blackheart Rum?
15 A  That was last year.
16    (Whereupon, a contract with
17    Blackheart Rum was marked as
18    Exhibit TT18 for
19    Identification.)
20 Q  I'm going to show you what's been marked
21 TT18, and this is the -- I believe this is the
22 contract between and you Blackheart Rum that you
23 were just referring to, correct?
24 A  Correct.
25 Q  If you look at the second page at the very



Page 101

T. TOTH

2 top where it says payment, and it says ▓ photos
3 usage.
4     Is that a typical amount you're paid for a
5 company to use your photo?
6     MR. GOLASZEWSKI: Objection.
7  A  It could be. If it's something I want to
8 do, yes.
9  Q  And the following bullet point where it
10 says ▓ for a full-day video shoot.
11     Is that the typical fee you charge for a
12 full-day video shoot?
13     MR. GOLASZEWSKI: Objection.
14  A  Not the typical rate.
15  Q  And the fourth bullet point, it is says
16 ▓ per social post, and 8 to 9 total.
17     So I guess that means that you agreed to
18 post eight to nine times, is that correct?
19  A  They would pay per post which they
20 actually ended up buying more posts since this
21 contract.
22  Q  Okay. So just looking just at this
23 contract though.
24     Is that a typical amount that a company of
25 this size would pay you to post on social media?

Page 102

T. TOTH

2  A  I mean, usually I get paid more, but I
3 agreed to pay this, or to be paid for this, because
4 this was something I wanted to do.
5  Q  You said they now agreed to pay more or
6 for additional posts, correct?
7  A  Yes.
8  Q  When did they approach you to renegotiate
9 this?
10  A  They did that through Playboy.
11  Q  When was that?
12  A  During this, at the end of last year.
13  Q  At the end of last year?
14  A  Mm hm. Sometime around there.
15  Q  Was this after the contract was over?
16  A  No, during.
17  Q  Do you have a new contract with them?
18  A  No. They just contact Playboy and pay us
19 through Playboy. It wasn't required, it was just
20 adding on more. So there wasn't a contract for
21 more.
22  Q  As of March 2017, are you still being paid
23 by Playboy for advertisements or posts?
24  A  Sometimes.
25  Q  So in March 2017, do you know how much you

Page 103

T. TOTH

2 were paid by Playboy?
3  A  I don't know if I did a post in March for
4 Playboy. I don't think I did in March.
5  Q  What about in 2016.
6     Do you know how much Playboy paid you for
7 that year?
8  A  Like for anything or just posts?
9  Q  Yeah. Your total compensation in 2016,
10 how much were you paid by Playboy?
11  A  I don't remember. I'd have to look back
12 at the tax returns.
13  Q  Did you file your 2016 tax returns?
14  A  Yes.
15  Q  When did you file them?
16  A  Just recently.
17     MR. SPIEGEL: For the record, we make a
18 demand for the 2016 tax returns.
19     MR. GOLASZEWSKI: You will have them.
20  Q  So we have a number of your tax returns.
21 I just want to go through them pretty briefly, okay.
22     MR. SPIEGEL: Off the record for a moment.
23     (Whereupon, an off-the-record
24     discussion was held at this
25     time.)

Page 104

T. TOTH

2     (Whereupon, 2011 financial
3     information was marked as
4     Exhibit TT19 for
5     Identification.)
6  Q  So in front of us is a tax return for you
7 for 2011; is that correct?
8  A  Yes.
9  Q  Okay. If you would, go forward three
10 pages. Schedule C, top left corner. It says,
11 Schedule C 1040 for sole proprietorship, and it says
12 Tiffany Gray which you said is your name, correct?
13  A  Correct.
14  Q  And it's for modeling. And on this return
15 on the right-hand corner, it says your gross income
16 is ▓.
17     Does that sound correct for 2011?
18  A  If that's on here, then yes.
19  Q  So that was your total income for 2011 to
20 the best of your knowledge, correct?
21  A  I guess so.
22  Q  If you would, turn to tab 7.
23     MR. SPIEGEL: And we can mark that as
24 TT20.
25     (Whereupon, 2012 financial



Page 105

1 T. TOTH
2 information was marked as
3 Exhibit TT20 for
4 Identification.)
5 Q And this is your individual tax returns
6 for 2012, correct?
7 MR. GOLASZEWSKI: Objection.
8 A Correct.
9 Q Now if you would, turn to Page 4 of the
10 tax return which is also marked Plaintiff's 001088.
11 This is your Schedule C showing income of
12 ▇ correct?
13 A Correct.
14 Q Is this accurate, this number?
15 A I think so.
16 Q Okay. If you would, turn to tab 8 which
17 we could mark as TT21.
18 (Whereupon, 2013 financial
19 information was marked as
20 Exhibit TT21 for
21 Identification.)
22 Q These are individual tax returns for 2013,
23 correct?
24 MR. GOLASZEWSKI: Objection.
25 A Correct.

Page 106

1 T. TOTH
2 Q If you would, turn to the fourth page
3 which is also marked as Plaintiff's 001102.
4 The Schedule C shows that you made gross
5 income of $▇; is that correct?
6 A That's what it says here, so I guess
7 that's correct.
8 Q If you would, turn to tab 9, please.
9 MR. SPIEGEL: Can you mark this as TT22.
10 (Whereupon, 2014 financial
11 information was marked as
12 Exhibit TT22 for
13 Identification.)
14 Q This is showing your individual tax
15 returns for 2014, correct?
16 A Correct.
17 Q If we turn to the fourth page which is
18 also marked as Plaintiff's 001110.
19 It shows gross income of $▇; is that
20 correct?
21 A It looks like that, yes.
22 Q Okay. Now let's go to Exhibit 10, please.
23 MR. SPIEGEL: Can we mark this as TT23.
24 (Whereupon, 2015 financial
25 information was marked as

Page 107

1 T. TOTH
2 Exhibit TT23 for
3 Identification.)
4 A These are your individual tax returns for
5 2015, correct?
6 MR. GOLASZEWSKI: Objection.
7 A Oh, yes.
8 Q Now if you would, turn to marked as
9 Plaintiff's 001134, and it's probably 10 or 15 pages
10 deep.
11 MR. GOLASZEWSKI: 001134.
12 Q And here it shows that you made a gross
13 income of ▇, correct?
14 A Correct.
15 Q If you would, turn to the first page.
16 Beginning of the tab.
17 I'm sorry, can you actually turn two
18 pages.
19 MR. GOLASZEWSKI: Plaintiff's 1118?
20 MR. SPIEGEL: Correct.
21 Q So it shows here in a 1099 you received
22 from Roma Costumes, correct?
23 A Correct.
24 Q And you received $▇, correct?
25 A Correct.

Page 108

1 T. TOTH
2 Q What was entailed for this compensation?
3 Why did they pay you?
4 A It would have been a photo shoot.
5 Q Do you know how many photo shoots this
6 entailed?
7 A I don't remember.
8 MR. GOLASZEWSKI: Just for the record,
9 there appears to be two 1099s on this page and
10 they are identical amounts.
11 They may very well be the same job, but
12 just for the record, I don't know.
13 Q If you would, turn to the next page. On
14 top left corner, it says First Slice Media, LLC.
15 And it looks as though you were
16 compensated $▇; is that correct?
17 A Correct.
18 Q And do you know what this was for?
19 A At the time, it was a company that I
20 posted on my Facebook with them.
21 Q So you reposted on your Facebook for them?
22 MR. GOLASZEWSKI: Objection.
23 A No, I posted articles.
24 Q So no photographs were included?
25 A No, not of me.



Page 109

T. TOTH

2 Q Okay. If we turn to the next page which
3 is Plaintiff's 001120. And this is J. Valentine.
4 A Valentine.
5 Q Valentine Inc. What is J. Valentine Inc.?
6 A It's a costume lingerie company.
7 Q And you were compensated $▮, correct?
8 A That's with it says here.
9 Q Was this for a photo shoot?
10 A It could have been. 2015. I mean, I've
11 worked like an appearance for them before.
12 Q So do you know what this money was for?
13 A Probably a photo shoot, but I can't say
14 for sure.
15 Q I'm sorry, and what kind company is J.
16 Valentine, Inc.?
17 A Like lingerie, costumes.
18 Q Are they known by any other name, any
19 other website?
20 A Not that I know of.
21 Q Do you know if you have a release or
22 contracts signed with J. Valentine?
23 A A release.
24 Q If we turn to the next page, Plaintiff's
25 001121.

Page 110

T. TOTH

2 And it says you received $▮ from
3 Cunningham Escott Slevin and Doherty.
4 What kind of company was that?
5 A That was CESD.
6 Q What is CESD?
7 A That's the agency.
8 Q Why did you receive ▮?
9 A That would have been for a job.
10 Q Photo shoot?
11 A I don't remember exactly what it was. It
12 might have been when I first started. I don't
13 remember what job it was.
14 Q And if you turn the page, please. It's
15 Plaintiff's 001122. This was ▮ from LVC, LLC.
16 Do you recall what kind of company this
17 is?
18 A I don't even know who that is.
19 Q If you turn the page, it's from 81
20 Enterprises, Inc. You received $▮
21 Do you know what company kind of company
22 81 Enterprises, Inc. is?
23 A Yes.
24 Q What kind of company is it?
25 A A lingerie.

Page 111

T. TOTH

2 Q So this ▮ this is for a photo shoot?
3 A I've only done photo shoots with them,
4 yes.
5 Q Only if you know, do you know how many
6 photos shoot you did in 2015 to receive this number?
7 MR. GOLASZEWSKI: Objection.
8 A I don't remember for 2015.
9 Q Over your lifetime, do you know how many
10 photo shoots you've done for 81 Enterprises Inc.
11 A I have not clue.
12 Q Is it somebody you work with today?
13 A Yes.
14 Q Do you have a contract with them?
15 A No contract.
16 Q Do you have a release with them?
17 A Release. With that clause in there.
18 Q Do you have a release with them for 2015?
19 A I always have a release with them, yes.
20 Q Do you have a release in your possession.
21 When I say in your possession, I mean in your home
22 or your records anywhere?
23 A Yes.
24 MR. SPIEGEL: If it's not already
25 produced, I would like to have it produced.

Page 112

T. TOTH

2 THE WITNESS: I can get it before we
3 leave.
4 MR. SPIEGEL: Even better.
5 Q Turn the page to Plaintiff's 001124.
6 A The net page?
7 Q Yes, please. This is from
8 HH Entertainment, Inc.
9 Do you know what type of company
10 HH Entertainment Inc. is?
11 A I don't remember.
12 Q Okay. And if you turn the page, there
13 appears to be 1099s for Hyperdrive Corp. and there
14 are four of them here. But they look to be the
15 same.
16 It all looks to be the same amount?
17 A It looks like copies.
18 Q Those are copies?
19 A Yeah.
20 Q Do you know what kind of company
21 Hyperdrive Corp. is?
22 A I don't remember.
23 Q Do you recall what this compensation is
24 for?
25 A Uh-huh.



Page 113

1 T. TOTH
2 Q If you could, turn the page, please.
3 Plaintiff's 001126. Looks like you have one check
4 for ▮ and a duplicate check here. Another check
5 for ▮, and a duplicate check there. I'm sorry,
6 take that back. Strike that.
7 These are different checks just for the
8 same amount, but for different dates; is that
9 correct?
10 A Correct.
11 Q What kind of company is Bench Warmer?
12 A It's like trading cards.
13 Q And it has you featured on the cards and
14 some personal information about you on them?
15 A Yes.
16 Q How were you compensated by Bench Warmer?
17 Was it per sale of the trading cards, or
18 did they just pay you flat rate?
19 A I've done where I've been paid for photo
20 shoots. I've been paid to sign. There are multiple
21 times I would come in and sign some cards and get
22 paid. I've been paid to post for them. So I mean,
23 it's different all the time.
24 Q So in this particular instance where we
25 have checks for ▮, do you recall

Page 114

1 T. TOTH
2 what this entailed?
3 A It was probably to sign some cards.
4 Q And below that is two checks for ▮
5 for a Spicy Lingerie, correct?
6 A Correct.
7 Q Do you recall what that was for?
8 A I don't know. It says on here, hashtag
9 modeling. So I don't know if it was like a post
10 or -- I'm not sure. I've worked for them quite a
11 bit.
12 Q Turn the page to Plaintiff's 001127. The
13 top check is from Golyta International Inc. I don't
14 know if I'm saying that right. And it's a check for
15 ▮ and the bottom left, it says iCollection photo
16 shoot.
17 Does that ring a bell?
18 A Yes, that sounds familiar.
19 Q What was this for?
20 A Don't know. I don't remember.
21 Q Okay. This looks like a copy of a check,
22 if you read below, which is for ▮ from Caps,
23 LLC.
24 Do you see that?
25 A Yes.

Page 115

1 T. TOTH
2 Q Do you know what that was for?
3 A I don't remember who Caps is. I don't
4 remember who that is. Sometimes they have different
5 names. I don't remember.
6 Q And another check from Bench Warmer.
7 So Bench Warmer, are they taking photos of
8 you, or are you giving them photos form them to put
9 on a plate?
10 A They pay you to do a photo shoot.
11 Q So at the very bottom, that check for
12 ▮ --
13 A That wouldn't be for the shoot.
14 Q So do they pay you both for the shoot and
15 for the sale of the cards?
16 A Each time you come in and sign some cards,
17 they pay you.
18 Q How do you know that's not for the shoot?
19 A Because I would have been paid more for
20 the shoot.
21 Q Do you know what you were paid for the
22 shoots?
23 A I don't remember. It's not here, so I
24 don't remember.
25 Q If you could, turn to Plaintiff's 00128.

Page 116

1 T. TOTH
2 MR. GOLASZEWSKI: For the record, it's
3 001128.
4 MR. SPIEGEL: I'm sorry. Thank you.
5 Q Plaintiff's 001128. The second check down
6 is for AW Production Inc. for ▮. On the bottom
7 left it says, let's F/S full day.
8 Is that for a full day of photo shoots?
9 A I think that's -- I mean, I've done makeup
10 for them too. So I don't know if that was for doing
11 makeup on the model. I don't know. I don't
12 remember. I've worked with them as a makeup artist
13 as well.
14 Q Have you gone to cosmetologist school?
15 A No. You don't need it to work on photo
16 shoots, only if you work in a salon.
17 Q Okay. And the next check down for ▮
18 from National Corset Supply House.
19 And do you see where it says for, it say's
20 body shots, photo?
21 A Okay. Yes.
22 Q Do you recall what this was for?
23 A I don't remember that one.
24 Q Okay. And the next one below it, if from
25 Pacific Group NY, LLC for a ▮



Page 117

1  T. TOTH
2  Do you recall what that was for?
3  A  I don't recognize that name either.
4  Q  Okay. And the next page which is
5  Plaintiff's 001129. There's a check for $▮ from
6  Spicy Lingerie.
7  Do you recall what this was for?
8  A  I do not. It just says hashtag model. So
9  I don't know.
10  Q  Have you ever done any work for Spicy
11  Lingerie outside of modeling?
12  A  What do you mean?
13  Q  Other than modeling for photo shoots, have
14  you done any other work with them?
15  A  I don't remember if I have for not.
16  Q  The next page which is marked as
17  Plaintiff's 001130, and this says financial
18  statements. I don't know what this is. This was
19  produce indeed discovery.
20  Is this from your checking account?
21  A  This looks like PayPal.
22  Q  So where it has sales activity of
23  $▮.
24  Do you see that five rows down?
25  A  Yes.

Page 118

1  T. TOTH
2  Q  Is that from your sales of photographs?
3  A  That would have been anybody who paid me
4  with PayPal. So I couldn't give a specific, who
5  it's from or from what.
6  Q  So you have no way to know how much of
7  this $▮ is attributed to modeling, correct?
8  A  I mean, it would all be from modeling,
9  because I don't get PayPal money from anywhere else
10  besides if it's for like posting something or a job
11  or -- I mean, nobody's just sending me money to my
12  PayPal, you know.
13  Q  So prior to this when were speaking about
14  you doing the posting, I think we saw a check here
15  for Fist Slice Media, LLC for $▮.
16  So when they gave you that money, they
17  give you a check?
18  A  Yes.
19  Q  So whenever you do posts on social media,
20  you receive checks?
21  A  Checks or PayPal or direct deposit.
22  Q  So sometimes you do receive PayPal
23  compensation when you're reposting on social media?
24  A  Yes.
25  Q  Okay. So this $▮ that you received

Page 119

1  T. TOTH
2  for the reposting from First Slice Media, this was
3  all part of your tax returns in 2015, correct?
4  A  It should be, if it was. My husband does
5  the taxes, so I just hand over everything.
6  Q  I just want to make sure that I understand
7  that your income from 2015, your reported income of
8  $▮, I want to see how much of that is
9  attributed to modeling and how much of that is
10  attributed to posting, makeup, whatever else you're
11  doing on the side.
12  Do you have any idea of how much this
13  $▮ would be attributed to modeling?
14  MR. GOLASZEWSKI: Objection.
15  A  All of it, because that's my -- I mean, I
16  only work maybe makeup jobs here on there if I want
17  to. But for the most part, it's -- I'd say,
18  99 percent is modeling.
19  Q  So do you consider the reposting on
20  Facebook modeling?
21  A  It is, yes.
22  Q  Same thing. So for this First Slice
23  Media -- just talking about them only -- correct me
24  if I'm wrong, I think you said before that you were
25  reposting articles?

Page 120

1  T. TOTH
2  A  Yes, articles. But about -- they could
3  have an article about you if they wanted, as well.
4  Q  But not all the reposting that you're
5  doing has a picture of you this it, correct?
6  A  Correct.
7  Q  And that's all encompassed in this
8  modeling Schedule C, correct?
9  A  Yes.
10  MR. SPIEGEL: Off the record.
11  (Whereupon, an off-the-record
12  discussion was held at this
13  time.)
14  Q  So part of the allegations in the lawsuit
15  is that you do not want to be associated with a
16  strip club, correct?
17  A  Correct.
18  Q  Have you ever worked as an exotic dancer
19  or stripper?
20  A  No.
21  Q  Have you ever worked in a strip club?
22  A  No.
23  Q  Have you ever worked as an escort, even no
24  just sex, companionship?
25  A  No.



Page 121

T. TOTH

Q Have you ever done any advertisement for a strip club?
A No.
Q Have you ever seen an advertisement for a strip club?
A Yes.
Q Do you expect those women who are advertising for the strip club to be present at the strip club?
A Probably. If they're advertising it, yes.
Q Have you ever been to a strip club?
A Yes.
Q Have you ever seen an advertisement for that strip club that you've been to?
A What do you mean? Like on a billboard somewhere?
Q Sure.
A Yes.
Q Were those women that you saw advertising for that strip club at the strip club?
A They could have been. I mean, sometimes they're good looking. Sometimes they're not. It's hard to tell sometimes.
Q Have you ever typed your name into Google?

Page 122

T. TOTH

A Back in the day, yes. But I keep from doing so.
Q Not recently?
A No, I do not Google my name. I refuse.
Q Are you aware that you have your image and videos on pornographic websites?
 MR. GOLASZEWSKI: Objection.
A It happens, yes.
Q Are you aware of it though?
 MR. GOLASZEWSKI: Objection.
A Yes. I mean, you can't control everything on the internet.
Q Did you authorizes pornographic websites to put your images or photos on their website?
A No, not on their website.
Q Have you ever tried to remove photos or videos of yourself from any pornographic websites?
A I'm sure I have.
Q Any that you recall?
A I mean, I haven't Google in a long time. The only thing I search is on social media.
Q Are you familiar with the other plaintiffs in this case?
A Yes.

Page 123

T. TOTH

Q Do you know them on a personal level?
A No.
Q You just know them from the lawsuit?
A Yes.
Q I'm going to show you the caption of the complaint which is marked as TT1. I would like you to take a look at all the named plaintiffs and see if you recognize any of the names.
A Yes.
Q Which ones do you recognize?
A Gemma, Jessa.
Q Gemma's last name is Gemma Lee Farrell?
A Yes.
Q And Jessa Hinton?
A Yes. Jesse Golden. I think I worked with Sheena back in the day. I don't know her personally, no. Heather Rae Young. Rachel. Sabella, I think I worked with once. I know Ursala, and I met Carmen once on a job.
Q So you know pretty much all of them?
A Pretty much.
Q These are exhibits to the complaint, but I've redacted the names.
 I just want to know if you could tell me

Page 124

T. TOTH

who these people are.
A Okay.
Q Because on the exhibits we received in the complaint, it has everyone's name, okay.
A Yes.
Q So the first one I'm going to show you is Exhibit B of the complaint. Same photo, just with the name redacted.
 Do you know who that is?
A Yes, that's Gemma.
Q That's Gemma. Are you friends with Gemma?
A I know her because she's a Playmate as well.
Q Okay. I'm going to going to -- I'm sorry, this is Exhibit D of the complaint.
 It's a smaller photo, but do you know who that is?
A That looks like Heather.
Q Heather --
A Heather Rae Young.
Q And if you could, turn to the next one which is Exhibit E of the complaint.
 Do you know who that is?
A That would be Rachel, and Sabella on the



Page 125

T. TOTH

right.
Q Turn to the next one, Exhibit G of the complaint.
A Okay.
Q Do you recognize anyone in any of those photos?
A That would be -- oh, my God, why can't I think of her name right now.
Q But you know who she is?
A Yes. Her last name is Mayes.
Q Can you turn to the next one, please, Exhibit H. Can you turn to the photo.
Do you know who that is?
A That's Jessa Hinton.
Q Okay. Can you turn to the next one, please, Exhibit J?
A I'm sorry. Going back, it was Ursala.
MR. GOLASZEWSKI: Mayes.
A It's a unique name.
Q Exhibit J, can you look at the photograph?
A Yes. That is Jesse. I think so. It's pretty like grainy, but it looks like it's Jesse.
Q If you could turn to the next one, Exhibit L of the complaint.

Page 126

T. TOTH

A That's Jesse for sure.
Q If you could turn to the next one, Exhibit M of the complaint.
A I do not know her.
Q Okay. You can turn to the next one, Exhibit N of the complaint.
A That would be Sheena.
Q Okay. Next one, Exhibit O of the complaint.
A That's carmen.
Q Do you consider yourself famous or a celebrity?
MR. GOLASZEWSKI: Objection.
A I mean, if people recognizing when you're out. I mean, it kind of depends on who you ask.
Q Just you personally, do you think of yourself as a celebrity?
MR. GOLASZEWSKI: Objection.
A I mean, how do you define that really?
Q Well, do you put yourself out for the public?
A Yeah. So like an influencer, yes.
Q So you're saying people stop and even recognize you when you're out.

Page 127

T. TOTH

Does that happen often?
MR. GOLASZEWSKI: Objection.
A When I'm made up and look like my photos, yes.
Q When did you get to New York?
A Last night.
Q So when you got to New York, when you arrived in New York, going from the airport to your hotel and here today, has anyone recognized you?
MR. GOLASZEWSKI: Objection.
A No, because I did not like my photo.
Q What about over the past week.
Has anybody stopped and you recognized you?
A I mean, sometimes people recognize me, but they don't see anything. I'll see it later on my social media like oh, I saw you here. Were you here? Sometimes they come up to my husband. So I mean, they don't always tell you.
Q So when you say when you're dressed up and when you're going for a photo shoot and you're in makeup?
MR. GOLASZEWSKI: Objection.
Q I'm just trying to clarify what you said

Page 128

T. TOTH

before.
You're saying when you're dressed up, people recognize you?
A Sometime, yeah. I mean, there have been times I've been out and they recognize you too and I didn't look that great.
Q So did you have any friends or fans recognize you from the advertisements on the defendants' websites?
MR. GOLASZEWSKI: Objection.
Q And inform you that you were associated with the strip clubs?
A I mean, I don't always check all the comments. But sometimes, I mean, with all my followers, they'll see it or they'll comment to me or they'll message me.
What was the question exactly?
Q Do any of your friends or fans, anyone ever recognize you through the ads that were displayed by the Clubs?
A Yes.
Q Did somebody post something online informing you of this, or did somebody call you?
Like how did you find out about that?



Page 129

1  T. TOTH
2  Q  I've had, like for example, like two years
3  ago, I was in New York walking through Time Square,
4  and I was walking to dinner with my husband, and
5  there's a picture of me, life-size in front of a
6  strip club. Like sometimes I see them myself.
7  There has been times fans have sent me saying they
8  see it. I mean, it's so many people on social media
9  now, it's not hard to find.
10      And obviously, like us models will look
11 out for each other. They could be like hey, I saw
12 your picture here. I mean, we all kind of know each
13 other.
14  Q  Has your agent -- does your agent know
15 that your images were used to advertise for the
16 strip clubs?
17      MR. GOLASZEWSKI: Objection.
18  A  I think -- yeah, I'm pretty sure. I think
19 so.
20  Q  Did you tell your agent about it, or did
21 your agent tell you about it?
22      MR. GOLASZEWSKI: Objection.
23  A  I don't remember.
24  Q  When I say "your agent," I mean any of the
25 agents that you have.

Page 130

1  T. TOTH
2  A  Yes.
3  Q  Let's go back a second. Talking about all
4  three of your agents, did any of them ever contact
5  you and say your likeness was being associated with
6  a strip club?
7  A  No. I don't think that they -- I don't
8  remember.
9  Q  Okay. Have you ever been contacted by a
10 strip club offering you employment?
11  A  No. Not that I'm aware of.
12  Q  Since these images have been posted, have
13 you been contacted by any strip clubs looking to
14 post your pictures to advertise for them?
15  A  No.
16  Q  So as far as these images that were used
17 by the clubs, what did you do to try have those
18 images removed?
19  A  I contacted a lawyer.
20  Q  Let's go pack to the complaint which is
21 marked as TT1.
22      The first photo of Exhibit 1 is in
23 promotion of the Halloween party, correct?
24  A  Yes.
25  Q  At the strip club, as far as you know,

Page 131

1  T. TOTH
2  right?
3  A  Yes.
4  Q  Do you consider this picture to be
5  offensive?
6      MR. GOLASZEWSKI: Objection.
7  A  Not the photo when I shot it, no.
8  Q  So what is offensive about this picture
9  then?
10  A  Because someone took this without my
11 permission and put it on their flyer to hopefully
12 bring in business. And my job is, I get paid to
13 model, and they didn't pay me for this, and I don't
14 do my job for free.
15  Q  If you look at the --
16  A  And because it's a strip club, and I don't
17 choose to be associated with a strip club.
18  Q  You said that you saw your image walking
19 through Time Square in front of a strip club,
20 correct?
21  A  Yes.
22  Q  Was it this image you saw?
23  A  No, it was not this image.
24  Q  So turn the page, the second page of
25 Exhibit A.

Page 132

1  T. TOTH
2      Was it this image you saw?
3  A  No, not this.
4  Q  It's a different image?
5  A  Yes.
6  Q  It's the image not in Exhibit A here?
7  A  It's not for this company.
8  Q  It's for a different strip club?
9  A  Yeah. I'm just saying, like I've seen my
10 images out there.
11  Q  Have you seen your image being advertised
12 in front of a strip club for any of these named
13 defendants in this lawsuit?
14  A  No, because it was just that one time when
15 I was in New York which I am not here often.
16  Q  Which strip club is it that you saw
17 advertising your picture?
18  A  I mean, that's all confidential. So I
19 can't really say.
20  Q  No, you could say. This is subject to a
21 confidentiality agreement.
22      MR. GOLASZEWSKI: If you know the name of
23  the club that in which the billboard was in
24  front of, you can certainly testify to that.
25  A  I think it was the Diamond one. I'm not



Page 133

1  T. TOTH
2 familiar with like all strip clubs, because they
3 have different affiliations.
4  Q  So you were saying before that you
5 contacted a lawyer.
6  That wasn't regarding this lawsuit, it was
7 regarding a different lawsuit against that club?
8  A  Correct.
9  Q  Without telling me the details of what
10 happened, is that matter still going on, or has it
11 been resolved?
12  A  It's been resolved.
13  Q  How long ago did you resolved it?
14  A  I don't remember exactly.
15  Q  So going back to the first picture,
16 please, of Exhibit A of the complaint.
17  How did you first come to find out about
18 this picture being used by the strip club?
19  A  I don't remember.
20  Q  Did somebody bring this to your attention
21 or did you see this yourself?
22  A  It could have been myself or it could have
23 been another model maybe saw it. I mean, if one of
24 us goes on there and sees one, we usually see girls
25 we know, and we're not going to not tell each other.

Page 134

1  T. TOTH
2 But it's not hard. When you're on social media a
3 lot, when it comes time for Halloween, there's a
4 million Halloween parties, and then someone steals
5 your image. It's not that hard. They're out there.
6 They're advertising, obviously, so it's reaching
7 people, and I'm one of those people.
8  Q  So if you go on Google Images and you do a
9 search for you, you probably see a lot of pictures
10 there that you didn't authorize of the use of,
11 correct?
12  MR. GOLASZEWSKI: Objection.
13  A  There could be.
14  Q  Have you ever done that, just done a
15 Google Image search and look for the pictures that
16 were published without your permission?
17  A  When I was younger, yes.
18  Q  But you don't do that anymore?
19  A  I haven't done it in years.
20  Q  So why do you choose to bring this
21 particular lawsuit?
22  A  Because I became aware of this one. I
23 mean, I can only take one at a time. If I could do
24 them all, I would. But I will now, though, so thank
25 you.

Page 135

1  T. TOTH
2  Q  But you currently have multiple lawsuits
3 pending, correct?
4  A  Correct.
5  Q  Are the other establishments that you're
6 suing also strip clubs?
7  A  Yes.
8  Q  All of them?
9  A  Not all of them.
10  Q  What other establishments are being sued?
11  A  Well, anyone I don't want to be affiliated
12 with. For example, swinger clubs or strip clubs.
13  Q  If you look at the second image on the
14 second page.
15  Do you find this advertisement to be
16 offensive?
17  MR. GOLASZEWSKI: Objection.
18  A  Not the picture itself. Well, kind of,
19 because it's saying that to leave anything to the
20 imagination when the reality is even better.
21 Meaning, that the reality of it is that I'm going to
22 be here at the strip club which is not true. False
23 advertisement.
24  Q  Okay. Thank you. We're going to stick on
25 Exhibit A. I'm going to go through -- these are

Page 136

1  T. TOTH
2 pretty specific allegations of the complaint. So
3 I'm going to ask you certain things.
4  So looking in Exhibit A of the complaints
5 with these pictures here -- you could go through
6 them if you'd like.
7  A  Okay.
8  Q  What about these images do you believe is
9 misleading or false?
10  MR. GOLASZEWSKI: Objection.
11  A  So what's false?
12  Q  False or misleading about these images in
13 Exhibit A.
14  A  It's giving people the idea that I'm going
15 to be at this event, and that I'm okay with being at
16 a strip club -- I mean, being advertised that I
17 either work there or I'm going to be there.
18  What else does it say?
19  And that girls are guaranteed to cool you
20 off which is not true.
21  Q  Do you believe that using your image --
22  A  This -- I'm sorry.
23  Q  No, I'm sorry. Continue.
24  A  This also says another hard week in front
25 of you. Come and get ready for it. Which I'm not



Page 137

1　　　　　　T. TOTH
2　in front of whoever is going for this. Yeah, it's
3　just offensive, because I'm not affiliated with any
4　strip clubs.
5　　Q　Do you believe that using your image had
6　an effect on a person visiting the strip club?
7　　A　Yes.
8　　Q　In what way?
9　　A　Because if they's put a fat unattractive
10　man on here, they would not show up.
11　　Q　But do you think that using your image in
12　particular, Tiffany Toth's image, had an effect on
13　someone coming to the strip club?
14　　　　MR. GOLASZEWSKI: Objection.
15　　A　Yes.
16　　Q　Why?
17　　A　Because I'm a Playmate, a model who models
18　lingerie and costumes, and they figured in that that
19　brings male attention which is a lot of their
20　customers.
21　　Q　Wouldn't you agree that if you put the
22　image of any attractive woman as the advertisement
23　of the strip club, it would have the same effect as
24　having your image?
25　　　　MR. GOLASZEWSKI: Objection.

Page 138

1　　　　　　T. TOTH
2　　A　No.
3　　Q　Why not?
4　　A　Because they would have used their own
5　girls that really work there, but they didn't.
6　Because if they believe that their girls bought in
7　attention, they would have used them for it.
8　　Q　What I'm saying is that could they have
9　used the image of any woman who in a bikini, to
10　advertise for the strip, having the same effect as
11　having you advertise for the strip club?
12　　　　MR. GOLASZEWSKI: Objection.
13　　A　I mean, there's no way to really say for
14　sure.
15　　Q　Your opinion.
16　　A　But it's not a fact, so I don't know.
17　　Q　Do you claim that you were injured as a
18　result of these posting?
19　　A　Injured how?
20　　Q　Damaged, economically dangered?
21　　A　I mean, for us in our industry, if they
22　just -- when you don't -- how do I say this?
23　　　　If someone sees something they're not
24　happy with or thinks you're affiliated with, they're
25　not going to hire you and they're not going to tell

Page 139

1　　　　　　T. TOTH
2　you. So you have no way of knowing. So it's kind
3　of like going to an audition, you don't know why you
4　didn't get the job. They're not going to call every
5　single person.
6　　　　So for example, had Playboy when was in my
7　contract, and they saw this and thought I, you know,
8　shot for this or I'm appearing here, they won't book
9　me anymore. So I lose work, and they don't tell you
10　why. Playboy would, but most jobs, they're just
11　going to see you affiliated with this, and they're
12　not going to hire you
13　　Q　Do you believe that your personal
14　reputation has suffered because of this?
15　　　　MR. GOLASZEWSKI: Objection.
16　　A　I mean, I -- personally, it's just
17　offensive. I mean, people that know me, know me.
18　　Q　And the people that know you, know that
19　you didn't sign up for this, correct?
20　　A　Yeah, correct. But other people don't.
21　　Q　Who is other people?
22　　A　Society. People on social media. They
23　figure if your face is on something, it was a job
24　that you were paid for, that you agreed to that.
25　　Q　So as far as you know, were you ever

Page 140

1　　　　　　T. TOTH
2　turned down from a photo shoot because of these
3　postings?
4　　A　They won't tell you. They just don't hire
5　you.
6　　Q　So as far as you know, that didn't happen?
7　　A　I mean, you don't know. That's just not
8　like how the industry works. They just don't tell
9　you.
10　　Q　Do you contend that you have suffered
11　future loss of earnings because of these posting?
12　　A　It could, yes.
13　　Q　Do you know when these photos were posted?
14　　A　These ones on their social media?
15　　Q　Yes.
16　　A　I mean, it usually says on them.
17　　Q　You can look through.
18　　A　I don't know. It looks like it was
19　cropped out, so it doesn't say exactly.
20　　Q　So you could look at the second page. It
21　actually has on there, April 15, 2014.
22　　A　Yeah.
23　　Q　I believe that's the only one with the
24　date.
25　　　　So the only one we see here is April 2014,



Page 141

1            T. TOTH
2 correct?
3    A    Correct.
4    Q    And as of the date of filing this lawsuit
5 in January of 2016, are you aware of whether or not
6 these pictures are still posted?
7    A    I haven't checked recently.
8    Q    From January 2016 when this lawsuit was
9 first filed, are you aware whether or not those
10 photos were still being used by these defendants?
11    A    I don't remember.
12    Q    But you testified before that your income
13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓, correct?
14      MR. GOLASZEWSKI: Objection.
15    A    Yeah, because social media wasn't as big
16 as it is now.
17    Q    When? 2014, it wasn't as big as it is
18 now?
19    A    Yeah. I don't even know if I was on
20 Instagram. I mean, social media is kind of a bigger
21 thing than it was.
22    Q    But as far as your personal income, from
23 2014 to when these photos were first posted to 2015,
24 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓?
25    A    Probably because of social media too.

Page 142

1            T. TOTH
2    Q    Because of social media, okay.
3      Do you have any feeling either way, or
4 knowledge either way, whether or not these
5 defendants intended to use Tiffany Toth's pictures
6 on their advertisement?
7      MR. GOLASZEWSKI: Objection.
8    A    I have no way of knowing that.
9    Q    Whether or not they knew you from before
10 and chose your pictures to put on their website?
11      MR. GOLASZEWSKI: Objection.
12    A    They could have.
13    Q    Do you know -- and going back to what you
14 said before -- is that these photos were taken on
15 behalf of Roma and Mystery House, right.
16      Do you know whether or not Roma sold your
17 photos to third parties?
18    A    They do not.
19    Q    How do you know that?
20    A    Because it's in their release. And they
21 only use their images with, for example, a website
22 that carries their product. That's all that the
23 release allows.
24    Q    Okay. And as far as Mystery House, are
25 you aware of whether or not they sell their images

Page 143

1            T. TOTH
2 to third parties?
3    A    They do not.
4    Q    And it's because you say this is also this
5 the release for Mystery House?
6    A    Yes, because I only signed for them to use
7 for their catalogs and their flyers.
8    Q    Okay. And if you could look through the
9 Exhibit A. I didn't see anywhere where it was
10 indicated your name. Scroll through them.
11      I didn't see anywhere where these
12 defendants ever indicated this is Tiffany Toth; is
13 that correct?
14      MR. GOLASZEWSKI: Objection.
15    A    Correct. They don't need to.
16    Q    And just looking at your complaint also,
17 you claim that you've been dangered $75,000,
18 correct?
19      MR. GOLASZEWSKI: Objection.
20    A    Correct. If that's what it says, yes.
21    Q    How did you come up with that number?
22    A    Well, I have an expert that helps me with
23 that, that knows how this works.
24    Q    Do you think that is a fair amount to be
25 paid for these photos?

Page 144

1            T. TOTH
2    A    Yes.
3    Q    Why do you think that's a fair amount?
4    A    Because I would have never even done the
5 job for any amount of money.
6    Q    Now, do you know whether or not that these
7 defendants knew that they didn't have permission to
8 use your photographs?
9      MR. GOLASZEWSKI: Objection.
10    A    I'm sorry, repeat that.
11    Q    Do you have any knowledge either way
12 whether or not these defendants knew that they
13 didn't have permission or a license to use these
14 photographs?
15    A    I can't say that for sure. I mean, it's
16 common knowledge. You don't just take photos.
17 Everybody has their rights. But I would assume they
18 knew better.
19      MR. SPIEGEL: Off the record.
20      (Whereupon, an off-the-record
21      discussion was held at this
22      time.)
23      MR. SPIEGEL: Rebecca Goldstein is just
24      going to ask a couple of questions.
25 EXAMINATION BY



### Page 145

T. TOTH

MS. GOLDSTEIN:
Q  Have you ever heard of a company called Timed Out, LLC.
A  Yes.
Q  How are you affiliated with them?
   MR. GOLASZEWSKI: Objection.
A  I know him personally.
Q  Who is him?
A  Peter.
Q  Peter. What's his last name?
A  Peter Hamm.
Q  And does Peter Hamm own Timed Out, LLC, to the best of your knowledge?
A  Correct.
Q  What does Timed Out do?
A  Works as an agent, manager.
Q  And is Timed Out your agent?
A  At times, yes.
Q  What type of agent?
A  Helps me with my like, I guess, you could say likeness of images. For example, like this kind of situation.
Q  So Peter Hamm is your agent or Timed Out would be your agent for these purposes?

### Page 146

T. TOTH

A  Well, his company is Timed Out.
Q  So to the best of your knowledge, is he the president of Timed Out?
A  Yes.
Q  Do you know if he's the only owner of the company?
A  I'm not sure.
Q  So you said Timed Out and Peter Hamm help you with situations like this.
   You mean this lawsuit?
A  Yes. I mean, if I contact him, yes, for like advise or -- yeah.
Q  And did you contact him in connection with this lawsuit?
A  I don't know if it was this one or not.
Q  But you've contacted him in connection with other lawsuits that you've filed?
A  Yes.
Q  And was one of those Timed Out versus LA Girl Jewelry?
   Does that ring a bell?
A  Probably, yes.
Q  Do you remember what your claims were in that case?

### Page 147

T. TOTH

A  I'd have to refer back to the paperwork.
Q  Okay. And how did you meet Peter Hamm?
A  I met him just like through the modeling agency -- not modeling agency, through the modeling industry through my agent, NTA.
Q  NTA you said?
A  Yeah.
Q  And they do your print work, are your print agent?
A  Yes.
Q  So do you -- have you paid Timed Out or Peter Hamm to help you in connection with these lawsuits?
A  No, I haven't paid him.
Q  So does he pay you?
A  No.
Q  Do you have any type of written agreement or any -- do you have any written agreement with him or with Timed Out?
A  I mean, I always have written agreements with my people, yes.
Q  And if you know, what's the subject of your agreement with Peter Hamm or Timed Out?
A  I'd have to refer back to it.

### Page 148

T. TOTH

Q  Have you ever owned any part of Timed Out?
A  No.
Q  Or have any equity stake in it?
A  No.
Q  And you said you weren't sure if they have any affiliation with this lawsuit, if they've helped you with this at all?
A  I'd have to look back. I'd have to look back at e-mails.
Q  E-mails with Peter Hamm or Timed Out?
A  Well, no. Just in general.
   MS. GOLDSTEIN: Okay. I think that's all of that.
Q  So have you understood all of the questions that you were asked today?
A  To the best my knowledge, yes.
Q  Have you answered all of the questions truthfully, to the best of your ability?
A  Yes.
Q  And is there anything else that you feel that's important to state today?
A  I don't think so. Just that I didn't give permission or work for the company. So that's about it.



Page 149

```
 1              T. TOTH
 2      MS. GOLDSTEIN: Okay.
 3      MR. SPIEGEL: John, do you have any
 4  follow-up questions?
 5      MR. GOLASZEWSKI: Nothing for plaintiffs.
 6      MR. SPIEGEL: Okay. We're done. Thank
 7  you.
 8          (Whereupon, at 3:17 p.m., the
 9          examination of this witness was
10          concluded.)
11
12  _____
        TIFFANY TOTH
13
14
15
16  Subscribed and sworn to before me
17  this _____ day of _____ 20___.
18
19  _____
        NOTARY PUBLIC
```

Page 150

```
              I N D E X
EXAMINATION BY                              PAGE
MR. SPIEGEL                                    4
MS. GOLDSTEIN                                144

      INFORMATION AND/OR DOCUMENTS REQUESTED
INFORMATION AND/OR DOCUMENTS                PAGE
contracts for the past 10 years with          93
Mystery House or Roma.

2016 tax returns                             103

witness's model release                      111

              E X H I B I T S
EXHIBITS                   FOR ID           PAGE
TT1    second amended complaint                7
TT2    photograph                             26
TT3    photograph                             27
TT4    photograph                             30
TT5    photograph                             30
TT6    photograph                             33
TT7    photograph                             34
TT8    photograph                             38
TT9    photograph                             43
TT10   photograph                             43
TT11   photograph                             46
```

Page 151

```
TT12   photograph                             50
TT13   photograph                             54
TT14   photograph                             57
TT15   photograph                             58
TT16   photograph                             60
TT17   sample release form                    88
TT18   contract with Blackheart Rum          100
TT19   2011 financial information            104
TT20   2012 financial information            104
TT21   2013 financial information            105
TT22   2014 financial information            106
TT23   2015 financial information            106

       (Exhibits retained by Reporter.)
```

Page 152

```
              C E R T I F I C A T E
STATE OF NEW YORK    )
                     :ss.:
COUNTY OF KINGS      )
```

I, AVERY N. ARMSTRONG, a Notary Public for and within the State of New York, do hereby certify:

That the witness whose examination is hereinbefore set forth was duly sworn and that such examination is a true record of the testimony given by that witness.

I further certify that I am not related to any of the parties to this action by blood or by marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 13th day of April 2017.

_____
AVERY N. ARMSTRONG

