Page 117

1  T. TOTH
2  Do you recall what that was for?
3  A  I don't recognize that name either.
4  Q  Okay. And the next page which is
5  Plaintiff's 001129. There's a check for $▮ from
6  Spicy Lingerie.
7  Do you recall what this was for?
8  A  I do not. It just says hashtag model. So
9  I don't know.
10  Q  Have you ever done any work for Spicy
11  Lingerie outside of modeling?
12  A  What do you mean?
13  Q  Other than modeling for photo shoots, have
14  you done any other work with them?
15  A  I don't remember if I have for not.
16  Q  The next page which is marked as
17  Plaintiff's 001130, and this says financial
18  statements. I don't know what this is. This was
19  produce indeed discovery.
20  Is this from your checking account?
21  A  This looks like PayPal.
22  Q  So where it has sales activity of
23  $▮.
24  Do you see that five rows down?
25  A  Yes.

Page 118

1  T. TOTH
2  Q  Is that from your sales of photographs?
3  A  That would have been anybody who paid me
4  with PayPal. So I couldn't give a specific, who
5  it's from or from what.
6  Q  So you have no way to know how much of
7  this $▮ is attributed to modeling, correct?
8  A  I mean, it would all be from modeling,
9  because I don't get PayPal money from anywhere else
10  besides if it's for like posting something or a job
11  or -- I mean, nobody's just sending me money to my
12  PayPal, you know.
13  Q  So prior to this when were speaking about
14  you doing the posting, I think we saw a check here
15  for Fist Slice Media, LLC for $▮.
16  So when they gave you that money, they
17  give you a check?
18  A  Yes.
19  Q  So whenever you do posts on social media,
20  you receive checks?
21  A  Checks or PayPal or direct deposit.
22  Q  So sometimes you do receive PayPal
23  compensation when you're reposting on social media?
24  A  Yes.
25  Q  Okay. So this $▮ that you received

Page 119

1  T. TOTH
2  for the reposting from First Slice Media, this was
3  all part of your tax returns in 2015, correct?
4  A  It should be, if it was. My husband does
5  the taxes, so I just hand over everything.
6  Q  I just want to make sure that I understand
7  that your income from 2015, your reported income of
8  $▮, I want to see how much of that is
9  attributed to modeling and how much of that is
10  attributed to posting, makeup, whatever else you're
11  doing on the side.
12  Do you have any idea of how much this
13  $▮ would be attributed to modeling?
14  MR. GOLASZEWSKI: Objection.
15  A  All of it, because that's my -- I mean, I
16  only work maybe makeup jobs here on there if I want
17  to. But for the most part, it's -- I'd say,
18  99 percent is modeling.
19  Q  So do you consider the reposting on
20  Facebook modeling?
21  A  It is, yes.
22  Q  Same thing. So for this First Slice
23  Media -- just talking about them only -- correct me
24  if I'm wrong, I think you said before that you were
25  reposting articles?

Page 120

1  T. TOTH
2  A  Yes, articles. But about -- they could
3  have an article about you if they wanted, as well.
4  Q  But not all the reposting that you're
5  doing has a picture of you this it, correct?
6  A  Correct.
7  Q  And that's all encompassed in this
8  modeling Schedule C, correct?
9  A  Yes.
10  MR. SPIEGEL: Off the record.
11  (Whereupon, an off-the-record
12  discussion was held at this
13  time.)
14  Q  So part of the allegations in the lawsuit
15  is that you do not want to be associated with a
16  strip club, correct?
17  A  Correct.
18  Q  Have you ever worked as an exotic dancer
19  or stripper?
20  A  No.
21  Q  Have you ever worked in a strip club?
22  A  No.
23  Q  Have you ever worked as an escort, even no
24  just sex, companionship?
25  A  No.



Page 121

T. TOTH

2  Q  Have you ever done any advertisement for a strip club?
4  A  No.
5  Q  Have you ever seen an advertisement for a strip club?
7  A  Yes.
8  Q  Do you expect those women who are advertising for the strip club to be present at the strip club?
11  A  Probably. If they're advertising it, yes.
12  Q  Have you ever been to a strip club?
13  A  Yes.
14  Q  Have you ever seen an advertisement for that strip club that you've been to?
16  A  What do you mean? Like on a billboard somewhere?
18  Q  Sure.
19  A  Yes.
20  Q  Were those women that you saw advertising for that strip club at the strip club?
22  A  They could have been. I mean, sometimes they're good looking. Sometimes they're not. It's hard to tell sometimes.
25  Q  Have you ever typed your name into Google?

Page 122

T. TOTH

2  A  Back in the day, yes. But I keep from doing so.
4  Q  Not recently?
5  A  No, I do not Google my name. I refuse.
6  Q  Are you aware that you have your image and videos on pornographic websites?
8     MR. GOLASZEWSKI: Objection.
9  A  It happens, yes.
10 Q  Are you aware of it though?
11    MR. GOLASZEWSKI: Objection.
12 A  Yes. I mean, you can't control everything on the internet.
14 Q  Did you authorizes pornographic websites to put your images or photos on their website?
16 A  No, not on their website.
17 Q  Have you ever tried to remove photos or videos of yourself from any pornographic websites?
19 A  I'm sure I have.
20 Q  Any that you recall?
21 A  I mean, I haven't Google in a long time. The only thing I search is on social media.
23 Q  Are you familiar with the other plaintiffs in this case?
25 A  Yes.

Page 123

T. TOTH

2  Q  Do you know them on a personal level?
3  A  No.
4  Q  You just know them from the lawsuit?
5  A  Yes.
6  Q  I'm going to show you the caption of the complaint which is marked as TT1. I would like you to take a look at all the named plaintiffs and see if you recognize any of the names.
10 A  Yes.
11 Q  Which ones do you recognize?
12 A  Gemma, Jessa.
13 Q  Gemma's last name is Gemma Lee Farrell?
14 A  Yes.
15 Q  And Jessa Hinton?
16 A  Yes. Jesse Golden. I think I worked with Sheena back in the day. I don't know her personally, no. Heather Rae Young. Rachel. Sabella, I think I worked with once. I know Ursala, and I met Carmen once on a job.
21 Q  So you know pretty much all of them?
22 A  Pretty much.
23 Q  These are exhibits to the complaint, but I've redacted the names.
25    I just want to know if you could tell me

Page 124

T. TOTH

2  who these people are.
3  A  Okay.
4  Q  Because on the exhibits we received in the complaint, it has everyone's name, okay.
6  A  Yes.
7  Q  So the first one I'm going to show you is Exhibit B of the complaint. Same photo, just with the name redacted.
10    Do you know who that is?
11 A  Yes, that's Gemma.
12 Q  That's Gemma. Are you friends with Gemma?
13 A  I know her because she's a Playmate as well.
15 Q  Okay. I'm going to going to -- I'm sorry, this is Exhibit D of the complaint.
17    It's a smaller photo, but do you know who that is?
19 A  That looks like Heather.
20 Q  Heather --
21 A  Heather Rae Young.
22 Q  And if you could, turn to the next one which is Exhibit E of the complaint.
24    Do you know who that is?
25 A  That would be Rachel, and Sabella on the



Page 125

1 T. TOTH
2 right.
3 Q Turn to the next one, Exhibit G of the
4 complaint.
5 A Okay.
6 Q Do you recognize anyone in any of those
7 photos?
8 A That would be -- oh, my God, why can't I
9 think of her name right now.
10 Q But you know who she is?
11 A Yes. Her last name is Mayes.
12 Q Can you turn to the next one, please,
13 Exhibit H. Can you turn to the photo.
14 Do you know who that is?
15 A That's Jessa Hinton.
16 Q Okay. Can you turn to the next one,
17 please, Exhibit J?
18 A I'm sorry. Going back, it was Ursala.
19 MR. GOLASZEWSKI: Mayes.
20 A It's a unique name.
21 Q Exhibit J, can you look at the photograph?
22 A Yes. That is Jesse. I think so. It's
23 pretty like grainy, but it looks like it's Jesse.
24 Q If you could turn to the next one, Exhibit
25 L of the complaint.

Page 126

1 T. TOTH
2 A That's Jesse for sure.
3 Q If you could turn to the next one, Exhibit
4 M of the complaint.
5 A I do not know her.
6 Q Okay. You can turn to the next one,
7 Exhibit N of the complaint.
8 A That would be Sheena.
9 Q Okay. Next one, Exhibit O of the
10 complaint.
11 A That's carmen.
12 Q Do you consider yourself famous or a
13 celebrity?
14 MR. GOLASZEWSKI: Objection.
15 A I mean, if people recognizing when you're
16 out. I mean, it kind of depends on who you ask.
17 Q Just you personally, do you think of
18 yourself as a celebrity?
19 MR. GOLASZEWSKI: Objection.
20 A I mean, how do you define that really?
21 Q Well, do you put yourself out for the
22 public?
23 A Yeah. So like an influencer, yes.
24 Q So you're saying people stop and even
25 recognize you when you're out.

Page 127

1 T. TOTH
2 Does that happen often?
3 MR. GOLASZEWSKI: Objection.
4 A When I'm made up and look like my photos,
5 yes.
6 Q When did you get to New York?
7 A Last night.
8 Q So when you got to New York, when you
9 arrived in New York, going from the airport to your
10 hotel and here today, has anyone recognized you?
11 MR. GOLASZEWSKI: Objection.
12 A No, because I did not like my photo.
13 Q What about over the past week.
14 Has anybody stopped and you recognized
15 you?
16 A I mean, sometimes people recognize me, but
17 they don't see anything. I'll see it later on my
18 social media like oh, I saw you here. Were you
19 here? Sometimes they come up to my husband. So I
20 mean, they don't always tell you.
21 Q So when you say when you're dressed up and
22 when you're going for a photo shoot and you're in
23 makeup?
24 MR. GOLASZEWSKI: Objection.
25 Q I'm just trying to clarify what you said

Page 128

1 T. TOTH
2 before.
3 You're saying when you're dressed up,
4 people recognize you?
5 A Sometime, yeah. I mean, there have been
6 times I've been out and they recognize you too and I
7 didn't look that great.
8 Q So did you have any friends or fans
9 recognize you from the advertisements on the
10 defendants' websites?
11 MR. GOLASZEWSKI: Objection.
12 Q And inform you that you were associated
13 with the strip clubs?
14 A I mean, I don't always check all the
15 comments. But sometimes, I mean, with all my
16 followers, they'll see it or they'll comment to me
17 or they'll message me.
18 What was the question exactly?
19 Q Do any of your friends or fans, anyone
20 ever recognize you through the ads that were
21 displayed by the Clubs?
22 A Yes.
23 Q Did somebody post something online
24 informing you of this, or did somebody call you?
25 Like how did you find out about that?



Page 129

T. TOTH

Q I've had, like for example, like two years ago, I was in New York walking through Time Square, and I was walking to dinner with my husband, and there's a picture of me, life-size in front of a strip club. Like sometimes I see them myself. There has been times fans have sent me saying they see it. I mean, it's so many people on social media now, it's not hard to find.
And obviously, like us models will look out for each other. They could be like hey, I saw your picture here. I mean, we all kind of know each other.

Q Has your agent -- does your agent know that your images were used to advertise for the strip clubs?

MR. GOLASZEWSKI: Objection.

A I think -- yeah, I'm pretty sure. I think so.

Q Did you tell your agent about it, or did your agent tell you about it?

MR. GOLASZEWSKI: Objection.

A I don't remember.

Q When I say "your agent," I mean any of the agents that you have.

Page 130

T. TOTH

A Yes.

Q Let's go back a second. Talking about all three of your agents, did any of them ever contact you and say your likeness was being associated with a strip club?

A No. I don't think that they -- I don't remember.

Q Okay. Have you ever been contacted by a strip club offering you employment?

A No. Not that I'm aware of.

Q Since these images have been posted, have you been contacted by any strip clubs looking to post your pictures to advertise for them?

A No.

Q So as far as these images that were used by the clubs, what did you do to try have those images removed?

A I contacted a lawyer.

Q Let's go pack to the complaint which is marked as TT1.
The first photo of Exhibit 1 is in promotion of the Halloween party, correct?

A Yes.

Q At the strip club, as far as you know,

Page 131

T. TOTH

right?

A Yes.

Q Do you consider this picture to be offensive?

MR. GOLASZEWSKI: Objection.

A Not the photo when I shot it, no.

Q So what is offensive about this picture then?

A Because someone took this without my permission and put it on their flyer to hopefully bring in business. And my job is, I get paid to model, and they didn't pay me for this, and I don't do my job for free.

Q If you look at the --

A And because it's a strip club, and I don't choose to be associated with a strip club.

Q You said that you saw your image walking through Time Square in front of a strip club, correct?

A Yes.

Q Was it this image you saw?

A No, it was not this image.

Q So turn the page, the second page of Exhibit A.

Page 132

T. TOTH

Was it this image you saw?

A No, not this.

Q It's a different image?

A Yes.

Q It's the image not in Exhibit A here?

A It's not for this company.

Q It's for a different strip club?

A Yeah. I'm just saying, like I've seen my images out there.

Q Have you seen your image being advertised in front of a strip club for any of these named defendants in this lawsuit?

A No, because it was just that one time when I was in New York which I am not here often.

Q Which strip club is it that you saw advertising your picture?

A I mean, that's all confidential. So I can't really say.

Q No, you could say. This is subject to a confidentiality agreement.

MR. GOLASZEWSKI: If you know the name of the club that in which the billboard was in front of, you can certainly testify to that.

A I think it was the Diamond one. I'm not



Page 133

T. TOTH

familiar with like all strip clubs, because they have different affiliations.

Q  So you were saying before that you contacted a lawyer.

That wasn't regarding this lawsuit, it was regarding a different lawsuit against that club?

A  Correct.

Q  Without telling me the details of what happened, is that matter still going on, or has it been resolved?

A  It's been resolved.

Q  How long ago did you resolved it?

A  I don't remember exactly.

Q  So going back to the first picture, please, of Exhibit A of the complaint.

How did you first come to find out about this picture being used by the strip club?

A  I don't remember.

Q  Did somebody bring this to your attention or did you see this yourself?

A  It could have been myself or it could have been another model maybe saw it. I mean, if one of us goes on there and sees one, we usually see girls we know, and we're not going to not tell each other.

Page 134

T. TOTH

But it's not hard. When you're on social media a lot, when it comes time for Halloween, there's a million Halloween parties, and then someone steals your image. It's not that hard. They're out there. They're advertising, obviously, so it's reaching people, and I'm one of those people.

Q  So if you go on Google Images and you do a search for you, you probably see a lot of pictures there that you didn't authorize of the use of, correct?

MR. GOLASZEWSKI: Objection.

A  There could be.

Q  Have you ever done that, just done a Google Image search and look for the pictures that were published without your permission?

A  When I was younger, yes.

Q  But you don't do that anymore?

A  I haven't done it in years.

Q  So why do you choose to bring this particular lawsuit?

A  Because I became aware of this one. I mean, I can only take one at a time. If I could do them all, I would. But I will now, though, so thank you.

Page 135

T. TOTH

Q  But you currently have multiple lawsuits pending, correct?

A  Correct.

Q  Are the other establishments that you're suing also strip clubs?

A  Yes.

Q  All of them?

A  Not all of them.

Q  What other establishments are being sued?

A  Well, anyone I don't want to be affiliated with. For example, swinger clubs or strip clubs.

Q  If you look at the second image on the second page.

Do you find this advertisement to be offensive?

MR. GOLASZEWSKI: Objection.

A  Not the picture itself. Well, kind of, because it's saying that to leave anything to the imagination when the reality is even better. Meaning, that the reality of it is that I'm going to be here at the strip club which is not true. False advertisement.

Q  Okay. Thank you. We're going to stick on Exhibit A. I'm going to go through -- these are

Page 136

T. TOTH

pretty specific allegations of the complaint. So I'm going to ask you certain things.

So looking in Exhibit A of the complaints with these pictures here -- you could go through them if you'd like.

A  Okay.

Q  What about these images do you believe is misleading or false?

MR. GOLASZEWSKI: Objection.

A  So what's false?

Q  False or misleading about these images in Exhibit A.

A  It's giving people the idea that I'm going to be at this event, and that I'm okay with being at a strip club -- I mean, being advertised that I either work there or I'm going to be there.

What else does it say?

And that girls are guaranteed to cool you off which is not true.

Q  Do you believe that using your image --

A  This -- I'm sorry.

Q  No, I'm sorry. Continue.

A  This also says another hard week in front of you. Come and get ready for it. Which I'm not



Page 137

1 T. TOTH
2 in front of whoever is going for this. Yeah, it's
3 just offensive, because I'm not affiliated with any
4 strip clubs.
5 Q Do you believe that using your image had
6 an effect on a person visiting the strip club?
7 A Yes.
8 Q In what way?
9 A Because if they's put a fat unattractive
10 man on here, they would not show up.
11 Q But do you think that using your image in
12 particular, Tiffany Toth's image, had an effect on
13 someone coming to the strip club?
14 MR. GOLASZEWSKI: Objection.
15 A Yes.
16 Q Why?
17 A Because I'm a Playmate, a model who models
18 lingerie and costumes, and they figured in that that
19 brings male attention which is a lot of their
20 customers.
21 Q Wouldn't you agree that if you put the
22 image of any attractive woman as the advertisement
23 of the strip club, it would have the same effect as
24 having your image?
25 MR. GOLASZEWSKI: Objection.

Page 138

1 T. TOTH
2 A No.
3 Q Why not?
4 A Because they would have used their own
5 girls that really work there, but they didn't.
6 Because if they believe that their girls bought in
7 attention, they would have used them for it.
8 Q What I'm saying is that could they have
9 used the image of any woman who in a bikini, to
10 advertise for the strip, having the same effect as
11 having you advertise for the strip club?
12 MR. GOLASZEWSKI: Objection.
13 A I mean, there's no way to really say for
14 sure.
15 Q Your opinion.
16 A But it's not a fact, so I don't know.
17 Q Do you claim that you were injured as a
18 result of these posting?
19 A Injured how?
20 Q Damaged, economically dangered?
21 A I mean, for us in our industry, if they
22 just -- when you don't -- how do I say this?
23 If someone sees something they're not
24 happy with or thinks you're affiliated with, they're
25 not going to hire you and they're not going to tell

Page 139

1 T. TOTH
2 you. So you have no way of knowing. So it's kind
3 of like going to an audition, you don't know why you
4 didn't get the job. They're not going to call every
5 single person.
6 So for example, had Playboy when was in my
7 contract, and they saw this and thought I, you know,
8 shot for this or I'm appearing here, they won't book
9 me anymore. So I lose work, and they don't tell you
10 why. Playboy would, but most jobs, they're just
11 going to see you affiliated with this, and they're
12 not going to hire you
13 Q Do you believe that your personal
14 reputation has suffered because of this?
15 MR. GOLASZEWSKI: Objection.
16 A I mean, I -- personally, it's just
17 offensive. I mean, people that know me, know me.
18 Q And the people that know you, know that
19 you didn't sign up for this, correct?
20 A Yeah, correct. But other people don't.
21 Q Who is other people?
22 A Society. People on social media. They
23 figure if your face is on something, it was a job
24 that you were paid for, that you agreed to that.
25 Q So as far as you know, were you ever

Page 140

1 T. TOTH
2 turned down from a photo shoot because of these
3 postings?
4 A They won't tell you. They just don't hire
5 you.
6 Q So as far as you know, that didn't happen?
7 A I mean, you don't know. That's just not
8 like how the industry works. They just don't tell
9 you.
10 Q Do you contend that you have suffered
11 future loss of earnings because of these posting?
12 A It could, yes.
13 Q Do you know when these photos were posted?
14 A These ones on their social media?
15 Q Yes.
16 A I mean, it usually says on them.
17 Q You can look through.
18 A I don't know. It looks like it was
19 cropped out, so it doesn't say exactly.
20 Q So you could look at the second page. It
21 actually has on there, April 15, 2014.
22 A Yeah.
23 Q I believe that's the only one with the
24 date.
25 So the only one we see here is April 2014,



Page 141

1   T. TOTH
2  correct?
3   A   Correct.
4   Q   And as of the date of filing this lawsuit
5  in January of 2016, are you aware of whether or not
6  these pictures are still posted?
7   A   I haven't checked recently.
8   Q   From January 2016 when this lawsuit was
9  first filed, are you aware whether or not those
10 photos were still being used by these defendants?
11  A   I don't remember.
12  Q   But you testified before that your income
13 ███████████████, correct?
14  MR. GOLASZEWSKI:  Objection.
15  A   Yeah, because social media wasn't as big
16 as it is now.
17  Q   When?  2014, it wasn't as big as it is
18 now?
19  A   Yeah.  I don't even know if I was on
20 Instagram.  I mean, social media is kind of a bigger
21 thing than it was.
22  Q   But as far as your personal income, from
23 2014 to when these photos were first posted to 2015,
24 ███████████████████?
25  A   Probably because of social media too.

Page 142

1   T. TOTH
2   Q   Because of social media, okay.
3      Do you have any feeling either way, or
4  knowledge either way, whether or not these
5  defendants intended to use Tiffany Toth's pictures
6  on their advertisement?
7   MR. GOLASZEWSKI:  Objection.
8   A   I have no way of knowing that.
9   Q   Whether or not they knew you from before
10 and chose your pictures to put on their website?
11  MR. GOLASZEWSKI:  Objection.
12  A   They could have.
13  Q   Do you know -- and going back to what you
14 said before -- is that these photos were taken on
15 behalf of Roma and Mystery House, right.
16     Do you know whether or not Roma sold your
17 photos to third parties?
18  A   They do not.
19  Q   How do you know that?
20  A   Because it's in their release.  And they
21 only use their images with, for example, a website
22 that carries their product.  That's all that the
23 release allows.
24  Q   Okay.  And as far as Mystery House, are
25 you aware of whether or not they sell their images

Page 143

1   T. TOTH
2  to third parties?
3   A   They do not.
4   Q   And it's because you say this is also this
5  the release for Mystery House?
6   A   Yes, because I only signed for them to use
7  for their catalogs and their flyers.
8   Q   Okay.  And if you could look through the
9  Exhibit A.  I didn't see anywhere where it was
10 indicated your name.  Scroll through them.
11     I didn't see anywhere where these
12 defendants ever indicated this is Tiffany Toth; is
13 that correct?
14  MR. GOLASZEWSKI:  Objection.
15  A   Correct.  They don't need to.
16  Q   And just looking at your complaint also,
17 you claim that you've been dangered $75,000,
18 correct?
19  MR. GOLASZEWSKI:  Objection.
20  A   Correct.  If that's what it says, yes.
21  Q   How did you come up with that number?
22  A   Well, I have an expert that helps me with
23 that, that knows how this works.
24  Q   Do you think that is a fair amount to be
25 paid for these photos?

Page 144

1   T. TOTH
2   A   Yes.
3   Q   Why do you think that's a fair amount?
4   A   Because I would have never even done the
5  job for any amount of money.
6   Q   Now, do you know whether or not that these
7  defendants knew that they didn't have permission to
8  use your photographs?
9   MR. GOLASZEWSKI:  Objection.
10  A   I'm sorry, repeat that.
11  Q   Do you have any knowledge either way
12 whether or not these defendants knew that they
13 didn't have permission or a license to use these
14 photographs?
15  A   I can't say that for sure.  I mean, it's
16 common knowledge.  You don't just take photos.
17 Everybody has their rights.  But I would assume they
18 knew better.
19  MR. SPIEGEL:  Off the record.
20     (Whereupon, an off-the-record
21     discussion was held at this
22     time.)
23  MR. SPIEGEL:  Rebecca Goldstein is just
24  going to ask a couple of questions.
25 EXAMINATION BY



Page 145

1  T. TOTH
2  MS. GOLDSTEIN:
3  Q  Have you ever heard of a company called
4  Timed Out, LLC.
5  A  Yes.
6  Q  How are you affiliated with them?
7     MR. GOLASZEWSKI: Objection.
8  A  I know him personally.
9  Q  Who is him?
10 A  Peter.
11 Q  Peter. What's his last name?
12 A  Peter Hamm.
13 Q  And does Peter Hamm own Timed Out, LLC, to
14 the best of your knowledge?
15 A  Correct.
16 Q  What does Timed Out do?
17 A  Works as an agent, manager.
18 Q  And is Timed Out your agent?
19 A  At times, yes.
20 Q  What type of agent?
21 A  Helps me with my like, I guess, you could
22 say likeness of images. For example, like this kind
23 of situation.
24 Q  So Peter Hamm is your agent or Timed Out
25 would be your agent for these purposes?

Page 146

1  T. TOTH
2  A  Well, his company is Timed Out.
3  Q  So to the best of your knowledge, is he
4  the president of Timed Out?
5  A  Yes.
6  Q  Do you know if he's the only owner of the
7  company?
8  A  I'm not sure.
9  Q  So you said Timed Out and Peter Hamm help
10 you with situations like this.
11    You mean this lawsuit?
12 A  Yes. I mean, if I contact him, yes, for
13 like advise or -- yeah.
14 Q  And did you contact him in connection with
15 this lawsuit?
16 A  I don't know if it was this one or not.
17 Q  But you've contacted him in connection
18 with other lawsuits that you've filed?
19 A  Yes.
20 Q  And was one of those Timed Out versus LA
21 Girl Jewelry?
22    Does that ring a bell?
23 A  Probably, yes.
24 Q  Do you remember what your claims were in
25 that case?

Page 147

1  T. TOTH
2  A  I'd have to refer back to the paperwork.
3  Q  Okay. And how did you meet Peter Hamm?
4  A  I met him just like through the modeling
5  agency -- not modeling agency, through the modeling
6  industry through my agent, NTA.
7  Q  NTA you said?
8  A  Yeah.
9  Q  And they do your print work, are your
10 print agent?
11 A  Yes.
12 Q  So do you -- have you paid Timed Out or
13 Peter Hamm to help you in connection with these
14 lawsuits?
15 A  No, I haven't paid him.
16 Q  So does he pay you?
17 A  No.
18 Q  Do you have any type of written agreement
19 or any -- do you have any written agreement with him
20 or with Timed Out?
21 A  I mean, I always have written agreements
22 with my people, yes.
23 Q  And if you know, what's the subject of
24 your agreement with Peter Hamm or Timed Out?
25 A  I'd have to refer back to it.

Page 148

1  T. TOTH
2  Q  Have you ever owned any part of Timed Out?
3  A  No.
4  Q  Or have any equity stake in it?
5  A  No.
6  Q  And you said you weren't sure if they have
7  any affiliation with this lawsuit, if they've helped
8  you with this at all?
9  A  I'd have to look back. I'd have to look
10 back at e-mails.
11 Q  E-mails with Peter Hamm or Timed Out?
12 A  Well, no. Just in general.
13    MS. GOLDSTEIN: Okay. I think that's all
14 of that.
15 Q  So have you understood all of the
16 questions that you were asked today?
17 A  To the best my knowledge, yes.
18 Q  Have you answered all of the questions
19 truthfully, to the best of your ability?
20 A  Yes.
21 Q  And is there anything else that you feel
22 that's important to state today?
23 A  I don't think so. Just that I didn't give
24 permission or work for the company. So that's about
25 it.



TIFFANY TOTH  
TOTH vs 59 MURRAY ENTERPRISES

April 13, 2017  
149–152

## Page 149

1  　　　　　　T. TOTH
2  　　MS. GOLDSTEIN:  Okay.
3  　　MR. SPIEGEL:  John, do you have any
4  follow-up questions?
5  　　MR. GOLASZEWSKI:  Nothing for plaintiffs.
6  　　MR. SPIEGEL:  Okay.  We're done.  Thank
7  you.
8  　　　(Whereupon, at 3:17 p.m., the
9  　　　examination of this witness was
10 　　　concluded.)
11
12 　_____
      TIFFANY TOTH
13
14
15
16 Subscribed and sworn to before me
17 this _____ day of _____ 20___.
18
19 _____
      NOTARY PUBLIC
20
21
22
23
24
25

## Page 150

　　　　　　　I N D E X
EXAMINATION BY                              PAGE
MR. SPIEGEL                                   4
MS. GOLDSTEIN                               144

　　　INFORMATION AND/OR DOCUMENTS REQUESTED
INFORMATION AND/OR DOCUMENTS                PAGE
contracts for the past 10 years with         93
Mystery House or Roma.

2016 tax returns                            103

witness's model release                     111

　　　　　　　E X H I B I T S
EXHIBITS              FOR ID                PAGE
TT1   second amended complaint               7
TT2   photograph                            26
TT3   photograph                            27
TT4   photograph                            30
TT5   photograph                            30
TT6   photograph                            33
TT7   photograph                            34
TT8   photograph                            38
TT9   photograph                            43
TT10  photograph                            43
TT11  photograph                            46

## Page 151

TT12  photograph                            50
TT13  photograph                            54
TT14  photograph                            57
TT15  photograph                            58
TT16  photograph                            60
TT17  sample release form                   88
TT18  contract with Blackheart Rum         100
TT19  2011 financial information           104
TT20  2012 financial information           104
TT21  2013 financial information           105
TT22  2014 financial information           106
TT23  2015 financial information           106

　　　(Exhibits retained by Reporter.)

## Page 152

　　　　　　C E R T I F I C A T E
STATE OF NEW YORK    )
                     :ss.:
COUNTY OF KINGS      )

    I, AVERY N. ARMSTRONG, a Notary Public for
and within the State of New York, do hereby certify:
    That the witness whose examination is
hereinbefore set forth was duly sworn and that such
examination is a true record of the testimony given
by that witness.
    I further certify that I am not related to
any of the parties to this action by blood or by
marriage and that I am in no way interested in the
outcome of this matter.
    IN WITNESS WHEREOF, I have hereunto set my
hand this 13th day of April 2017.

　　　　　　　_____
　　　　　　　AVERY N. ARMSTRONG



ESQUIRE  
DEPOSITION SOLUTIONS

800.211.DEPO (3376)  
EsquireSolutions.com