UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------X

TIFFANY TOTH, GEMMA LEE,
JESSA HINTON, BROOKE TAYLOR,
JESSE GOLDEN, LINA POSADA,
SHEENA LEE WEBER, HEATHER RAE YOUNG,
RACHEL KOREN, SABELLA SHAKE,
URSULA MAYES, and CARMEN ELECTRA,

        Plaintiffs,

   - against -

59 MURRAY ENTERPRISES, INC.,
d/b/a NEW YORK DOLLS GENTLEMEN'S
CLUB, BARRY LIPSITZ, AAM HOLDING
CORPORATION, d/b/a PRIVATE EYES
GENTLEMEN'S CLUB, ANITA MICELI,
JAY-JAY CABERET, INC., d/b/a
FLASHDANCERS GENTLEMEN'S CLUB,
and MARSHA LIPSITZ,

        Defendants.

-----------------------------------X

**MEMORANDUM AND ORDER**

15 Civ. 8028 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

    Plaintiffs, eleven models earning a living by promoting their images to commercial brands and entertainment outlets, bring this action for false endorsement, misappropriation of likeness, deceptive trade practice, and defamation against defendant gentlemen's clubs and their owners, alleging that defendants misappropriated plaintiffs' images by using them in defendants' promotional material without consent. Plaintiffs now move for summary judgment pursuant to Rule 56 of the Federal

1

Rules of Civil Procedure. Defendants cross-move for summary judgment and also move to strike the expert reports, survey, and testimony of plaintiffs' proposed experts Martin Buncher and Stephen Chamberlin. For the reasons set forth below, we grant in part and deny in part both plaintiffs' motion for summary judgment and defendants' cross-motion for summary judgment, and grant defendants' motion to strike the reports, survey, and testimony of plaintiffs' proposed experts in its entirety.

## I. <u>BACKGROUND</u>[1]

### A. Parties

Plaintiff Electra is a professional model, actress, recording artist, and entrepreneur. She has released a self-titled album produced by Prince on his Paisley Park record label, appeared on television shows such as *Baywatch*, *90210*, *Britain's Got Talent*, and *Ex-Isle*, starred in popular movies such as *Scary Movie*, *Dirty Love*, *Cheaper by the Dozen 2*, and *Meet the Spartans*, and released a single that reached the number 25 spot on Billboard's Dance Club Play Chart. In 2006, Electra became a published author with the release of her book *How to be Sexy*. Pls.' 56.1 Stmt. ¶ 57.

---

[1] The facts described below are largely drawn from the Second Amended Complaint, ECF No. 18 ("SAC"), Plaintiffs' Local Rule 56.1 Statement, ECF No. 81 ("Pls.' 56.1 Stmt."), Defendants' Response to Pls.' 56.1 Stmt., ECF No. 93 ("Defs.' 56.1 Response"), Defs.' Local Rule 56.1 Statement, ECF No. 110 ("Defs.' 56.1 Stmt."), and Plaintiffs' Response to Defs.' 56.1 Stmt., ECF No. 117 ("Pls.' 56.1 Response"). We will note any facts in dispute.

The other ten plaintiffs[2] — plaintiffs Golden, Hinton, Koren, Lee, Mayes, Posada, Shake, Toth, Weber, and Young — are models, actresses, and/or businesswomen who have appeared in a wide variety of commercials, promotional campaigns, and magazines. Pls.' 56.1 Stmt. ¶¶ 9, 15, 20, 24, 28, 32, 36, 42, 47, 52. Several of these plaintiffs have also made unspecified appearances in television shows and films. All plaintiffs, including Electra, reside in either California or Texas, see SAC ¶¶ 11–22, and at least some of plaintiffs' appearances were made in media targeting audiences outside of the New York metropolitan area. See, e.g., id. ¶¶ 36 (hosting a television show for a local station in Los Angeles, California), 47 (promoting foreign lingerie brands). Plaintiffs also lay claim to varying degrees of social media celebrity, citing followings on Facebook, Instagram, and Twitter as of May 2018.

Corporate defendants 59 Murray Enterprises, Inc., AAM Holding Corp., and Jay-Jay Cabaret, Inc. own and operate Manhattan-based gentlemen's clubs — namely, New York Dolls Gentlemen's Club ("NY Dolls"), Private Eyes Gentlemen's Club ("Private Eyes"), and Flashdancer's Gentlemen's Club ("Flashdancer's"), respectively (collectively, "the Clubs"). Pls.' 56.1 Stmt. ¶¶ 63, 65, 67. For all times relevant to this

---

[2]    Counsel for plaintiffs confirmed that Brooke Taylor has withdrawn all claims in this action. Oral Arg. Tr. ("Tr.") 2:16–18.

3

litigation, individual defendant Barry Lipsitz has been the sole owner of 59 Murray and co-owner, along with defendant Marsha Lipsitz, of AAM and Jay-Jay Cabaret. Defs.' 56.1 Stmt. ¶¶ 193, 221–22. Defendant Anita Miceli is a former co-owner of AAM whose ownership interest ended in 2010. Id. ¶ 217.

### B. The Images

The Clubs are engaged in the business of selling alcohol while nude or seminude women entertain patrons. Pls.' 56.1 Stmt. ¶¶ 63, 65, 67. In order to promote their businesses, the Clubs, with the assistance of third-party contractors, post promotional content on their websites and social media accounts. The content is typically some combination of the Club's logo, a woman striking a pose, and a sentence or two of text either identifying a specific event or generally promoting interest in the Clubs.

An advertisement for a NY Dolls Halloween party posted to the NY Dolls website in October of 2014 is typical. SAC Ex. A, ECF No. 18-1 at 2 ("A1"). A1 features an image of plaintiff Toth posing in a costume alongside a superimposed NY Dolls logo and text that reads "New York Dolls Halloween Party!" and "100 entertainers in costume! Giveaways and lots of other surprises!" The advertisement includes a caption below the

image clarifying that the costumes will be the entertainers' "sexiest":



The second screenshot included in Exhibit A provides an example of promotional content posted to the Clubs' social media accounts. SAC Ex. A, ECF No. 18-1 at 3 ("A2"). A2, posted to the NY Dolls Facebook page, features an image of plaintiff Toth in what could be a bathing suit, her arms pulled back above her head as she strikes a pose against an empty white background. The only text is a caption adjacent to the image asking "Who needs to leave anything to the imagination when the reality is even better?":





Plaintiffs attach an additional 35 images to the SAC that the parties agree _in toto_ feature the likenesses of at least one plaintiff.  <u>See</u> SAC Exs. A-O, ECF Nos. 18-1 through 18-3.[3]  None of the content identifies plaintiffs by name.

It is undisputed that defendants never sought permission to use plaintiffs' images in their promotional content, and that in fact plaintiffs never specifically agreed to appear in the

---

[3]    <u>See</u> SAC Ex. A, ECF No. 18-1 at 4 ("A3"), 6 ("A4"), 7 ("A5") (Toth); SAC Exs. B and C, ECF No. 18-1 at 10 ("B1") and 12 ("C1") (Lee); SAC Ex. D, ECF No. 18-1 at 14 ("D1"), 15 ("D2") (Young); SAC Exs. E and F, ECF No. 18-1 at 17 ("E1"), 19 ("F1") (Koren and Shake); SAC Ex. G, ECF Nos. 18-1 at 21 ("G1"), 22 ("G2") and 18-2 at 1 ("G3") (Mayes); SAC Exs. H and I, ECF No. 18-2 at 3 ("H1"), 4 ("H2"), 5 ("H3"), 6 ("H4"), 7 ("H5"), 8 ("H6"), 9 ("H7"), 11 ("I1"), 12 ("I2"), 13 ("I3"), 14 ("I4"), 15 ("I5") (Hinton); SAC Exs. J, K, and L, ECF No. 18-2 at 17 ("J1"), 19 ("K1"), 21 ("L1") (Golden); SAC Ex. M, ECF Nos. 18-2 at 23 ("M1") and 18-3 at 1 ("M2"), 2 ("M3"), 3 ("M4"), 4 ("M5") (Posada); SAC Ex. N, ECF No. 18-3 at 7 ("N1"), 8 ("N2") (Weber); SAC Ex. O, ECF No. 18-3 at 11 ("O1") (Electra).  G1 through G3 are the only images that do not appear on the Clubs' websites or accounts; the images appear instead on either www.stripclublists.com (G1 and G2) or www.stripclubcoupons.com (G3).

Clubs' promotional content or at any of the events promoted therein. Pls.'s 56.1 Stmt. ¶¶ 5, 6. Nor did plaintiffs agree to endorse the Clubs. Id. Moreover, plaintiffs were never offered, nor did they receive, any specific compensation for the Clubs' use of their images. Id. ¶ 7.

It is also undisputed that the Clubs entered into agreements with third-parties to create and maintain their respective websites and social media accounts. Paul Brown and his company Internet Management Corporation ("IMC") designed the Clubs' websites and have provided advertising services to the Clubs for over 20 years, while Melange Media Group LLC ("Melange") was responsible for creating the Clubs' social media accounts and ran those accounts from at least February 2014 through the filing of the complaint in this action. Defs.' 56.1 Stmt. ¶¶ 195, 198; Pls.' 56.1 Stmt. ¶¶ 70-73; Declaration of John Golaszewski ("Golaszewski Decl.") Ex. O, June 1, 2018, ECF No. 80-3.

Defendants maintain that these third-party contractors were responsible for creating and publishing the promotional content posted to the Clubs' websites and accounts, including the selection of the images at issue. Pls.' 56.1 Stmt. ¶¶ 81, 85; Defs.' 56.1 Stmt. ¶¶ 196, 198. Plaintiffs counter that, at times, one of the Clubs' employees coordinated with IMC and

Melange regarding the posting of promotional content, Pls.' 56.1 Response ¶ 196, but it is undisputed that the Clubs never requested the use of any particular plaintiff's image, nor is it disputed that the extent of the Clubs' involvement in the posting of the images at issue was requesting images of models that were consistent with the general themes of the advertisements. Defs.' 56.1 Stmt. ¶ 211. Brown himself has readily admitted that IMC was responsible for posting all of the images at issue except for O1.[4] Defs.' 56.1 Stmt. ¶ 208.

## C. Permission to Use the Images

A number of plaintiffs conceded that they typically sign releases for photoshoots that they participate in, see, e.g., Defs.' 56.1 Stmt. ¶¶ 13, 29, 92, 135, but the only plaintiffs for which there are releases specific to images at issue in this litigation are Lee, Koren, Shake, Mayes, Hinton, and Golden. Defs.' 56.1 Stmt. ¶¶ 35 (Lee), 69 (Koren), 78 and 87 (Shake), 98 (Mayes),[5] 122 (Hinton), 144 (Golden). The specific language of each release varies, but all grant the releasee unlimited rights to the use of the images at issue. See, e.g., Defs.' 56.1 Stmt.

---

[4]     Defendants assert that image O1 was posted by Melange. Defs.' 56.1 Stmt. ¶ 199. As plaintiffs note, Brown's admission is difficult to square with the fact that 22 of the 37 images at issue were posted to social media accounts run by Melange, as opposed to the Clubs' websites run by Brown and IMC. Pls.' 56.1 Response ¶ 197. Plaintiffs, however, do not contend that the Clubs, as opposed to Melange, were directly responsible for posting the images that appeared on the Clubs' social media accounts.

[5]     See also Tr. 12:4–13:6.

¶¶ 38 ("I . . . further waive any claim that I may at any time have to the eventual use to which such Images may be applied. Additionally, I hereby warrant, transfer, sell and assign all right, title and interest to the Images to Company for the consideration state [sic] herein"), 87 ("All negatives and positives, together with the prints shall constitute your property, solely and completely."), 123 ("I agree that I have no rights to the Images and all rights to the Images belong to [releasee] without reservation of rights, in perpetuity, throughout the universe, in all media whether now known or later discovered.").

While defendants claim that Brown advised them that he had secured permission to use the images at issue, plaintiffs dispute that Brown did so. Pls.' 56.1 Response ¶ 200. Instead, plaintiffs claim that the Clubs were on a "faith basis" with Brown, and never saw or actually requested any written confirmation that Brown or his company had the rights to use any of the images. See Pls.' 56.1 Stmt. ¶¶ 88–91; Defs.' 56.1 Stmt. ¶ 203. Consistent with defendants' "faith basis" approach, there is no evidence in the record that the Clubs were aware prior to the commencement of this action that their contractors were posting images without properly securing the rights to those images. Pls.' 56.1 Response ¶ 212; see also Pls.' 56.1

Stmt. ¶ 80. Defendants have since removed all of the images at issue from their promotional material. Tr. 17:11–25.

### D. Earnings and Income

Plaintiffs offer undisputed evidence of income from modeling and standard rates that they charged for their services. Electra earned over $5,000,000 from modeling between 2009 and 2012. Defs.' 56.1 Stmt. ¶¶ 182–189. For years in which the other ten plaintiffs reported incomes from modeling, they ranged from $400 (Weber) to $92,000 (Golden). Defs.' 56.1 Stmt. ¶¶ 140, 167. All plaintiffs' tax returns show that their income either increased or remained roughly the same from 2009 to 2016. Defs.' 56.1 Stmt. ¶ 191. Where there is evidence of plaintiffs' "day rates," or fees charged by plaintiffs for a full day photoshoot, those rates range from $1,500 to $3,000. Defs.' 56.1 Stmt. ¶ 39, 86, 124.

The Clubs did not garner any additional profits from using plaintiffs' images, and there is no evidence of an increase in revenue attributable to any special events that were promoted through the use of plaintiffs' images. Defs.' 56.1 Stmt. ¶ 192.

### E. Procedural Background

Plaintiffs filed their initial complaint on October 13, 2015, ECF No. 1, and subsequently filed two amended complaints in January of 2016. See ECF Nos. 13 and 18. Each complaint

alleges the same eight causes of action: (1) false endorsement under Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1); (2) misappropriation of likeness for advertising purposes under N.Y. Civil Rights Law ("NYCRL") §§ 50-51; (3) deceptive trade practices under N.Y. General Business Law ("NYGBL") § 349(h); (4) defamation; (5) negligence; (6) conversion; (7) unjust enrichment; and (8) quantum meruit.

On July 15, 2016, defendants filed a third-party complaint against IMC and Melange. ECF No. 25. Neither third-party defendant appeared.

After a lengthy and contentious period of discovery, the parties held a teleconference with the Court on April 19, 2018 during which plaintiffs indicated that they were withdrawing their claims of negligence, conversion, unjust enrichment, and quantum meruit and so confirmed during oral argument on November 29, 2018. Tr. 2:12-15. Also during oral argument on November 29, 2018, plaintiffs confirmed that they were withdrawing all claims made on behalf of plaintiff Brooke Taylor. Id. at 2:16-22.

## II.  DISCUSSION

A motion for summary judgment is appropriately granted when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R.

Civ. P. 56(a).  In this context, "[a] fact is 'material' when it might affect the outcome of the suit under governing law," and "[a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks and citations omitted).  "In assessing the record to determine whether there is [such] a genuine issue to be tried, we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986)).

On a motion for summary judgment, "[t]he moving party bears the initial burden of demonstrating 'the absence of a genuine issue of material fact.'" F.D.I.C. v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir.2010) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)).  Where that burden is carried, the non-moving party "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." Id. (citing Anderson, 477 U.S. at 249).  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts ... and may not

rely on conclusory allegations or unsubstantiated speculation."
Brown v. Eli Lilly and Co., 654 F.3d 347, 358 (2d Cir. 2011)
(internal quotation marks and citations omitted).

### A. Individual Defendants

Plaintiffs do not contest defendants' cross-motion for
summary judgment to dismiss all claims against individual
defendants Lipsitz, Lipsitz, and Miceli. See Tr. 2:19–22.
Because there is nothing in the record to support a piercing of
the corporate veil or any other theory of liability implicating
individual defendants, we grant defendants' cross-motion for
summary judgment and deny plaintiffs' motion as to the
individual defendants.

### B. Lanham Act § 43 (28 U.S.C. § 1125(a)(1)) False Endorsement Claim

Section 43 of the Lanham Act prohibits the use of a
protected mark in a way that is likely to cause consumer
confusion "as to the origin, sponsorship, or approval of
[defendants'] goods." 15 U.S.C.A. § 1125 (a)(1)(A) (emphasis
added). In order to establish a claim for false endorsement
under Section 43(a), plaintiffs must prove that defendants: "(1)
in commerce, (2) made a false or misleading representation of
fact (3) in connection with goods or services (4) that is likely
to cause consumer confusion as to the origin, sponsorship, or
approval of the goods or services." Burck v. Mars, Inc., 571 F.

13

Supp. 2d 446, 455 (S.D.N.Y. 2008); see also Beastie Boys v. Monster Energy Co., 66 F. Supp. 3d 424, 448 (S.D.N.Y. 2014).

As defendants do not dispute that plaintiffs have established that the defendants' advertisements and promotions were used "in commerce" and "in connection with goods or services," we begin by addressing whether defendants made a false or misleading representation of fact.

### 1. False or Misleading Representation of Fact

Defendants argue that the use of plaintiffs' images is neither literally nor impliedly false. But whether a representation is literally or impliedly false is a question traditionally addressed within the context of false advertising claims brought under 15 U.S.C.A. § 1125 (a)(1)(B), not in the context of false endorsement claims brought under subsection (A) of the section. See, e.g., Fischer v. Forrest, No. 14-cv-1304 (PAE), 2015 WL 195822, at *11 (S.D.N.Y. Jan. 13, 2015); Roberts v. Bliss, 229 F. Supp. 3d 240, 249 (S.D.N.Y. 2017); Beastie Boys, 66 F. Supp. 3d at 449-56 (S.D.N.Y. 2014). In a false endorsement claim brought under 15 U.S.C.A. § 1125 (a)(1)(A), the unauthorized and suggestive use of a person's image can satisfy the requisite element of falsity. See Roberts, 229 F. Supp. 3d at 249 ("The false or misleading representation of fact, in the context of a false endorsement claim, may involve

the misleading implication that a celebrity or public figure endorses a product, when she does not."); <u>A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC</u>, 131 F. Supp. 3d 196, 208 (S.D.N.Y. 2015) (citing cases holding that "the use of an image on a product can support a claim for false endorsement"); <u>see also</u> 5 <u>McCarthy on Trademarks and Unfair Competition</u> § 28:15 (5th ed.).

Here, where the parties do not dispute that plaintiffs never endorsed or agreed to be associated with the Clubs, the prominent display of plaintiffs' images in the Clubs' advertising constitutes false or misleading representations of fact for purposes of a false endorsement claim. Whether these misrepresentations are likely to cause consumer confusion actionable under the Lanham Act, however, is a separate question and the subject of the next step in our analysis.

### 2. Likelihood of Consumer Confusion

"It is well settled that the crucial determinant in an action for trademark infringement or unfair competition is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." <u>Pirone v. MacMillan, Inc.</u>, 894 F.2d 579, 584 (2d Cir. 1990) (internal quotation marks omitted); <u>see also</u> <u>Dallas Cowboys</u>

<u>Cheerleaders, Inc. v. Pussycat Cinema, Ltd.</u>, 604 F.2d 200, 205 (2d Cir. 1979) ("The public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement"). This is normally a factual question, but a court may dismiss claims as a matter law if satisfied that there is no genuine issue of material fact. <u>Pirone</u>, 894 F.2d at 584–85.

"Generally speaking, establishing a likelihood of confusion is the plaintiff's burden." <u>Bondar v. LASplash Cosmetics</u>, No. 12-cv-1417 (SAS), 2012 WL 6150859, at *5 (S.D.N.Y. Dec. 11, 2012). We evaluate plaintiffs' showing of likelihood of confusion using a modified version of the traditional <u>Polaroid</u> test, omitting from our analysis elements of the test that are inapplicable to false endorsement claims. <u>See</u> <u>Polaroid Corp. v. Polarad Elecs. Corp.</u>, 287 F.2d 492, 495 (2d Cir. 1961); <u>see also</u> <u>Jackson v. Odenat</u>, 9 F. Supp. 3d 342, 356 (S.D.N.Y. 2014); <u>Beastie Boys</u>, 66 F. Supp. 3d at 424. The <u>Polaroid</u> factors we consider are: (1) strength of the trademark; (2) evidence of actual consumer confusion; (3) evidence that the imitative mark was adopted in bad faith; (4) similarity of the marks; (5) proximity of the products and their competitiveness with one another; and (6) sophistication of consumers in the relevant market.

16

"The application of the <u>Polaroid</u> test is not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused." <u>Starbucks Corp. v. Wolfe's Borough Coffee, Inc.</u>, 588 F.3d 97, 115 (2d Cir. 2009) (internal quotation marks omitted). "No single factor is dispositive," <u>Brennan's, Inc. v. Brennan's Rest., LLC</u>, 360 F.3d 125, 130 (2d Cir. 2004), and the fact "that one or more factors may weigh in one party's favor does not preclude summary judgment in the other's favor with respect to likelihood of confusion." <u>Disney Enters., Inc. v. Sarelli</u>, 322 F. Supp. 3d 413, 432–33 (S.D.N.Y. 2018).

a. <u>Strength of Mark</u>

For purposes of a false endorsement claim, "the 'mark' is the plaintiff's persona and the 'strength of the mark' refers to the level of recognition that the plaintiff has among the consumers to whom the advertisements are directed." <u>Jackson</u>, 9 F. Supp. 3d at 356. "The strength of [plaintiff's] mark or name is a crucial factor in determining likelihood of consumer confusion." <u>Pelton v. Rexall Sundown, Inc.</u>, No. 99-cv-4342 (JSM), 2001 WL 327164, at *3 (S.D.N.Y. Apr. 4, 2001).

Plaintiffs, however, argue that the operative question in evaluating the strength of mark factor is not whether plaintiffs are recognizable, but rather whether plaintiffs possessed a mere

intention to commercialize their marks. This argument stands in stark contrast to the caselaw and ignores the reality that, absent some level of recognition, there is no basis for inferring consumer confusion regarding the sponsorship or approval of the Clubs' goods and services. See <u>Bondar</u>, 2012 WL 6150859, at *7 ("Of course, the misappropriation of a completely anonymous face could not form the basis for a false endorsement claim, because consumers would not infer that an unknown model was 'endorsing' a product, as opposed to lending her image to a company for a fee"); <u>Pelton</u>, 2001 WL 327164, at *3–4 (granting defendant's motion for summary judgment where there was no evidence that plaintiff, who claimed international renown and had appeared as a model in various magazines and promotional campaigns, was "a recognizable celebrity"); <u>Albert v. Apex Fitness, Inc.</u>, No. 97-cv-1151 (LAK), 1997 WL 323899, at *1 (S.D.N.Y. June 13, 1997); <u>Passelaigue v. Getty Images (US), Inc.</u>, No. 16-cv-1362 (VSB), 2018 WL 1156011, at *8 (S.D.N.Y. Mar. 1, 2018).[6]

---

[6]     In support of their argument, plaintiffs rely primarily on <u>Fischer v. Forrest</u>, 286 F. Supp. 3d 590 (S.D.N.Y. 2018). <u>See</u> Pls.' Reply Br. 9, ECF No. 115.  But in <u>Fischer</u>, the court held that plaintiff Fischer failed to demonstrate a likelihood of consumer confusion as a matter of law, despite the magistrate judge's finding that Fischer met "or appeared to meet" the strength of mark factor by showing that he had profitably marketed his product for a number of years.  <u>Fischer</u>, 286 F. Supp. 3d at 612.  We decline to redefine the strength of the mark factor on account of stray dicta.

Plaintiff Electra has offered persuasive evidence of the strength of her mark. Electra's uncontroverted resume establishes that she has not just appeared in popular movies and television shows, but had regular and starring roles in them. She is a recording artist that has released a self-titled album under a well-known record label. Brands and businesses have placed value in her appearances to the tune of millions of dollars. These achievements are indicia of a strong mark. Moreover, counsel for defendants concede that Electra may be well known enough to be recognized in an advertisement containing only her image and without her name, Defs.' Br. 15, ECF No. 109, and defendants' own expert Joseph Hunter concludes that "Carmen Electra is a celebrity model and commercial talent, who has receive notoriety and a notable reputation in her field . . . ." Affidavit of Joseph Hunter ("Hunter Aff."), ECF No. 98 at 11.

In contrast, the remaining ten plaintiffs have failed to adduce evidence of a strong mark. Unlike plaintiff Electra, none of these other plaintiffs offered evidence of significant income earned through their various appearances. And while these other plaintiffs have participated in promotional campaigns for a wide variety of brands and appeared in magazines, TV shows, and movies, their resumes are devoid of

evidence that they actually garnered recognition for any of their appearances. Simply listing brands or magazine titles is insufficient. <u>See</u> <u>Pelton</u>, 2001 WL 327164, at *3 ("One appearance in a Sports Illustrated Swimsuit Issue in 1984 and some advertising work for well-known consumer products does not deliver celebrity status."). Plaintiffs' recitations of their social media followings as of May 2018 are equally unavailing, in large part due to the fact that there is no evidence in the record as to what plaintiffs' social media followings were at the time of the publishing of the images at issue – the operative inquiry. The bottom line is that regardless of the plaintiffs' presence on social media, they have failed to cite even one example of actual recognition (other than the single response out of 636 correctly identifying Electra in image O1, <u>see</u> <u>infra</u> n.10).

For these reasons, while plaintiff Electra has demonstrated that she has a strong mark, the other ten plaintiffs have failed to do so.

b. <u>Evidence of Actual Confusion</u>

We now examine the second factor: evidence of actual confusion among consumers. While evidence of "actual confusion need not be shown to prevail under the Lanham Act," <u>see</u> <u>Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.</u>, 799 F.2d 867,

875 (2d Cir. 1986), it is "highly probative of likelihood of confusion." Allen v. Nat'l Video, Inc., 610 F. Supp. 612, 628 (S.D.N.Y. 1985). Such evidence can be anecdotal, see Disney Enterprises, Inc. v. Sarelli, 322 F. Supp. 3d 413, 435 (S.D.N.Y. 2018), but plaintiffs' sole evidence of consumer confusion in this case is a survey conducted by their proposed expert Martin Buncher (the "Buncher Survey"). Golaszewski Decl. Ex. S, ECF No. 80-3; Tr. 13:7–11.

The Buncher Survey, a self-administered internet questionnaire, asks a sample of adult male New York[7] residents who had patronized a gentlemen's club in the previous two years a series of closed- and open-ended questions relating to three of the images at issue in this litigation. See Golaszewski Decl. Ex. S, ECF No. 80-3 at 68–69. Plaintiffs cite the responses from the Survey as evidence that the use of plaintiffs' images caused consumers to believe that plaintiffs had "agreed to promote the Strip Clubs," "agreed to be in the advertising," "represent[ed] the lifestyle to which the Club is oriented," and "might participate in some of the events described in the advertising." See Pls.' Br. 11, ECF No. 82.

---

[7]     The Buncher Survey describes the sample of respondents as Florida residents, which appears to be a "cut and paste" error, as other aspects of the survey suggest that in fact respondents were a sample of New York residents. See Golaszewski Decl. Ex. S, ECF No. 80-3 at 69, 141.

Defendants move to strike the Buncher Survey under Federal Rules of Evidence ("FRE") 702 and 403.  Under FRE 702, expert testimony is admissible "so long as the witness is qualified as an expert and (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods reliably to the facts of the case." United States v. Pryor, 474 F. App'x 831, 834 (2d Cir. 2012) (summary order) (internal quotation marks omitted).  "While the proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied, the district court is the ultimate 'gatekeeper'" and must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007) (citation omitted).

Moreover, "as with all evidence, under Rule 403, the Court may exclude testimony if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or delay."  LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A., 209 F. Supp. 3d 612, 636 (S.D.N.Y. 2016).  "[B]oth Rule 702 and 403 require the court to look at the cumulative effect of all of the flaws in a survey."  Malletier v. Dooney & Bourke, Inc., 525

F. Supp. 2d 558, 596 (S.D.N.Y. 2007); see also Mastercard Int'l
Inc. v. First Nat'l Bank of Omaha, Inc., No. 02-cv-3691 (DLC),
2004 WL 326708, at *10 (S.D.N.Y. Feb 23, 2004) (excluding a
survey based upon the cumulative effect of flaws in the
methodology that "diminish[ed] its relevance in predicting
actual confusion . . . such that the potential for the Survey's
results to prejudice unfairly, to confuse, and to mislead the
jury substantially outweighs any limited relevance"). Moreover,
"a survey may be kept from the jury's attention entirely by the
trial judge if it is irrelevant to the issues." Starter Corp.
v. Converse, Inc., 170 F.3d 286, 297 (2d Cir. 1999).

The Buncher Survey's flaws are manifold. Putting aside the
significance of Buncher's apparently inaccurate description of
the sample population, the self-administered questionnaire uses
only three of the 37 images at issue in this litigation - H5
(Hinton), M1 (Posada), and O1 (Electra) - without providing an
adequate explanation as to how those three images were selected
or specifically how they were representative of the other 34
images.

More importantly, however, Buncher failed to provide survey
takers with an opportunity to indicate lack of knowledge or an
instruction for participants not to guess – fatal defects where
the questions themselves are confusing and misleading. See

<u>Malletier v. Dooney & Bourke, Inc.</u>, 525 F. Supp. 2d 558, 596 (S.D.N.Y. 2007) ("[C]onsumer confusion surveys should be designed to discourage guessing.") (citing cases). Question 9.4 is illustrative of this defect. It asks respondents to indicate which of the following statements they believed to be true: "The models <u>might participate</u> in some of the events described in the advertising" or "The models <u>would not participate</u> in some of the events described in the advertising." Golaszewski Decl. Ex. S, ECF No. 80-3 at 136. 86% of respondents answered that the models "might participate in some of the events described in the advertising" — despite the fact that none of the advertisements actually describe any events. Without the opportunity to indicate a lack of knowledge or understanding of the question, respondents were forced to choose between two statements with the same flawed premise.[8]

The Buncher Survey also includes questions with undefined terms that are inscrutable without further explanation. Questions 9.3 and 9.5, for example, ask respondents about the "lifestyles" either "reflected in the advertising" or "to which

_____

[8] An additional issue with Question 9.4 is that "might participate" and "would not participate" are not opposing statements. Respondents who believed that the models were unlikely to participate in whatever events the survey is referring to would be forced to answer "might participate" even if they believed there was merely a small chance that the models may participate.

the Clubs are oriented," without any explanation as what the term "lifestyle" referred to.  Id.

Most importantly, the questions in the Buncher Survey are not directed at the relevant issues in a false endorsement claim.  That more than 90% of respondents believed that the models agreed to promote the Clubs or be in the advertisements may demonstrate that the advertisements are impliedly false, but do not speak to recognition or endorsement.  See Golaszewski Decl. Ex. S, ECF No. 80-3 at 145.  Other survey results purporting to show how effective the use of plaintiffs' images were at arousing interest in the Clubs also miss the mark.  The degree to which a generic model's appearance in an ad increases a consumer's interest in the Clubs is not the issue; rather, the issue is whether respondents recognized plaintiffs or understood their appearances to be endorsements of the Clubs' goods or services.[9]

Buncher himself concedes that his survey demonstrates that the identity of the model is "not a significant factor" or "a critical variable so long as she is a -- an attractive woman and in an attractive outfit, and is just as – used in the same manner as some models that the clubs use that aren't even

---

[9]     Buncher's focus on the effectiveness of the advertisements is curious in light of the undisputed fact that the Clubs did not garner any additional profits from the use of plaintiffs' images in their advertisements.  Defs.' 56.1 Stmt. ¶ 192.

involved in the case."[10]   Declaration of Peter Shapiro Ex. B ("Buncher Tr.") at 57:9-14; 59:8-10, July 5, 2018, ECF No. 97-4.

The concession by Buncher undermines plaintiffs litigative position since the identity of the endorser is a "significant factor" and "critical variable" in assessing likelihood of consumer confusion in a false endorsement claim.   Because the Buncher Survey is methodologically flawed and not probative of the relevant issues, we grant defendants' motion to strike the report, survey, and testimony of Martin Buncher.   Given the absence of a survey or anecdotal evidence supporting actual confusion, we find that the "evidence of actual confusion" factor strongly favors defendants.   See Sports Auth., Inc. v. Prime Hosp. Corp., 89 F.3d 955, 964 (2d Cir. 1996) ("[T]he absence of surveys is evidence that actual confusion cannot be shown.").

### c.   Evidence of Bad Faith

Third, we consider evidence that the imitative mark was adopted in bad faith, looking to "whether defendant in adopting its mark intended to capitalize on plaintiff's good will."   EMI

---

[10]   Notably, of the 636 responses to the open-ended prompts in questions 2 and 3 of the survey ("What is the first thing that comes to mind [looking at these three advertisements]?" and "What else comes to mind?"), only one included an identification of a plaintiff appearing in the ads (Electra in image O1).   That same respondent was clearly unfamiliar with either Hinton or Posada, as he incorrectly identified one of the two as Paris Hilton.   See Golaszewski Decl. Ex. S, ECF No. 80-3 at 159.

26

<u>Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.</u>, 228 F.3d 56, 66 (2d Cir. 2000).  As it is undisputed that defendants never specifically requested the use of any of the plaintiffs' images in their promotional material, it is clear that defendants did not intend to capitalize on plaintiffs' good will.  Defs.' 56.1 Stmt. ¶ 211.  Moreover, plaintiffs fail to offer evidence creating a genuine issue of fact as to whether defendants knew or had reason to know that their third-party contractors did not have the rights to use the images at issue.  <u>See</u> Pls.' 56.1 Stmt. ¶¶ 80, 88-91; Pls.' 56.1 Response ¶ 212.  Thus, this factor also weighs in favor of defendants.

### d.   <u>Other Factors</u>

The final three factors favor plaintiffs.  Defendants do not dispute that the advertisements at issue include the likenesses of the plaintiffs.  <u>See</u> <u>Jackson</u>, 9 F.Supp.3d at 358 (discussing the "similarity of the marks" factor in a false endorsement action).  To the extent that proximity of the products is relevant in a false endorsement action, <u>see</u> <u>Beastie Boys</u>, 66 F.Supp.3d at 456, defendants concede that the plaintiffs and the Clubs are in the related fields of "selling" womens' appearances.[11]  Defs.' Opp. Br. 5, ECF No. 90.  Finally,

---

[11]   Defendants argue that while the parties are in related fields, they are not "competitors" in that field.  But courts "have long recognized that the parties need not be in actual competition with each other when the claim is

the nature and cost of the product (alcohol) coupled with the environment in which it is served, suggest that the Clubs' consumers are fairly characterized as impulse driven and unsophisticated vis a vis the Clubs' offerings. See Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 390 (2d Cir. 2005) ("A court is entitled to reach a conclusion about consumer sophistication based solely on the nature of the product or its price.").

    e.  Balancing

    Ultimately, the likelihood of confusion analysis in this case turns on whether plaintiffs are sufficiently recognizable such that their appearance in the advertisements is likely to confuse consumers.  Even making all inferences in defendants' favor, plaintiff Electra has established sufficient recognizibility.  For that reason, and taken together with the Court's analysis of the other Polaroid factors, we grant plaintiffs' motion for summary judgment as to Electra's Lanham Act claim and deny defendants' cross-motion.

    Conversely, the remaining plaintiffs have failed to demonstrate sufficiently strong marks and no reasonable juror could find that the use of their images in the Clubs'

based on false affiliation or sponsorship." Jackson, 9 F. Supp. 3d at 358–59.

28

advertisements is likely to cause consumer confusion. The Court therefore denies plaintiffs' motion for summary judgment with respect to the Lanham Act claims of all other plaintiffs and grants defendants' cross-motion.

### 3. Lanham Act Injunctive Relief

Having established a likelihood of consumer confusion, plaintiff Electra is entitled to injunctive relief under the Lanham Act. See Allen, 610 F. Supp. at 630. The Court permanently enjoins defendants from using Electra's image in any of their promotional content without Electra's permission.

### 4. Lanham Act Damages, Fees, and Costs

Plaintiff Electra also seeks actual damages based on the fair market value of her image. See 15 U.S.C. § 1117(a). "Plaintiffs normally have a greater burden in attempting to establish entitlement to damages for violation of section 43(a): They must establish actual consumer confusion or deception resulting from the violation." PPX Enterprises, Inc. v. Audiofidelity Enterprises, Inc., 818 F.2d 266, 271 (2d Cir. 1987). Plaintiffs may also show "that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion." George Basch Co. v. Blue Coral, Inc., 968 F.2d 1532, 1537 (2d Cir. 1992); see also Beastie Boys, 66 F. Supp. 3d at 458 (holding that "reckless

disregard does not suffice" to prove intentional deception for purposes of Lanham Act damages). For the reasons stated above, plaintiffs failed to proffer evidence of either bad faith or actual consumer confusion. We therefore deny plaintiffs' motion for summary judgment for Lanham Act damages and grant defendants' cross-motion.[12] Plaintiffs motion for an award attorney fees under 15 U.S.C. §§ 1117(a) fails for the same reason. Conopco, Inc. v. Campbell Soup Co., 95 F.3d 187, 194 (2d Cir. 1996) (permitting a prevailing plaintiff to recover attorney fees under the Lanham Act only "on evidence of fraud or bad faith"). Finally, plaintiffs move for costs under the Lanham Act. See 15 U.S.C. § 1117(a). The Court maintains "a wide field of equitable discretion" in determining whether to award a party costs. 5 McCarthy on Trademarks and Unfair Competition § 30:107 (5th ed.). Here, where both parties' motions were granted in part and denied in part, both sides should bear their own costs.

### C. New York Civil Rights Law §§ 50-51 Claim

Plaintiffs' second cause of action is predicated on NYCRL § 51, which provides that any person whose image is used within the state of New York for advertising purposes without their written consent may maintain an action for equitable relief,

---

[12] It follows that we also deny plaintiffs' request for treble damages.

actual damages, and exemplary damages.  In order to succeed on such a claim, plaintiffs must prove "(i) usage of plaintiff's . . . portrait . . . , (ii) within the state of New York, (iii) for purposes of advertising or trade, (iv) without plaintiff's written consent."  Passelaigue, 2018 WL 1156011, at *5 (citing Molina v. Phoenix Sound Inc., 747 N.Y.S.2d 227, 230 (1st Dep't 2002)).  Defendants do not contest elements (i) through (iii).  Rather, defendants argue that some of plaintiffs' claims are barred by the one-year statute of limitations, that plaintiffs waived their NYCRL § 51 claims when they signed unlimited releases in connection with the images at issue, and further that plaintiffs cannot prove damages.

### 1.    Statute of Limitations

NYCRL § 51 claims must be brought within one year from the date that the offending material is first published.  N.Y. C.P.L.R. 215(3); see Nussenzweig v. diCorcia, 878 N.E.2d 589, 589 (N.Y. 2007).  Plaintiffs do not dispute that A1 through A5, D1, D2, J1, K1, M1 through M5, N1, N2, and O1 were first published more than one year prior to the filing of the complaint in this action.  See Tr. 18:23-21:14.  Accordingly, we grant defendants' cross-motion for summary judgment with respect to these images.  The remaining images are B1, C1, E1, F1, G1-

G3, H1–H7, I1–I5, and L1, advertisements containing images of plaintiffs Lee, Koren, Shake, Mayes, Hinton, and Golden.

### 2. Releases

The remaining plaintiffs, despite having executed agreements releasing any and all of their rights to the images at issue, nevertheless seek to recover damages for defendants' use of the images under NYCRL § 51. Plaintiffs' releases were comprehensive. They agreed, in return for compensation, to release "all rights to the Images . . . without reservation of rights," Defs.' 56.1 Stmt. ¶ 123, or "waiv[ing] any claim that [they] may have at any time to the eventual use to which such Images may be applied." Id. at ¶ 38. Thus, they expressly disclaimed their right to pursue claims relating to these images and gave releasees the authority to allow third-parties like the Clubs to use their images in any form and for any purpose whatsoever, without limitation.

Plaintiffs now ask the Court to either ignore, or read implied exceptions for NYCRL § 51 claims into, these otherwise unlimited releases, without citing any New York caselaw establishing such an implicit exception.[13] It is axiomatic that

_____

[13] None of the cases cited by plaintiffs involve the execution of similarly unlimited releases. See Pls.' Letter, Dec. 2, 2018, ECF No. 128 (citing Chambers v. Time Warner, 00-cv-2839 (JSR), 2003 WL 749422, (Mar. 5, 2003 S.D.N.Y.) and Rosemont Enterprises, Inc. v. Urban Sys., Inc., 340 N.Y.S.2d 144 (Sup. Ct. 1973), aff'd as modified 345 N.Y.S.2d 17 (1st Dep't.

under New York law "a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170 (N.Y. 2002). Plaintiffs' releases are crystal clear. Thus, there is no reason not to enforce plaintiffs' waivers of "any claim that [they] may have at any time to the eventual use to which [their images] may be applied" according to the plain meaning of those terms. Accordingly, defendants' cross-motion for summary judgment with respect to the remaining plaintiffs' NYCRL § 51 claims is granted and plaintiffs' motion is denied.[14]

### 3.    Damages

The remaining plaintiffs have also failed as a matter of law to prove damages. Plaintiffs proffer Stephen Chamberlin, an agent in the model and talent industry since 1989, as an expert on ascertaining the fair market value of each image at issue. Chamberlin purports to determine the price at which willing buyers and sellers of the images would agree to transact. Golaszewski Decl. Ex. U, ECF No. 80-3 at 219. To this end, and

---

1973)); Tr. 10:3–17 (citing Grodin v. Liberty Cable, 664 N.Y.S.2d 276 (1st Dep't 1997)).

[14]    Although we need not reach it, this case raises an interesting question regarding whether plaintiffs' releases amount to "written consent" for purposes of NYCRL § 51.  Suffice it to say that it is inconsistent with NYCRL § 51 for plaintiffs that have signed unlimited releases to rely on the absence of written consent in pursuing damages under that statute.

for each plaintiff, Chamberlin (1) briefly summarizes plaintiff's background; (2) indicates reliance on the same general categories of documents; (3) reproduces the images at issue; and (4) summarily concludes that "Based on [his] experience and expertise in this industry, when negotiating a rate of compensation for [plaintiff he is considering] for the identified images used by Defendant, at a minimum, I would quote an established working day rate of [$X]." Chamberlin then multiplies the working day rate by the number of images and the "usages" of images, ultimately finding total damages for the remaining plaintiffs of $555,000. Id. at 221.

At the outset, we emphasize that Chamberlin's underlying assumption that the remaining plaintiffs are entitled to receive the "fair market value" of images that they already sold is deeply flawed. These plaintiffs negotiated with a willing buyer and were paid the fair market value for any and all rights to the images. To allow plaintiffs to be compensated a second time would be a clear windfall. Put another way, any theory of damages based upon the faulty notion that plaintiffs – as opposed to releasees – would be the willing sellers in a hypothetical transaction is fundamentally suspect.

Second, Chamberlin fails to specify what documents, testimony, or research he relies upon in reaching his

conclusions – an issue of particular concern here, where the undisputed evidence in the record makes clear that none of the plaintiffs (with the possible exception of Electra) ever earned fees of the magnitude described in the Chamberlin Report. In response to defendants' motion to strike, Chamberlin supplements his report with a declaration attaching copies of specific agreements that he claims support his calculation of plaintiffs' working day rates. Declaration of Stephen Chamberlin ("Chamberlin Decl.") ¶ 40, ECF No. 120. But, tellingly, Chamberlin mischaracterizes many of these agreements in such a way as to deceptively bolster their significance. Chamberlin Decl. ¶ 40. For example, Chamberlin concludes that Lee's working day rate would be, at a minimum, $25,000, based in part on the fact that Lee had "entered into agreement in which she was paid $25,000 for a <u>one-day shoot</u> for *Playboy*." <u>Id.</u> (emphasis added). But, as is readily apparent from the face of the agreement, Lee was paid $25,000 for much more than a "one-day shoot," including, <u>inter alia</u>, additional photoshoots, film sessions, and up to 20 days of promotional appearances. Chamberlin Decl. Ex. A, ECF No. 120-1 at 9–10. The appropriate conclusion from the contract is that Lee's rate for a one-day photoshoot would be substantially less than $25,000.[15] Another

---

[15] As described <u>infra</u>, Lee's undisputed day rate was, in fact, $2,000.

example is Chamberlin's citation to agreements between Koren and "Cashmere Hair" that value Koren's services (which, like Lee's *Playboy* contract, go above and beyond a one-day shoot) at $50,000 and $25,000. Id. at 29. Chamberlin also neglects to disclose that Koren owns Cashmere Hair. Pls.' 56.1 Stmt. ¶ 24. What Koren pays herself for her image cannot be the foundation for a reliable calculation of fair market value.

Chamberlin also improperly assumes that separate licenses would have been agreed upon for each use of an image, rather than the issuance of a single license for all uses of each image. Id. Chamberlin uses this assumption as a basis for multiplying each models' working day rate by the number of distinct usages, which increases his calculated damages nearly four-and-a-half times. Chamberlin himself concedes that there is generally "one license and one payment," Chamberlin Decl. ¶ 19, and although he argues that this payment would include charges for different types of usages, it does not follow – and is indeed contradicted by the evidence in the record[16] – that a model's fees are properly calculated by multiplying their working day rate by the number of distinct usages.

The unreliability of Chamberlin's methodology is laid bare when comparing the damages in the Chamberlin Report with what

---

[16]     For example, Chamberlin's approach is difficult to square with the evidence of plaintiffs allowing releasees unlimited usages in unlimited forms in exchange for (modest) flat fees.

plaintiffs were actually paid for their images or photoshoots. While Chamberlin conjures up damages of $40,000 for plaintiff Koren (based upon two usages and a $20,000 working day rate), we already know precisely how much she would have agreed to accept in exchange for defendants' use of her image: $500, or eighty times less than the damages calculated by Chamberlin. Defs.' 56.1 Stmt. ¶ 70. This was the amount of consideration that Koren actually accepted in exchange for allowing the releasee to use the images "for any purpose whatsoever, without further compensation to me." Declaration of Peter Shapiro Ex. 11, July 9, 2018, ECF No. 111-26 at 7. Plaintiff Shake was also paid $500 in exchange for all of her rights to her image at issue – 60 times more than what Chamberlin determines is the image's "fair market value." Defs.' 56.1 Stmt. ¶ 81. The $100,000 that Chamberlin ascribes to defendants' use of Mayes' image is nearly twice the sum of her earned income from modeling for the years 2011, 2012, and 2013, Defs.' 56.1 Stmt. ¶¶ 95–97, and over 35 times what she was paid to participate in the photoshoot during which the photograph at issue was taken. Defs.' 56.1 Stmt. ¶ 103. The alleged damages of plaintiffs Hinton, Lee, and Golden are similarly inconsistent with their prior fees and earnings.[17] Defs.' 56.1 Stmt. ¶¶ 39, 124, 140–143.

---

[17]     Nor can these wild discrepancies between actual earnings and contrived

"The Second Circuit instructs district courts to exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." _LVL XIII Brands, Inc._, 209 F. Supp. 3d at 636 (internal quotation marks omitted) (citing _Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC_, 571 F.3d 206, 214 (2d Cir. 2009)). Consistent with this principal and our discussion of the law governing the admissibility of experts _supra_, we grant defendants' motion to strike the report and testimony of plaintiffs' proposed expert Stephen Chamberlin. As a result, and for the reasons stated above, were we required to reach a decision we would deny plaintiffs' motion for summary judgment as to any actual damages to be awarded under NYCRL § 51 and grant defendants' cross-motion.

### D. New York General Business Law § 349 Claim

Plaintiffs also assert claims under NYGBL §349, which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). The elements of a

---

damages be explained by "premiums" that plaintiffs would charge to account for "the embarrassment factor" and the fact that "businesses would not work with a model who posed for certain disreputable businesses." See Chamberlin Decl. ¶¶ 20, 23. Remaining plaintiffs received any such "premium" when they sold all of their rights to releasees, and evidently were not so concerned with embarrassing associations as to negotiate limitations as to who could use their images in the future.

deceptive trade practices claim under NYGBL § 349 are: "(1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." Spagnola v. Chubb Corp., 574 F.3d 64, 74 (2d Cir. 2009). Although it is now well-established that a non-consumer may bring a claim under NYGBL § 349, "the gravamen of the complaint must be consumer injury or harm to the public interest." Stadt v. Fox News Network LLC, 719 F. Supp. 2d 312, 319 (S.D.N.Y. 2010).

The overwhelming majority of courts in this Circuit have concluded that "the general variety of consumer confusion that is the gravamen of [a false endorsement] claim" is an insufficient harm to the public interest for purposes of NYGBL § 349. See Mayes v. Summit Entm't Corp., 287 F. Supp. 3d 200, 206 (E.D.N.Y. 2018) (collecting cases); see also Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd., No. 07-cv-6959 (DAB), 2009 WL 4857605, at *8 (S.D.N.Y. Dec. 14, 2009) (requiring "a specific and substantial injury to the public interest *over and above ordinary trademark infringement*" in order to maintain a NYGBL § 349 claim) (internal quotation marks omitted); Kaplan, Inc. v. Yun, 16 F. Supp. 3d 341, 352 (S.D.N.Y. 2014) ("[C]ourts in New York have routinely dismissed

trademark claims brought under Sections 349 and 350 as being outside the scope of the statutes . . . .").

As plaintiffs' do not allege an injury to the public interest above and beyond "the general variety of consumer confusion," we deny plaintiffs' motion for summary judgment on their NYGBL claims and grant defendants' cross-motion.

### E. Defamation Claim[18]

Finally, plaintiffs claim that defendants' publication of the images at issue "constitutes a representation that plaintiffs [were] either employed by one or more of the Clubs, that they endorsed one or more of the Clubs, or that they had some affiliation with one or more of the Clubs," and that this representation is defamatory. SAC ¶ 149.

To prove a claim for defamation, a party must show: "(1) a written defamatory statement of fact concerning the plaintiff; (2) publication to a third party; (3) fault (either negligence or actual malice depending on the status of the libeled party); (4) falsity of the defamatory statement; and (5) special damages or per se actionability (defamatory on its face)." Celle v. Filipino Rep. Enters. Inc., 209 F.3d 163, 176 (2d Cir. 2000).

_____

[18] Like claims brought under NYCRL § 51, the statute of limitations for defamation claims is one year and is governed by the single publication rule. See Osmers v. Parade Publications, Inc., 430 F.Supp. 924 (S.D.N.Y. 1964). For this reason, we reach the same conclusion as we did in our statute of limitations analysis under NYCRL § 51, and grant defendants' cross-motion for summary judgment with respect to images A1 through A5, D1, D2, J1, K1, M1 through M5, N1, N2, and O1.

Plaintiffs' motion for summary judgment fails at the first element. There is no quarrel that "a threshold issue for resolution by the court is whether the statement alleged to have caused plaintiff an injury is reasonably susceptible to the defamatory meaning imputed to it." Levin v. McPhee, 119 F.3d 189, 195 (2d Cir. 1997) (citing James v. Gannett Co., 353 N.E.2d 834, 837–38 (N.Y. 1976)). If, however, the statements are reasonably susceptible to multiple meanings, some of which are not defamatory, "it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." Celle, 209 F.3d at 178. As one interpretation of the alleged defamatory statements – indeed, the most likely interpretation – is that plaintiffs had simply agreed to appear in the advertisements for a standard modeling fee, we must deny plaintiffs' motion for summary judgment as to the defamation claim.

The third element of a defamation claim — fault — requires the Court to grant defendants' cross-motion for summary judgment on the defamation claim. Plaintiffs do not dispute that they are "public figures" for purposes of their defamation claim. Tr. 23:18–22; see Celle, 209 F.3d at 177. A public figure who sues for defamation must show that the allegedly defamatory

material was published with "actual malice — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." New York Times Co. v. Sullivan, 376 U.S. 254, 280 (1964) (internal quotation marks omitted); see also Don King Prods., Inc. v. Douglas, 742 F. Supp. 778, 782 n.4 (S.D.N.Y. 1990) (applying the "actual malice" standard to a defamation suit brought against a non-media defendant).

In analyzing actual malice at the summary judgment stage, "the question is whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." Kipper v. NYP Holdings Co., 912 N.E.2d 26, 29 (N.Y. 2009) (internal quotation marks omitted). The inquiry is a subjective one, and requires facts demonstrating that defendants "in fact entertained serious doubts as to the truth of [their] publication or acted with a high degree of awareness of probable falsity." Id. (internal quotation marks and citation omitted). For the reasons described supra in our discussion of defendants' alleged bad faith, there are no such facts in the record. At worst, the evidence shows that defendants failed to investigate the status of their or their contractors' rights to use plaintiffs' images, which in and of itself is insufficient as a matter of law to prove actual

malice. See Lerman v. Flynt Distrib. Co., 745 F.2d 123, 141 (2d Cir. 1984).

## III. CONCLUSION

Plaintiff's motion for summary judgment is granted and defendants' cross-motion for summary judgment is denied as to plaintiff Electra's Lanham Act claim. The Clubs are permanently enjoined from using Electra's image in any of their promotional material without Electra's permission. Plaintiffs' motion for summary judgment is denied and defendants' cross-motion for summary judgment is granted as to all other claims for relief. Defendants' motion to strike the reports, survey, and testimony of plaintiffs' proposed experts is granted in its entirety. The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 79, 94, 95, 96, and 101 and close this case.

**SO ORDERED.**

Dated: New York, New York
       January 3, 2019

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

43