N.Y.S.D. Case #
15-cv-8028(NRB)

19-235-cv
Electra v. 59 Murray Enterprs., Inc.

1
2            UNITED STATES COURT OF APPEALS
3               FOR THE SECOND CIRCUIT
4              ————————————————
5
6                 August Term, 2019
7
8 (Argued: January 8, 2020          Decided: February 9, 2021)
9
10               Docket No. 19-235
11
12              ————————————————
13
14 CARMEN ELECTRA, TIFFANY TOTH, GEMMA LEE, JESSA HINTON, JESSE
15 GOLDEN, LINA POSADA, SHEENA LEE WEBER, HEATHER RAE YOUNG,
16 RACHEL KOREN, SABELLA SHAKE, URSULA MAYES,
17
18             *Plaintiffs-Appellants*,
19
20          v.
21
22 59 MURRAY ENTERPRISES, INC., DBA NEW YORK DOLLS GENTLEMEN'S
23 CLUB, JAY-JAY CABARET, INC., AAM HOLDING CORPORATION, DBA
24 PRIVATE EYES GENTLEMEN'S CLUB,
25
26            *Defendants-Appellees*.[1]
27
28             ————————————————
29
30 Before: KEARSE, CALABRESI, and POOLER, *Circuit Judges*.
31

---

[1] The Clerk of Court is directed to amend the caption as above.

CERTIFIED COPY ISSUED ON 02/09/2021

1    Appeal from grant of summary judgment of the United States District

2    Court for the Southern District of New York (Naomi R. Buchwald, *J.*) to

3    Defendants-Appellees 59 Murray Enterprises, Inc., AAM Holding Corp., and Jay-

4    Jay Cabaret, Inc. Plaintiffs-Appellants Carmen Electra, Tiffany Toth, Gemma Lee,

5    Jessa Hinton, Jesse Golden, Lina Posada, Sheena Lee Weber, Heather Rae Young,

6    Rachel Koren, Sabella Shake, and Ursula Mayes allege that Appellees unlawfully

7    used photographs of them to advertise strip clubs owned by Appellees in

8    violation of New York Civil Rights Law §§ 50 and 51. The district court held that

9    Appellants' signing of full releases of their rights to the photographs defeated

10   their claims. We conclude that the terms of Shake and Hinton's release

11   agreements are disputed material facts, and Appellees concede that neither they

12   nor the third-party contractors that created and published the advertisements

13   secured legal rights to use any of the photographs at issue. We hold that the

14   district court erred in granting summary judgment to Appellees and in denying

2

1    summary judgment to Appellants on liability. We thus vacate the judgment in

2    part and remand for further proceedings.

3         Appellants also appeal from the district court's order concluding that

4    Appellants had not accepted an offer of judgment pursuant to Federal Rule of

5    Civil Procedure 68. We hold that the district court correctly concluded they had

6    not accepted the offer because the offer's settlement amount term was

7    ambiguous, the parties disagreed over how to interpret the term, and there was

8    accordingly no meeting of the minds.

9         Appellants further appeal from the district court's grant of summary

10   judgment to Appellees as to their Lanham Act, 15 U.S.C. § 1125(a), New York

11   General Business Law Section 349, and libel claims. We hold that the district

12   court correctly dismissed these claims.

13        Affirmed in part, vacated in part, and remanded.

14                          _____

1          JOHN V. GOLASZEWSKI, Casas Law Firm, P.C., New
2          York, NY, *for Plaintiffs-Appellants.*

3

4          PETER T. SHAPIRO, Lewis Brisbois Bisgaard & Smith
5          LLP, New York, NY, *for Defendants-Appellees.*

6

7 POOLER, *Circuit Judge*:

8      Plaintiffs-Appellants Carmen Electra, Tiffany Toth, Gemma Lee, Jessa

9 Hinton, Jesse Golden, Lina Posada, Sheena Lee Weber, Heather Rae Young,

10 Rachel Koren, Sabella Shake, and Ursula Mayes (collectively, "Appellants")

11 appeal from so much of a final judgment of the United States District Court for

12 the Southern District of New York (Naomi R. Buchwald, *J.*) as dismissed their

13 claims under New York Civil Rights Law Sections 50 and 51, the Lanham Act, 15

14 U.S.C. § 1125(a), New York General Business Law Section 349, and New York

15 libel law, alleging that Defendants-Appellees 59 Murray Enterprises, Inc., AAM

16 Holding Corp., and Jay-Jay Cabaret, Inc. unlawfully used photographs of

17 Appellants without their consent to advertise Appellees' strip clubs. Appellants

18 principally challenge the district court's July 26, 2017 order rejecting their

4

1    attempt to have judgment entered in their favor pursuant to Federal Rule of Civil

2    Procedure 68 for $660,000, and its January 3, 2019 order granting summary

3    judgment to Appellees.

4           The district court held that Appellants' signing of full releases of their

5    rights to the photographs defeated their claims. We conclude that the terms of

6    Shake and Hinton's release agreements are disputed material facts, and

7    Appellees concede that neither they nor the third-party contractors that created

8    and published the advertisements secured legal rights to use any of the

9    photographs at issue. We hold that the district court erred in granting summary

10   judgment to Appellees and in denying summary judgment to Appellants on

11   liability. We thus vacate the judgment in part and remand for further

12   proceedings.

13          We also hold that the district court correctly rejected Appellants'

14   purported acceptance of the offer of judgment pursuant to Federal Rule of Civil

15   Procedure 68 because the offer's settlement amount term was ambiguous, the

1    parties disagreed over how to interpret the term, and there was accordingly no

2    meeting of the minds. We further hold that the district court did not err in its

3    grant of summary judgment to Appellees as to Appellants' Lanham Act, 15

4    U.S.C. § 1125(a), New York General Business Law Section 349, and libel claims.

5                                         **BACKGROUND**

6    **I.     Factual Background**

7           Appellants are professional models, actresses, and businesswomen who

8    commercially promote their image and likeness to various clients, brands, and

9    media outlets, or have done so previously. Their images have appeared in a

10   variety of magazines, advertising campaigns, and other publications. Several

11   Appellants have appeared in film and television programs, and many of them

12   have a large social media following.

13          59 Murray Enterprises, Inc., AAM Holding Corp., and Jay-Jay Cabaret, Inc.

14   (collectively, "the Club Companies" or "Appellees") individually own and

15   operate various strip clubs in New York City, including New York Dolls

                                              6

1   Gentlemen's Club, Private Eyes Gentlemen's Club, and Flashdancers

2   Gentlemen's Club (collectively, "the Clubs"). Barry Lipsitz is the sole owner of 59

3   Murray Enterprises and a partial owner of AAM Holding and Jay-Jay Cabaret.

4   Lipsitz's son, Barry Albert Lipsitz ("Albert"), was the manager of the Clubs

5   during the relevant time period. The gravamen of Appellants' complaint is that,

6   between 2013 and 2015, the Club Companies used Appellants' "[i]mages for

7   commercial purposes in order to promote their Clubs by and through various

8   marketing and promotional mediums," including the Clubs' website and social

9   media accounts, "without the prior consent of any" of the Appellants. App'x at

10  87.

11      Appellants attached the challenged advertisements to their second

12  amended complaint ("SAC"), and a selection of the advertisements is appended

13  to this opinion. The advertisements were varied in form, purpose, and content,

14  but each combined a prurient photograph of one or more of the Appellants, the

15  logo or name of one of the Clubs, and promotional text. For instance, a

7

1    photograph of Koren and Shake appeared on the website for New York Dolls

2    Gentlemen's Club with text advertising an "exclusive Black & White Party

3    experience reserved for NYC's elite party goers, athletes, celebrities & business

4    moguls," App'x at 115. A photograph of Lee appeared on webpages advertising

5    employment opportunities for two of the Clubs. A photograph of Hinton, with

6    text stating "Welcome to the New Flashdancers," App'x at 123-27, appeared on

7    the Flashdancers website, and its Twitter, Facebook, and Instagram accounts.

8    Similarly, a photograph of Golden appeared in an advertisement for a Halloween

9    party at Private Eyes Gentlemen's Club, and a photograph of Mayes appeared in

10   an advertisement offering a free-admission "VIP pass" to the "Newly

11   Remodeled" New York Dolls club. App'x at 120. The advertisements did not

12   name the models.

13         Appellants were never asked to authorize the use of their images in the

14   Clubs' advertisements, and they never entered into release agreements with the

15   Club Companies authorizing such use. They never received nor were offered

8

1   compensation for the use of their images in the advertisements. No Appellant

2   ever performed, or agreed to perform, services for the Clubs. Indeed, Appellants

3   contend that they do not endorse the Clubs or strip clubs generally and would

4   never agree to appear at the kinds of events or perform the activities promoted in

5   the advertisements.

6       Each Appellant previously entered into agreements releasing their rights

7   to photographs in which they appear as models, and the record includes release

8   agreements relating to at least some of the photographs at issue in this litigation.

9   As explained in further detail below, the district court correctly held that the one-

10  year statute of limitations applicable in actions under Section 51 of New York's

11  Civil Rights Law barred the claims of all but six of Appellants. We accordingly

12  focus on the record of releases to the photographs of Appellants with timely

13  claims: Lee, Mayes, Koren, Shake, Hinton, and Golden.

14      The advertisements using Lee's image used a photograph taken by

15  J Squared Photography for Dreamgirl Lingerie ("Dreamgirl"). Lee signed a

9

1    release granting Dreamgirl, as well as "its legal representatives and assigns, the

2    exclusive and absolute right and permission . . . to purchase, own, assign, license,

3    transfer, sell, distribute, copyright, use, reuse, publish, republish, exhibit,

4    display, produce and reproduce, print and reprint" the photograph, "or to

5    authorize others to do any of the foregoing, in any and all media now existing or

6    hereafter developed, and in any and all forms or formats of distribution." App'x

7    at 2199. The release explicitly authorized use "for any commercial or

8    noncommercial purpose whatsoever," App'x at 2199, and "waive[d] any claim

9    that [Lee] may at any time have to the eventual use to which such Images may be

10    applied," App'x at 2200.

11        The advertisement using Mayes's image also used a photograph originally

12    shot for Dreamgirl. Mayes entered into a release for the photograph with

10

1    Dreamgirl that mirrors, in relevant part, Dreamgirl's release agreement with

2    Lee.[2]

3         The advertisement using Koren's and Shake's images used a photograph

4    taken for Fastdates.com in which they are both featured. Koren entered into a

5    release for the photograph with Gianatsis Design Associates that "authorize[d]

6    the use and reproduction, by Gianatsis Design Associates or Jim Gianatsis or

7    anyone authorized by Gianatsis Design Associates, of any and all photographs"

8    taken of her at the photoshoot for "any purpose whatsoever, without further

9    compensation," and provided that the photographs would be the property of

10   Gianatsis Design Associates "solely and completely." App'x at 2204. The parties

11   agree that Shake entered into a release for the image, but the content of that

12   release agreement is not in the record.

---

[2] While initially disputing the fact, Appellants conceded before the district court
that one of the release agreements in the record applied to the image of Mayes at
issue.

11

1          The advertisements featuring Hinton's image used photographs originally

2    shot for Forplay, a costume and lingerie company. Hinton testified that while she

3    had previously signed a release in connection with a photoshoot with Forplay,

4    she did not always do so, and she did not recall whether she signed a release for

5    the photograph used in the advertisements at issue. The record includes a release

6    agreement that Hinton signed with Forplay. This release agreement provides

7    that Hinton gives "for all time to Forplay Catalog, Inc. its heirs, legal

8    representatives and assigns, for those whom Forplay Catalog, Inc. is acting, and

9    those acting with its authority and permission the unrestricted right and

10   permission to copyright and/or exploit in any way" the photographs "for

11   illustration, art, promotion, sale, advertising, trade, or any other purpose

12   whatsoever," and further, that "all rights to the Images belong to Forplay

13   Catalog, Inc." App'x at 2214. Though Appellants did not dispute in Appellees'

14   Rule 56.1 statement that Hinton signed this release in connection with

12

1  photographs contained at Exhibits E and F in the SAC, these exhibits are labeled

2  as advertisements featuring the images of Koren and Shake.

3      Lastly, the advertisements featuring Golden's image used photographs

4  originally shot for Leg Avenue. The parties agreed before the district court that

5  Golden entered into a modeling contract with Leg Avenue that included a

6  release agreement that applied to the photographs at issue. This release provides

7  that Golden "irrevocably assign[s] to Leg Avenue, Inc. and its legal

8  representatives, successors, agents, assigns, and all persons or corporations

9  acting with its permission . . . , without restriction, without further compensation

10  to [her], and for any purpose whatsoever, the unrestricted rights to copyright,

11  use, publish, sell, or distribute" the photographs. App'x at 1630.

12      The Club Companies used third-party contractors to create the

13  advertisements and publish them on the Clubs' websites and social media,

14  including Paul Brown and his company, Internet Management Corporation

15  ("IMC"), which designed the Clubs' websites and provided advertising services

13

1    to the Clubs, and Melange Media Group LLC ("Melange"), which created and

2    ran the Clubs' social media accounts. Albert, Lipsitz's son, served as the contact

3    person between the contractors and the Clubs.[3] Brown and Lipsitz testified that

4    they believed IMC was responsible for the publication of all the advertisements

5    at issue, except for the advertisement using the photograph of Carmen Electra,

6    which was published by Melange. Brown admitted that he "couldn't put a lot of

7    weight in that though because some of these images I don't recognize. I would

8    have no idea." App'x at 271, 503. Appellants dispute that IMC was responsible

9    for nearly all the images, as many of the images were posted on the Clubs' social

10    media accounts, which were Melange's responsibility. The parties nevertheless

11    agree that the Clubs never asked Melange or IMC to use a photograph of a

---

[3] Though the parties agree that Lipsitz was not involved in the creation of the advertisements, the parties dispute whether Albert provided advertising copy for some of the advertisements or merely informed the third-party contractors of the purposes of the events to be promoted in the advertisements.

14

1    specific person, instead requesting photographs that would complement the

2    advertised event or the purpose of a particular webpage.

3        Though the photographs at issue were taken for a number of different

4    companies, Brown averred that he thought that all the photographs IMC posted

5    on the Clubs' websites came from catalogs of images that Forplay would send to

6    IMC each month. Even if the photographs did not originate from the Forplay

7    catalog, however, Brown averred that the photographs would have come from

8    another source that informed IMC that the photographs "could be freely used

9    because all the rights to the photos had been conveyed." Affidavit of Paul Brown

10   at 3, *Toth v. 59 Murray Enters., Inc.*, No. 15-cv-8028 (S.D.N.Y. 2019), ECF No. 108.

11       Brown averred that he believed he had a legal right to use each image and

12   that he would never intentionally post an image without the legal right to do so.

13   The same affidavit states that Brown told Lipsitz and Albert that he had releases

14   from Forplay for the photographs that IMC used in the advertisements. Both

15   Lipsitz and Albert declared that they believed IMC had a legal right to use the

15

1    photographs. However, Brown was unable to find any release from Forplay

2    granting him or IMC the right to use Forplay images, and Appellees never asked

3    Brown for written confirmation that IMC had the rights to use the photographs.

4    Though Lipsitz testified that he believed IMC had an agreement allowing IMC to

5    use Forplay's images, he did not actually see this agreement. At oral argument

6    on appeal, Appellees conceded that the third-party contractors failed to secure

7    the legal rights to use the images by license, assignment, or any other means.

8        Appellants' tax returns show that their income either increased or

9    remained approximately the same from 2009 to 2016. Appellees did not gain any

10   additional profits from the use of the images, and there is no evidence of an

11   increase in the Clubs' revenue attributable to the special events promoted by

12   some of the advertisements.

13   **II.    Procedural History**

14       On October 15, 2015, Appellants filed a complaint alleging, inter alia, that

15   Appellees' use of the photographs in advertisements without written consent

1     violated their statutory right of privacy and publicity under New York Civil

2     Rights Law §§ 50-51, constituted false endorsement under Section 43 of the

3     Lanham Act, 15 U.S.C. § 1125(a)(1), was a deceptive trade practice under New

4     York General Business Law Section 349(h), and constituted libel under New York

5     law.[4] Appellants sought compensatory and punitive damages, a permanent

6     injunction barring Appellees from the use of Appellants' images in

7     advertisements promoting the Clubs, and attorneys' fees and costs.

8         On June 15, 2017, Appellees served a "Rule 68 Offer of Judgment" (the

9     "Offer of Judgment") on Appellants pursuant to Federal Rule of Civil Procedure

10    68. The Offer of Judgment stated in relevant part as follows:

11         Pursuant to Rule 68 of the Federal Rules of Civil Procedure,
12         Defendants hereby offer to Plaintiffs collectively to take a judgment
13         against Defendants in the amount of $82,500.00, inclusive of interest,

---

[4] The complaint brought four other causes of action, including (1) negligence; (2) conversion; (3) unjust enrichment; and (4) quantum meruit. Appellants voluntarily dismissed those claims.

1  costs and attorneys' fees, and without any admission of liability, on
2  each of the Causes of Action contained in the Complaint, based upon
3  facts existing as of the date of acceptance of the offer. . . . If Plaintiffs
4  do not accept this offer, in writing, within 14 days after service of this
5  offer upon him, this offer will be deemed rejected.
6
7  App'x at 24-25. On June 27, 2017, Appellants returned to Appellees a document

8  entitled "Plaintiffs' Acceptance of Defendants' Rule 68 Offer of Judgment"

9  (hereinafter "Acceptance Reply" or "Reply"), which stated as follows:

10      **PLEASE TAKE NOTICE** that, pursuant to Rule 68 of the
11  Federal Rules of Civil Procedure, Plaintiffs hereby accept
12  Defendants [sic] June 15, 2017 offer to allow judgment to be taken
13  against Defendants "in the amount of $82,500, inclusive of interest,
14  costs and attorneys' fees, and without admission of liability, on each
15  of the Causes of Action contained in the Complaint based upon facts
16  existing as of the date of acceptance of the offer." (Exhibit A).
17
18      PLEASE TAKE FURTHER NOTICE that, as set forth in
19  Plaintiffs' January 31, 2016 Second Amended Complaint (Dkt. 18;
20  Exhibit B, ¶¶ 118-183), as of the date of Defendants' Offer of
21  Judgment, Plaintiffs had eight (8) Causes of Action against
22  Defendants.
23
24      PLEASE TAKE FURTHER NOTICE that Plaintiffs hereby
25  accept a total of six hundred and sixty thousand dollars
26  ($660,000.00), inclusive of interest, costs and attorneys' fees, for full

1    and final settlement of all eight (8) Causes of Action contained in the
2    Complaint based upon facts existing as of the date of acceptance of
3    the offer.
4
5  App'x at 27-28.

6         Although the Rules provide that if the Rule 68 offer has been accepted

7  "either party may then file the offer and notice of acceptance, plus proof of

8  service," and that the "clerk must then enter judgment," Fed. R. Civ. P. 68(a), no

9  such judgment was actually entered in the present case. Following receipt of

10 Appellants' Reply, Appellees filed in the district court on July 5 a letter urging

11 that no judgment be entered in accordance with the Reply because in Appellees'

12 Rule 68 Offer "[t]he figure of $660,000 was not mentioned . . . and was clearly not

13 contemplated; rather, $82,500 was intended to dispose of the entire case," and

14 Appellants' counsel was "well aware of Defendants' stated intent based on

15 written communications among counsel that directly preceded the offer." App'x

16 at 30. Appellees' counsel stated that prior to the Rule 68 Offer, when "counsel

17 discussed settlement[,] Defendants offered $82,500 to dispose of the entire case."

19

1    App'x at 31. After "Plaintiffs[] countered by demanding $800,000," defense

2    counsel "advised that the amount demanded was too high to counter," and "[b]y

3    a June 15th email, a copy of which is annexed hereto, . . . advised that rather than

4    countering the demand [they] would be filing an offer of judgment for the same

5    amount previously offered; i.e., $82,500." App'x at 31. Appellees attached to their

6    letter the June 15 email referred to, which stated, "We are going to file an offer of

7    judgment for the amount previously offered." App'x at 33.

8         On July 7, 2017, Appellants filed with the district court a letter opposing

9    Appellees' July 5 request to decline filing the judgment proposed by Appellants.

10   Appellants argued that the $82,500 referred to in the Rule 68 Offer expressly

11   applied to "each" of the complaint's causes of action, App'x at 39 (emphasis in

12   original), and urged the district court to disregard "extrinsic evidence," App'x at

13   39-40 (citing *Steiner v. Lewmar, Inc.*, 816 F.3d 26, 35 (2d Cir. 2016)).

20

1    On July 26, 2017, the district court declined to enter Appellants' proposed

2    judgment, reasoning that the offer was ambiguous and citing the district court's

3    supervisory authority over the case.[5]

4    After further litigation, Appellants moved for summary judgment on their

5    claims and for "such other and further relief as [the] Court deems just and

6    proper." Motion for Summary Judgment at 1, *Toth v. 59 Murray Enters., Inc.*, No.

7    15-cv-8028 (S.D.N.Y. 2019), ECF No. 79. Appellants' further submissions,

8    including their memorandum of law and a letter accompanying the summary

9    judgment motion, explained that Appellants sought summary judgment on their

10   compensatory damages based on the fair market value of the images, as well as a

11   permanent injunction prohibiting Appellees from using Appellants' images.

12   Appellees cross-moved for summary judgment and moved to strike the report

---

[5] Our Court subsequently dismissed Appellants' appeal from this order on the basis that it was not an immediately appealable collateral order. *Electra v. 59 Murray Enters., Inc.*, No. 16-cv-8028, 2017 WL 5714513 (2d Cir. Nov. 21, 2017).

1    and testimony of Appellants' proposed damages expert, Stephen Chamberlin.

2    On January 3, 2019, the district court struck Chamberlin's report and testimony

3    as speculative and based on unreliable methodology, and it granted summary

4    judgment to Appellees on all of Appellants' claims.

5           As to Appellants' claims under New York Civil Rights Law §§ 50-51, the

6    district court concluded that Lee, Koren, Shake, Mayes, Hinton, and Golden had

7    brought suit within one year of the publication of the challenged advertisements,

8    but that the claims of the other Appellants were time-barred under the applicable

9    one-year statute of limitations. *See* N.Y. C.P.L.R. § 215(3). As to the six Appellants

10   whose claims were not time-barred, the district court held that they could not sue

11   under Section 51 because they signed full releases of their rights to the images.

12   Accordingly, the district court dismissed the complaint and entered judgment for

13   Appellees. Appellants timely appealed.

1    **DISCUSSION**

2    I.    **Rule 68 Offer of Settlement**

3    Federal Rule of Civil Procedure 68 provides:

4    [A] party defending against a claim may serve on an opposing party
5    an offer to allow judgment on specified terms, with the costs then
6    accrued. If, within 14 days after being served, the opposing party
7    serves written notice accepting the offer, either party may then file
8    the offer and notice of acceptance, plus proof of service. The clerk
9    must then enter judgment.

10   Fed. R. Civ. P. 68(a).

11   "Rule 68 offers of judgment and acceptances thereof are contracts to be

12   interpreted according to ordinary contract principles." *Steiner*, 816 F.3d at 31.

13   Appellants argue, however, that we have stated that "Rule 68 offers of judgment

14   . . . are different from other contract offers in that they carry legal consequences:

15   a party that rejects a Rule 68 offer may be subject to the cost-shifting provision of

16   Rule 68(d) if it does not obtain a more favorable judgment," *id.*, and that under

17   the doctrine of contra proferentem, "ambiguities in the language of a Rule 68

23

1    offer of judgment are to be construed against the party making the offer," *Lilly v.*

2    *City of New York*, 934 F.3d 222, 236 (2d Cir. 2019) (internal quotation marks and

3    citation omitted).

4         "The primary goal of contract interpretation is to effectuate the intent of

5    the parties as manifested by the language used in the contract." *Steiner*, 816 F.3d

6    at 34 (internal quotation marks and citation omitted). This Court's exposition of

7    ambiguity under contract law in the Rule 68 context in *Goodheart Clothing Co., Inc.*

8    *v. Laura Goodman Enterprises, Inc.* is instructive:

9         If a writing, or the term in question, appears to be plain and
10        unambiguous on its face, its meaning must be determined from the
11        four corners of the instrument without resort to extrinsic evidence of
12        any nature. On the other hand, if the term in question does not have
13        a plain meaning it follows that the term is ambiguous. Contract
14        language is ambiguous if it is reasonably susceptible of more than one
15        interpretation, and a court makes this determination by reference to
16        the contract alone. Conversely, contractual language is unambiguous
17        if it has a definite and precise meaning, unattended by danger of
18        misconception in the purport of the contract itself, and concerning
19        which there is no reasonable basis for a difference of opinion.

1    962 F.2d 268, 272 (2d Cir. 1992) (internal quotation marks, brackets, and citations

2    omitted and alterations incorporated). "In determining whether the contract is

3    ambiguous, a court looks at the contract as a whole in light of the circumstances

4    present when the contract was entered." *Steiner*, 816 F.3d at 33 (internal

5    quotation marks and citation omitted).

6         Appellants argue that the district court erred in concluding that

7    Appellants had not accepted Appellees' Offer of Judgment, arguing that (1) the

8    contract unambiguously offered $660,000; and (2) even if the offer was

9    ambiguous, our case law requires that the offer must be construed against the

10   offeror, without looking to extrinsic evidence. In response, Appellees argue that

11   the offer was ambiguous, and this ambiguity rendered the offer inoperative. "We

12   review *de novo* a district court's interpretation of a Rule 68 offer." *Steiner*, 816 F.3d

13   at 31; *see also Goodheart*, 962 F.2d at 273 ("[I]nterpretation of a contract generally is

14   a question of law, subject to *de novo* review.").

25

1    Preliminarily, we note that it is inapt to apply the doctrine of contra

2   proferentem to this case because that doctrine assumes the *existence of* a contract

3   about which there is some dispute as to one or more terms. Contra proferentem

4   is intended to be an interpretive methodology of last resort:

5       [I]f, after all of the other guides to interpretation have been exhausted and
6       the court concludes that there remain two reasonable interpretations of the
7       contract, with each party knowing or having reason to know of the other
8       party's understanding of the term, the court should as a policy matter,
9       assuming it is clear that the parties have indeed attempted to enter into a
10      contract, choose the interpretation that is adverse to the party that drafted
11      the contract.
12
13  *U.S. Naval Inst. v. Charter Commc'ns, Inc.*, 875 F.2d 1044, 1050 (2d Cir. 1989)

14  (quoted in 5 *Corbin on Contracts* § 24.27 (2020)). To apply contra proferentem to

15  the threshold question of whether an enforceable contract existed—*i.e.*, to

16  whether there was mutual assent to be bound—would be the antithesis of its

17  generally accepted purpose as an interpretive tiebreaker of last resort.

18   Here, for the reasons discussed below, there simply was no meeting of the

19  minds: plaintiffs' purported acceptance of the Offer of Judgment is more

26

1    properly construed as a counteroffer because it changed the most essential term

2    of the Offer of Judgment—the dollar amount offered. Without a valid acceptance,

3    there is no contract; without a contract, there is no need to interpret its purported

4    terms; without the need for interpretation, there is no need to apply an

5    interpretive methodology of last resort. While our cases have approved of

6    applying contra proferentem to validly accepted Rule 68 offers, none has done so

7    where, as here, there was such a fundamental misconstrual of the terms offered

8    by the Appellees that it was impossible to conclude that a contract existed at all.

9           For a valid Rule 68 agreement to have been formed, there must have been

10   a "meeting of the minds" under elementary principles of contract law. *See, e.g.*,

11   *Mallory v. Eyrich*, 922 F.2d 1273, 1279-80 (6th Cir. 1991); *Johnson v. Univ. Coll. of*

12   *Univ. of Ala. in Birmingham*, 706 F.2d 1205, 1209 (11th Cir. 1983); *Radecki v. Amoco*

13   *Oil Co.*, 858 F.2d 397, 400 (8th Cir. 1988) ("To decide whether there has been a

14   valid offer and acceptance for purposes of Rule 68, courts apply the principles of

15   contract law."); *Steiner*, 816 F.3d at 31 ("Rule 68 offers of judgment and

27

1   acceptances thereof are contracts to be interpreted according to ordinary contract

2   principles").

3        "The plain purpose of Rule 68 is to encourage settlement and avoid

4   litigation. . . . The Rule prompts both parties to a suit to evaluate the risks and

5   costs of litigation, and to balance them against the likelihood of success upon

6   trial on the merits." *Marek v. Chesny*, 473 U.S. 1, 5 (1985). With respect to a suit

7   seeking money damages, the process requires that the plaintiff, who can total his

8   damages and the costs already incurred, be able to "compar[e] th[at] sum to the

9   amount offered." *Id.* at 7. "Thus, Rule 68 offers must provide 'a clear baseline

10  from which plaintiffs may evaluate the merits of their case relative to the value of

11  the offer.'" *Basha v. Mitsubishi Motor Credit of Am., Inc.*, 336 F.3d 451, 455 (5th Cir.

12  2003) (quoting *Thomas v. Nat'l Football League Players Ass'n*, 273 F.3d 1124, 1130

13  (D.C. Cir. 2001); *see also, e.g., Stanczyk v. City of New York*, 752 F.3d 273, 283 (2d

14  Cir. 2014) ("Rule 68 offers . . . must be capable of comparison to the judgment

15  ultimately obtained[.]" (citation omitted)).

28

1    The Rule 68 process does not work if the dollar amount offered is not clear.

2    For example, where a Rule 68 offer included a monetary component for the

3    plaintiff's claimed "actual damages" that would be an amount that "the

4    attorneys for the parties [were to] agree[] upon [as] reasonable," rather than

5    specifying that amount in the offer, *Basha*, 336 F.3d at 454 (internal quotation

6    marks and alterations omitted), the offer did not comport with the Rule, and

7    entry of a Rule 68 judgment was properly denied:

8        Because the offer purported to settle all claims, yet failed to quantify
9        damages, . . . mutual assent did not exist between the parties.
10       Moreover, *such a vague offer of judgment did not provide Basha with a*
11       *clear baseline to evaluate the risks of continued litigation*. To hold
12       otherwise would be to strip Rule 68 of its purpose.
13
14   *Id.* at 455 (emphasis added); *see also Thomas*, 273 F.3d at 1130 (explaining that "an

15   unallocated offer of judgment to multiple plaintiffs is not effective under Rule

16   68" because no plaintiff would have been presented with a number against

17   which to compare his or her likely recovery).

29

1    We conclude that Appellees' Rule 68 Offer of Judgment was, indeed,

2    ambiguous. As the district court noted, the sentence in the Rule 68 offer reading,

3    "Defendants hereby offer to Plaintiffs collectively to take a judgment against

4    Defendants in the amount of $82,500.00 . . . on each of the Causes of Action

5    contained in the Complaint," App'x at 24, is reasonably susceptible to more than

6    one interpretation because the word "collectively" contradicts the use of the

7    word "each." The Rule 68 offer therefore was ambiguous in its most crucial term:

8    the amount of settlement. Appellants' arguments to the contrary simply ignore

9    this contradiction and are accordingly unconvincing.

10    An offer that states a dollar amount to be specified in the judgment but

11    does so using language that would permit the defendant to argue later that the

12    offer was for a different amount has no Rule 68 validity. Appellants here point

13    out that if they had simply stated that they accepted Appellees' Offer of

14    Judgment without attempting an explanation or elaboration, Appellees would

15    have been free to point to the offer's reference to *each* cause of action, and to

30

1    contend that they were entitled to have Appellants pay post-offer costs if after

2    trial Appellants recovered any sum less than $660,000. Appellants' Br. at 70.

3    Plainly the Rule was not intended to provide a defendant with such a double-

4    edged sword—enabling him to argue that plaintiffs could not receive more than

5    $82,500 if they accepted the Rule 68 offer, but could be held liable for post-offer

6    costs if they won any amount less than $660,000. Neither was the Rule intended

7    to allow a plaintiff, who knows that the specified sum in the offer is the

8    defendant's intended ceiling, to insist that the Rule 68 judgment be entered for a

9    higher amount than the one specified in the offer.

10        In sum, because the Rule 68 offer was ambiguous as to what dollar amount

11   the Appellees were offering—*i.e.*, as to the most fundamental aspect of the

12   proposed contract, the amount to be specified in the judgment—the Offer of

13   Judgment was not a proper Rule 68 offer. There was here no mutual assent;

14   Appellees' Offer of Judgment was of no effect under Rule 68; the district court

15   properly refused to enter the judgment proposed by Appellants; and Appellants

31

1    are not subject to the costs-shifting consequences that would have occurred if

2    Appellees' Offer of Judgment had been a proper Rule 68 offer.

3         Because the parties never reached agreement on a settlement amount, the

4    district court correctly refused to resolve ambiguities in Appellants' favor and

5    enter judgment for Appellants pursuant to their purported acceptance of the

6    Rule 68 offer. We therefore affirm the July 26, 2017 order of the district court.

7         Finally, even if we were to conclude that, notwithstanding the

8    fundamental ambiguity in the Offer of Judgment, a Rule 68 contract had

9    somehow been formed calling for a Rule 68 judgment in the amount of $660,000,

10   we would uphold the district court's refusal to enter such a judgment on the

11   ground that Appellees should be allowed to avoid the contract on the basis of

12   mistake. Although unilateral mistake is generally not an impediment to the

13   formation of a contract, it may in some circumstances allow the party that made

14   the mistake to avoid the contract. "Where a mistake of one party at the time a

15   contract was made as to a basic assumption on which he made the contract has a

32

1    material effect . . . that is adverse to him," and "the other party had reason to

2    know of the mistake," "the contract is"— except in circumstances not existing

3    here—"voidable by him." Restatement (Second) of Contracts § 153(b) (1981); *see*

4    *also* 5 Corbin on Contracts § 24.27 (2020) ("When the terms of a written contract

5    have been authored by one of the parties and *merely* assented to by the other, this

6    fact will in some cases influence the interpretation that the court will give to

7    these terms. After the court has examined all of the other factors that affect the

8    search for the parties' intended meaning, . . . there may yet remain a question as

9    to what meaning was intended and should be given effect. This uncertainty may

10   be so great that the court should hold that no contract exists." (emphasis added)).

11           In the context of a Rule 68 judgment, for example, where a defendant

12   intended to make a Rule 68 offer of judgment in the amount of $500 but because

13   of a typographical error offered $500,000, which was accepted by plaintiffs in a

14   case in which they had made no money demand prior to filing suit, the

15   complaint alleged that that defendant had caused actual damage only in the

1    amount of $3,600, and they were "shocked" by the offer when it was received,

2    the Rule 68 judgment for $500,000 was properly set aside on the ground that

3    there was no Rule 68 contract because there had been no meeting of the minds.

4    *See Whitaker v. Associated Credit Servs., Inc.*, 946 F.2d 1222, 1223-25 (6th Cir. 1991).

5         The circumstances surrounding Appellees' Rule 68 offer here support the

6    district court's refusal to enter a Rule 68 judgment. Appellees made their formal

7    Rule 68 offer of $82,500 only after making an informal offer to settle the entire

8    case for that amount. Appellants rejected the informal offer and made a counter-

9    offer to settle for $800,000. Appellees then rejected that counter-offer in a June 15,

10   2017 email to Appellants' counsel, and in that email stated, "We are going to file

11   an offer of judgment for the amount previously offered." App'x at 33. On that

12   same day, Appellants made the Offer of Judgment at issue here. Appellants have

13   not disputed, either in the district court or here, that this was the sequence of

14   events, or that they received and understood the June 15 email. This undisputed

15   record reveals that Appellants knew Appellees intended to have a Rule 68

34

1    judgment entered that required them to pay Appellants collectively a total of

2    $82,500. As Appellants attempted to have such a judgment entered only in the

3    amount of $660,000, the parties never reached agreement on a specific amount.

4    **II.    Claims Under New York Civil Rights Law § 51**

5           "We review a district court's grant of summary judgment *de novo*."

6    *Brandon v. Kinter*, 938 F.3d 21, 31 (2d Cir. 2019). For summary judgment to be

7    warranted, the movant must "show[] that there is no genuine dispute as to any

8    material fact and the movant is entitled to judgment as a matter of law." Fed. R.

9    Civ. P. 56(a). "Material facts are those which might affect the outcome of the suit

10   under the governing law, and a dispute is genuine if the evidence is such that a

11   reasonable jury could return a verdict for the nonmoving party." *Coppola v. Bear*

12   *Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007) (internal quotation marks and

13   citation omitted). "In reviewing the district court's grant of summary judgment,

14   we must construe the facts in the light most favorable to the non-moving party

35

1    and must resolve all ambiguities and draw all reasonable inferences against the

2    movant." *Brandon*, 938 F.3d at 31 (internal quotation marks and citation omitted).

3    **A.    New York Civil Rights Law §§ 50-51**

4           Though New York courts do not recognize a common law action for

5    invasion of privacy, Sections 50 and 51 of the New York Civil Rights Law

6    provide for a limited statutory right of privacy. *Messenger v. Gruner + Jahr*

7    *Printing & Publ'g,* 208 F.3d 122, 125 (2d Cir. 2000). Under Section 50, it is a

8    misdemeanor to "use[] for advertising purposes, or for the purposes of trade, the

9    name, portrait or picture of any living person without having first obtained the

10    written consent of such person . . . ." N.Y. Civ. Rights Law § 50. Section 51

11    authorizes a private right of action for damages and injunctive relief for those

12    injured by a violation of Section 50, providing in relevant part as follows:

13           Any person whose name, portrait, picture or voice is used within this
14           state for advertising purposes or for the purposes of trade without the
15           written consent first obtained as above provided [in Section 50] may
16           maintain an equitable action in the supreme court of this state against
17           the person, firm or corporation so using his name, portrait, picture or

1   voice, to prevent and restrain the use thereof; and may also sue and
2   recover damages for any injuries sustained by reason of such use . . . .

3 N.Y. Civ. Rights Law § 51. To establish liability under Section 51, a plaintiff

4 "must demonstrate each of four elements: (i) usage of plaintiff's name, portrait,

5 picture, or voice, (ii) within the state of New York, (iii) for purposes of

6 advertising or trade, (iv) without plaintiff's written consent." *Molina v. Phx.*

7 *Sound Inc.*, 747 N.Y.S.2d 227, 230 (App. Div. 1st Dep't 2002) (citation omitted). "A

8 name, portrait or picture is used 'for advertising purposes' if it appears in a

9 publication which, taken in its entirety, was distributed for use in, or as part of,

10 an advertisement or solicitation for patronage of a particular product or service,"

11 *Beverley v. Choices Women's Med. Ctr., Inc.*, 78 N.Y.2d 745, 751 (1991) (citation

12 omitted), and is used for purposes of trade if it "involves use which would draw

13 trade to the firm." *Kane v. Orange Cty. Publ'ns.*, 649 N.Y.S.2d 23, 25 (App. Div. 2d

14 Dep't 1996). Because the statute was "drafted narrowly to encompass only the

15 commercial use of an individual's name or likeness and no more," *Finger v. Omni*

1    *Publ'ns. Int'l, Ltd.*, 77 N.Y.2d 138, 141 (1990) (internal quotation marks and

2    citation omitted), the statute's terms are "to be narrowly construed and strictly

3    limited to nonconsensual commercial appropriations of the name, portrait or

4    picture of a living person." *Messenger*, 208 F.3d at 125 (internal quotation marks

5    and citation omitted).

6         New York courts hold that Section 51 also protects a statutory right of

7    publicity. *See Brinkley v. Casablancas*, 438 N.Y.S.2d 1004, 1012 (App. Div. 1st Dep't

8    1981); *see also Gautier v. Pro–Football, Inc.*, 304 N.Y. 354, 359 (1952). Section 51 "has

9    been applied in cases . . . where the picture of a person who has apparently never

10   sought publicity has been used without his or her consent for trade or

11   advertising purposes. In such cases it has been noted that the statute serves to

12   protect the sentiments, thoughts and feelings of an individual." *Stephano v. News*

13   *Grp. Publ'ns., Inc.*, 64 N.Y.2d 174, 182 (1984) (internal quotation marks and

14   citations omitted). Yet, Section 51 "is not limited to situations where the

15   defendant's conduct has caused distress to a person who wishes to lead a private

38

1   life free of all commercial publicity." *Id.* at 183. Because Section 51 "applies to any

2   use of a person's picture or portrait for advertising or trade purposes whenever

3   the defendant has not obtained the person's written consent to do so," the statute

4   also applies in cases seeking to vindicate the statutory right of publicity—those

5   in which "the plaintiff generally seeks publicity, or uses his name, portrait, or

6   picture, for commercial purposes but has not given written consent for a

7   particular use." *Id.*

8       In *Arrington v. New York Times Co.*, the Court of Appeals held that

9   allegations that a photograph distributor sold the plaintiff's image to a

10  newspaper without the plaintiff's consent sufficed to state a claim for

11  nonconsensual commercialization of an image for purposes of trade. 55 N.Y.2d

12  433, 443 (1982). Soon thereafter, the New York legislature amended Section 51 to

13  expressly permit lawful sales or transfers of images by adding the following

14  provision:

1         [N]othing contained in this article shall be so construed as to prevent
2         any person, firm or corporation from selling or otherwise transferring
3         any material containing such name, portrait, picture or voice in
4         whatever medium to any user of such name, portrait, picture or voice,
5         or to any third party for sale or transfer directly or indirectly to such
6         a user, for use in a manner lawful under this article . . . .
7
8 N.Y. Civ. Rights Law § 51.

9         Accordingly, in actions under Section 51 challenging the sale or transfer of

10 an image from an image distributor to a third party, or a third party's use of an

11 image, courts generally assess whether such use or transfer is lawful by looking

12 to the text of the relevant written release agreement. *See, e.g.*, *Delaney v. Newsday,*

13 *Inc.*, No. 90-6007, 1991 WL 95125, at *1-2 (N.Y. Sup. Ct. Jan. 28, 1991); *see also*

14 *Spiegel v. Schulmann*, 604 F.3d 72, 78 (2d Cir. 2010); *Krupnik v. NBC Universal, Inc.*,

15 No. 103249-10, 2010 WL 9013658, *3-5 (N.Y. Sup. Ct. June 29, 2010). "Under New

16 York law, a defendant's immunity from a claim for invasion of privacy is no

17 broader than the consent executed to him." *Spiegel*, 604 F.3d at 77 (internal

18 quotation marks and citation omitted). "Where the plaintiff's consent is limited

40

1   with respect to form or forum, the use of the plaintiff's photograph is without

2   consent if it exceeds the limitation." *Id.*; *see also Shields v. Gross*, 58 N.Y.2d 338, 344

3   (1983) ("The statute acts to restrict an advertiser's prior unrestrained common-

4   law right to use another's photograph until written consent is obtained. Once

5   written consent is obtained, however, the photograph may be published as

6   permitted by its terms." (citation omitted)).

7   **B.     The Terms of the Release Agreements for Shake's and Hinton's**
8   **Photographs Are Disputed**
9
10          It is conceded that the Club Companies used Appellants' pictures within

11  the state of New York for the purposes of advertising or trade, *see Molina*, 747

12  N.Y.S.2d at 230, and Appellees do not argue that any exceptions apply. Further,

13  it is undisputed that the Club Companies lacked written consent from

14  Appellants to use their images in Club advertisements. For use of the

15  photographs in the Club Companies' advertisements to be lawful, then, we look

16  to the terms of the releases for each photograph. "A release is a contract, and its

41

1    construction is governed by contract law." *Warmhold v. Zagarino*, 40 N.Y.S.3d 499,

2    500 (App. Div. 2d Dep't 2016) (internal quotation marks and citation omitted).

3    Whether a Section 51 plaintiff entered into a release agreement and the terms of

4    such an agreement, however, are factual questions. *See, e.g., Taggart v. Wadleigh-*

5    *Maurice, Ltd.*, 489 F.2d 434, 438 (3d Cir. 1973); *Alvidrez v. Roberto Coin, Inc.*, 791

6    N.Y.S.2d 344, 347 (Sup. Ct. 2005).

7         The district court granted Appellees summary judgment after finding that

8    each Appellant with a timely Section 51 claim—Lee, Koren, Shake, Mayes,

9    Hinton, and Golden—had entered into a "comprehensive" release that

10   "grant[ed] the releasee unlimited rights to the use of the images at issue." *Toth v.*

11   *59 Murray Enters., Inc.*, No. 15-cv-8028, 2019 WL 95564, at *3, *11 (S.D.N.Y. Jan. 3,

12   2019). Appellants argue that the district court erred in so finding because the

13   record did not contain releases for the images at issue. We agree.

14        It is undisputed that Lee, Koren, and Mayes entered into agreements

15   releasing all their rights to the photographs and authorizing assignment, license,

1    or use of the photographs by third parties. Appellants argue that there is no

2    release in the record for the photograph of Golden, and Appellees offer no

3    argument to the contrary before this Court. But the parties plainly agreed before

4    the district court that "Golden executed an exclusive contract with Leg Avenue

5    in conjunction with a release by which she assigned the rights to the photographs

6    at issue, without limitation, to Leg Avenue," App'x at 2218. This release assigned

7    all rights to the photograph to the releasee Leg Avenue, as well as its "successors,

8    agents, assigns, and all persons or corporations acting with its permission . . . ,

9    without restriction . . . ." App'x at 1630. Appellants cannot now argue that the

10   release for Golden's photograph creates a material dispute of fact.

11        While the parties agree that Shake entered into a release for the

12   photograph at issue, this release is not in the record. The parties dispute the

13   terms of the release, including whether the releasee would receive all proprietary

14   rights to the image or be able to use the image for any purpose. Shake testified

43

1    that she understood that the photographs covered by the release were to be used

2    only for a calendar that Fastdates created.

3        Further, while Appellants did not dispute Appellees' statement in their

4    Rule 56.1 filing that "Hinton signed a release in connection with the photographs

5    depicted in Exhibits E and F," App'x at 2214, these exhibits are labeled as

6    advertisements featuring the images of Koren and Shake, not Hinton. Hinton

7    testified that she did not always sign releases for photographs with Forplay, and

8    she did not recall whether she signed a release for the photograph used in the

9    advertisements at issue. Appellants contend on appeal that the record does not

10   include the release that Hinton signed for the photograph, and Appellees

11   concede this point, arguing only that Hinton testified that she did not know if the

12   release in the record pertained to the images at issue in the case.

13       In summary, though there was no dispute of material fact raised relating to

14   the releases for the photographs of Lee, Koren, Mayes, and Golden, the terms of

15   the releases for the photographs of Shake and Hinton present disputed questions

44

1    of material facts. We thus vacate the district court's grant of summary judgment

2    to Appellees on the claims of Shake and Hinton.

3    **C.     Whether the Releases Bar Appellants' Section 51 Claims**

4        Relying on the release agreements in the record, the district court

5    concluded that Appellants had executed agreements releasing all their

6    proprietary rights to the photographs and authorizing releasees to allow third

7    parties to use the photographs for any purpose. The district court held that the

8    release agreements disclaimed Appellants' rights to challenge the use of the

9    photographs, barring Appellants' Section 51 claims. In a footnote, the district

10   court suggested that though it did not need to address the question of whether

11   the releases constituted "written consent" for purposes of Section 51, it was

12   "inconsistent" with the statute "for plaintiffs that have signed unlimited releases

13   to rely on the absence of written consent in pursuing damages under that

14   statute." *Toth*, 2019 WL 95564 at *11 n.14.

45

1    Appellants contend that this was an error of law, arguing that Appellees

2    lacked written consent from Appellants, the releasees, or anyone else to use the

3    images; that Appellees were not third-party beneficiaries of the release

4    agreements; and that the release agreements did not constitute written consent

5    for purposes of Section 51. We agree.

6        Under New York law, "the terms of a contract may be enforced only by

7    contracting parties or intended third-party beneficiaries of the contract . . . ."

8    *Rajamin v. Deutsche Bank Nat. Tr. Co.*, 757 F.3d 79, 86 (2d Cir. 2014). Here, both

9    parties agree that the Club Companies and their contractors—including Brown,

10   IMC, and Melange—were not parties to the releases, and that there are no other

11   agreements between Appellants and the Club Companies or their contractors

12   authorizing the use of the photographs. In addition, Appellees conceded during

13   oral argument that the contractors secured no legal rights to use the

14   photographs, such as through an assignment or license. Appellees and their

15   contractors are plainly not third-party beneficiaries of the release agreements. *See*

46

1    *State of Cal. Pub. Emps.' Ret. Sys. v. Shearman & Sterling*, 95 N.Y.2d 427, 434 (2000)

2    (explaining that a "party asserting rights as a third-party beneficiary must

3    establish," inter alia, "that the contract was intended for his benefit"). Appellees

4    therefore had no legal rights under the releases or any subsequent agreement to

5    use the images and cannot rely on the releases to bar Appellants' claims.

6         We further conclude that the releases are not written consent for purposes

7    of Section 51. The text of the statute requires a party to have "written consent" to

8    use the image, though it allows "sale or transfer" of the image "for use in a

9    manner lawful under" Section 51. N.Y. Civ. Rights Law § 51. As case law

10   demonstrates, written consent in favor of one party does not allow others to use

11   an image for trade or advertising. *See, e.g.*, *Chambers v. Time Warner*, No. 00-cv-

12   2839, 2003 WL 749422, at *4 (S.D.N.Y. Mar. 5, 2003). This is true no matter how

13   broadly an agreement releases proprietary rights to the releasee. In *Rosemont*

14   *Enterprises, Inc. v. Urban Systems, Inc.*, for example, the New York Supreme Court

15   held—in an action under Section 51 brought by Howard Hughes against the

47

1   maker of "The Howard Hughes Game" — that Hughes's "exclusive assignment

2   of the right to exploit the Hughes name and personality" to another party did not

3   defeat the claim. 340 N.Y.S.2d 144, 144, 147 (Sup. Ct. 1973), *aff'd as modified*, 345

4   N.Y.S.2d 17 (App. Div. 1st Dep't 1973). The court explained that Hughes was

5   "free to protect himself from the exploitation of his name and likeness against all

6   the world except [the assignee]. It is only between them will that assignment

7   constitute a defense to a similar law suit." *Id.* at 147.

8        A cause of action under Section 51 does not depend on the proprietary

9   rights a plaintiff has in a particular image. In *Gautier v. Pro-Football, Inc.*, the

10  Appellate Division explained that Section 51 provides "primarily a recovery for

11  injury to the person, not to his property or business." 106 N.Y.S.2d 553, 560 (App.

12  Div. 1st Dep't 1951), *aff'd*, 304 N.Y. 354. *Gautier* continued,

13       True, where an individual's right of privacy has been invaded there
14       are certain other elements which may be taken into consideration in
15       assessing the damages. Thus, where a cause of action under the Civil
16       Rights statute has been established, damages may include recovery
17       for a so-called 'property' interest inherent and inextricably

1       interwoven in the individual's personality, but it is the injury to the

2       person not to the property which establishes the cause of action. That

3       is the focal point of the statute.

4

5  *Id.* (citation omitted).[6] The district court's conclusion that the release agreements

6  defeated Appellants' claims would construe Section 51 claims as coextensive

7  with claims for breach of contract: only the releasees, who retained proprietary

8  interest in the image, could sue. But this is wrong, even in this "modern era" of

---

[6] Such reasoning has long precedent in New York courts. Shortly after the statute was first passed into law, the New York Court of Appeals recognized in *Rhodes v. Sperry & Hutchinson Co.* that ownership of an image and right to use the image for purposes of trade or advertising are distinct:

> [A]s to pictures whose ownership remained in the person represented at the time when the act took effect, or portraits subsequently made, a transfer of ownership no longer conveys the right to use the picture for advertising purposes, unless the written consent of the person portrayed shall have been given. The acquisition of such pictures by itself does not carry with it the right to use them for advertising or trade purposes, except with the written consent of the person represented; but the statute in no wise forbids the transfer of the right so to use them, provided that right is conferred by a written consent to that effect.

193 N.Y. 223, 230-31 (1908), *aff'd*, 220 U.S. 502 (1911).

49

1    the internet. *Cf. Gautier*, 304 N.Y. at 360. "Section 51 of the Civil Rights Law was

2    not enacted . . . to supplement causes of action based on contracts . . . ." *Gautier*,

3    106 N.Y.S.2d at 560-61.

4    Thus, Lee's and Mayes' releases in favor of Dreamgirl, Koren's release in

5    favor of Gianatsis Design Associates, and Golden's release in favor of Leg

6    Avenue do not constitute written consent for all others to use their images for

7    purposes of advertising or trade. That their releases conveyed their proprietary

8    rights to the photographs does not defeat their claims, because their cause of

9    action under Section 51 is based on their statutory rights, not their proprietary

10   rights in the photographs. And while the releases could provide a defense in an

11   action against the releasees or those who could assert lawful use by reason of

12   assignment or license, Appellees concede that they had no legal rights to the

13   images. Appellants therefore have established that Appellees used their images

14   without written consent, and they are entitled to summary judgment as to

15   Appellees' liability under Section 51.

50

1    **D.    Section 51 Remedies**

2        Section 51 authorizes private parties to seek injunctive relief,

3    compensatory damages "for any injuries sustained" because of the unconsented

4    use of their picture, and exemplary damages if the defendant knowingly used

5    the picture "in such manner as is forbidden or declared to be unlawful" by

6    Section 50. N.Y. Civ. Rights Law § 51.

7        The district court held that even if the comprehensive releases for the

8    photographs at issue did not defeat Appellants' Section 51 claims, their claims

9    should nevertheless be dismissed because Appellants failed to establish

10   entitlement to damages. Having found Lee, Koren, Shake, Mayes, Hinton, and

11   Golden entitled to summary judgment on liability under Section 51, we turn to

12   the district court's alternative basis for dismissal.

13       Appellants argue that the district court erred in striking the report of their

14   damages expert, Stephen Chamberlin, and that Appellants were entitled to prove

15   damages at trial. Appellees respond that that (1) the district court correctly struck

51

1    Chamberlin's report, and (2) Appellants' Section 51 claims fail because they

2    failed to adduce any evidence of damages. Though we conclude that the district

3    court correctly excluded Chamberlin's damages report, we also conclude that

4    this is not fatal to Appellants' Section 51 claims.

5           "The decision to admit expert testimony is left to the broad discretion of

6    the trial judge and will be overturned only when manifestly erroneous." *Zerega*

7    *Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213 (2d Cir.

8    2009). Federal Rule of Evidence 702 provides that a person "qualified as an

9    expert by knowledge, skill, experience, training, or education" can offer opinion

10   testimony if:

11          (a) the expert's scientific, technical, or other specialized knowledge
12          will help the trier of fact to understand the evidence or to determine
13          a fact in issue;
14          (b) the testimony is based on sufficient facts or data;
15          (c) the testimony is the product of reliable principles and methods;
16          and
17          (d) the expert has reliably applied the principles and methods to the
18          facts of the case.

1    Fed. R. Evid. 702. To decide "whether a step in an expert's analysis is unreliable,

2    the district court should undertake a rigorous examination of the facts on which

3    the expert relies, the method by which the expert draws an opinion from those

4    facts, and how the expert applies the facts and methods to the case at hand."

5    *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "A

6    district court has discretion under Federal Rule of Evidence 703 to determine

7    whether the expert acted reasonably in making assumptions of fact upon which

8    he would base his testimony." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21

9    (2d Cir. 1996) (internal quotation marks and citations omitted). "Although expert

10   testimony should be excluded if it is speculative or conjectural, or if it is based on

11   assumptions that are so unrealistic and contradictory as to suggest bad faith or to

12   be in essence an apples and oranges comparison, other contentions that the

13   assumptions are unfounded go to the weight, not the admissibility, of the

14   testimony." *Id.* (internal quotation marks and citations omitted).

53

1    In light of these principles, we conclude that the district court did not

2    abuse its discretion in excluding the Chamberlin Report as speculative and

3    methodologically unreliable. The Chamberlin Report states that it "established a

4    fair market fee for the use of each Model's image, taking into account each

5    Plaintiff's payment history over the course of her or his career, as well as the

6    Model's work quality, experience, exposure, and duration of career." App'x at

7    430. Relying on this fair market fee, the Chamberlin Report generated damages

8    assessments for Lee ($175,000), Koren ($40,000), Mayes ($100,000), Shake

9    ($30,000), Hinton ($270,000), and Golden ($85,000), and for the other appellants

10   (in varying amounts). But the "payment history" the Chamberlin Report relies on

11   is derived in part from contractual agreements that paid Appellants for

12   substantially more than what Appellants seek compensation for here—namely,

13   the fair market value of a single photoshoot. For example, the Chamberlin Report

14   extrapolated from Lee's agreement to conduct multiple film and photoshoots

15   and up to 20 days of promotional appearances for $25,000 that her "working day

54

1    rate"—the fee a model would receive for eight hours of work—would be at least

2    $25,000. App'x at 436, 2277-78. Similarly, the Chamberlin Report derived Koren's

3    daily fee based on her contract to serve as a company ambassador, a role that

4    included a photoshoot, video interview, and public relations obligations. In

5    addition, though Chamberlin admitted that there is typically "one license and

6    one payment" for each photoshoot, App'x at 2259, the Chamberlin Report made

7    its damages calculation by multiplying the working day rate by the number of

8    ways in which the photographs were used. This methodology resulted in

9    calculations of damages amounts far greater than the actual amount Appellants

10   received for the photographs in the first instance. Because the Chamberlin Report

11   therefore systematically overestimated the fair market value of the photographs

12   at issue, we find no abuse of discretion in the district court's decision to strike it.

13          We nevertheless conclude that the exclusion of the Chamberlin Report is

14   not fatal to Appellants' claims. The SAC alleges that Appellees "violated N.Y.

15   Civil Rights Law §§ 50-51 by invading Plaintiffs' privacy, misappropriating their

55

1    likeness, and publishing altered Images of Plaintiffs which made it appear as

2    though Plaintiffs were employed at one or more of the Clubs, or endorsed one or

3    more of the Clubs." App'x at 90. As to relief, the SAC states as follows:

4            Due to Defendants' violation of Plaintiffs' rights of privacy and
5            publicity under sections 50 and 51 of the N.Y. Civil Rights Act,
6            Plaintiffs [have] been damaged in an amount to be determined at trial,
7            but in all events not less than seventy-five thousand dollars
8            ($75,000.00), exclusive of punitive and exemplary damages.

9            In addition, and pursuant to section 51 of the N.Y. Civil Rights Act,
10           Plaintiffs hereby request[] an Order permanently enjoining
11           Defendants from violating Plaintiffs' right to privacy and publicity.

12           In addition, and likewise pursuant to section 51 of the N.Y. Civil
13           Rights Act, Plaintiffs hereby request an award of punitive damages,
14           in an amount to be determined at trial, due to Defendants knowing
15           and intentional violation of their statutory rights to privacy and
16           publicity.

17   App'x at 91. Appellants thus brought suit under Section 51 seeking not just

18   compensatory damages, but also injunctive relief. Appellants reiterated that they

19   sought equitable relief during oral argument before the district court on their

20   summary judgment motion, as well as in their motion papers. Thus, Appellants

1    can proceed at a minimum with their action to seek a permanent injunction. *Cf.*

2    *Onassis v. Christian Dior-New York, Inc.*, 472 N.Y.S.2d 254, 263 (Sup. Ct. 1984), *aff'd*,

3    488 N.Y.S.2d 943 (App. Div. 1st Dep't 1985) (granting a preliminary injunction

4    under Section 51 while noting that the plaintiff could pursue claims for damages

5    at trial).

6         We also conclude that the striking of the Chamberlin Report does not

7    necessarily preclude Appellants from seeking damages. The SAC plainly asserts

8    as a basis for compensatory damages the violation of Appellants' statutory rights

9    of both privacy and publicity. New York's statutory right of privacy "is based

10   upon the classic right of privacy's theoretical basis, which is to prevent injury to

11   feelings." *Lombardo v. Doyle, Dane & Bernbach, Inc.*, 396 N.Y.S.2d 661, 664 (App.

12   Div. 2d Dep't 1977). Consequently, damages for the violation of New York's

13   statutory right of privacy "often are only nominal since they are designed

14   primarily to compensate for injury to feelings." *Lerman v. Flynt Distrib. Co., Inc.*,

15   745 F.2d 123, 141 (2d Cir. 1984); *see, e.g., Grant v. Esquire, Inc.*, 367 F. Supp. 876,

57

1   881 (S.D.N.Y. 1973) (explaining that the plaintiff will "be entitled to recover for

2   any lacerations to his feelings that he may be able to establish" if the jury decides

3   in his favor); *Harris v. H.W. Gossard Co.*, 185 N.Y.S. 861, 863 (App. Div. 1st Dep't

4   1921) (affirming the award of six cents in recompense for the injured feelings of a

5   Section 51 plaintiff, a well-known actress).

6        Nominal damages are damages nonetheless. Appellants at least initially

7   sought recovery of damages before the district court for mental distress and

8   embarrassment caused by the use of their images in advertisements for strip

9   clubs before the district court. Accordingly, the district court, on remand, may

10   consider whether Appellants may recover on this theory.

11        As to whether Appellants can seek to recover the fair market value of the

12   images as compensation, Appellees argue that (1) Appellants did not establish

13   that they were entitled to recover the fair market value of their images, and (2)

14   even if fair market value were the proper measure of damages, Appellants

15   cannot establish the fair market value of their images in the absence of the

1  Chamberlin Report. Appellants contend that fair market value is a proper

2  measure of their damages, and Appellants could proceed to prove fair market

3  value even in the absence of the Chamberlin Report because an expert opinion is

4  not required to support a damages assessment.

5       In striking the Chamberlin Report, the district court relied in part on its

6  reasoning that Appellants' fair market value damages theory was

7  "fundamentally suspect" because, as they "negotiated with a willing buyer and

8  were paid the fair market value for any and all rights to the images" already,

9  allowing them "to be compensated a second time would be a clear windfall."

10 *Toth*, 2019 WL 95564, at *12. As we have explained, however, a Section 51 claim is

11 not a breach of contract action, but rather an action for infringement of a person's

12 statutory right of privacy or publicity. The district court's reasoning could be

13 persuasive if Appellees had secured legal rights to use the photographs through

14 assignment, license, or other means authorized in the release agreements. In such

15 a case, written consent sufficient to make their use of Appellants' image lawful

59

1    would run from the release to Appellees. But it is conceded that Appellees did

2    not secure legal rights to the images, and so damages would not constitute a

3    windfall: Appellants have not yet been compensated for the *Clubs'* use of their

4    images. We thus conclude that recovery of the fair market value of the images is

5    a viable damages theory in this case. *See Brinkley*, 438 N.Y.S.2d at 1012-13.

6           We are not aware of any precedent holding that an expert opinion is

7    required to prove compensatory damages in an action under Section 51, though

8    this Court has endorsed the use of experts to prove fair market value in other

9    contexts. *See Schonfeld v. Hilliard*, 218 F.3d 164, 178 (2d Cir. 2000). Furthermore,

10   our case law does not suggest that Section 51 is "one of the rare causes of action

11   in which the law predicates recovery upon expert testimony." *See Salem v. U.S.*

12   *Lines Co.*, 370 U.S. 31, 35 (1962). Awarding damages under Section 51 "is a

13   difficult question at best. Objective standards for measuring injury resulting from

14   an invasion of privacy or an appropriation of one's name, likeness, or reputation

15   are unlikely to be available, so that a considerable degree of discretion must rest

60

1    with the finder of fact." *Big Seven Music Corp. v. Lennon*, 554 F.2d 504, 512 (2d Cir.

2    1977). Nevertheless, the "fact that in cases involving infringements of the right of

3    privacy the damages may be difficult of ascertainment or cannot be measured by

4    a pecuniary standard is not a good ground for denying recovery at all. Of

5    necessity, the question of the measure of these damages is a matter that should

6    be left to the sound discretion of the jury." *Manger v. Kree Inst. of Electrolysis*, 233

7    F.2d 5, 9 n.5 (2d Cir. 1956) (internal quotation marks and citations omitted); *see*

8    *also Myers v. U.S. Camera Pub. Corp.*, 167 N.Y.S.2d 771, 774 (City Ct. 1957).

9           "It is well settled that expert testimony is unnecessary in cases where

10   jurors are as capable of comprehending the primary facts and of drawing correct

11   conclusions from them as are witnesses possessed of special or peculiar

12   training." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (internal

13   quotation marks and citation omitted). The district court made no conclusions as

14   to the necessity of an expert opinion, and we decline to answer that question in

15   the first instance. On remand, the district court can consider whether an expert

                                              61

1    opinion is required to prove the fair market value of the photographs at issue,

2    and if so, whether Appellants may supplement the record.

3    **III.    Other Claims**

4            Appellants also challenge the district court's grant of summary judgment

5    to Appellees alleging that Appellees unlawfully used photographs of them

6    without their consent to advertise strip clubs that Appellees owned, in violation

7    of the Lanham Act, 15 U.S.C. § 1125(a), New York General Business Law Section

8    349, and New York libel law.[7]

---

[7] Appellants also appeal from the portion of the district court's order declining to award damages, attorneys' fees, and costs for Appellants' only successful claim, Electra's claim under the Lanham Act. Appellants' brief cursorily contends that Electra is entitled to a jury trial on damages, but offers no argument as to why the district court erred in concluding that Electra was not entitled to damages under the Lanham Act in the first instance, *see PPX Enters., Inc. v. Audiofidelity Enters., Inc.*, 818 F.2d 266, 271 (2d Cir. 1987), *abrogation on other grounds recognized in Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 n.9 (2d Cir. 1998), nor any argument as to fees or costs. We therefore consider Appellants' arguments on these points to be waived. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal.").

1    We turn first to Appellants' appeal from the dismissal of their Lanham Act

2    claim. The Lanham Act prohibits, in relevant part, the "use[] in commerce [of]

3    any word, term, name, symbol, or device, or any combination thereof . . . likely to

4    cause confusion, or to cause mistake, or to deceive as to the affiliation,

5    connection, or association of such person with another person, or as to the origin,

6    sponsorship, or approval of his or her goods, services, or commercial activities

7    by another person." 15 U.S.C. § 1125(a)(1)(A). To succeed on a false endorsement

8    claim under the Lanham Act, "a plaintiff must prove (1) that the mark . . . is

9    distinctive as to the source of the good or service at issue, and (2) that there is the

10   likelihood of confusion between the plaintiff's good or service and that of the

11   defendant." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 154 (2d Cir. 2007). To

12   determine the likelihood of consumer confusion, we apply the eight-factor test of

13   *Polaroid Corporation v. Polarad Electronics Corporation.* 287 F.2d 492, 495 (2d Cir.

14   1961). *See Kelly-Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013). As is relevant

15   here, these factors include, inter alia, the strength of the mark, evidence of actual

63

1    consumer confusion, and evidence that the mark was adopted in bad faith.

2    *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009).

3            "On appeal from a grant of summary judgment, the findings with respect

4    to predicate facts underlying each *Polaroid* factor are reviewed with considerable

5    deference to the district court." *Playtex Prods., Inc. v. Ga.-Pac. Corp.*, 390 F.3d 158,

6    162 (2d Cir. 2004) (internal quotation marks and footnote citation omitted),

7    *superseded on other grounds as recognized in Starbucks Corp.*, 588 F.3d at 107-08. In

8    addition, this Court "review[s] the district court's decision to admit or exclude

9    expert testimony under a highly deferential abuse of discretion standard."

10   *Zuchowicz v. United States*, 140 F.3d 381, 386 (2d Cir. 1998).

11           We conclude that the district court correctly dismissed Appellants'

12   Lanham Act claim. The district court properly analyzed the record of each

13   Appellant's public prominence to determine the strength of their marks, because

14   among other reasons, the advertisements at issue provided no information

15   identifying Appellants other than their pictures. *See Bondar v. LASplash Cosmetics*,

64

1    No. 12-cv-1417, 2012 WL 6150859, at *7 (S.D.N.Y. Dec. 11, 2012) ("[T]he

2    misappropriation of a completely anonymous face could not form the basis for a

3    false endorsement claim, because consumers would not infer that an unknown

4    model was 'endorsing' a product, as opposed to lending her image to a company

5    for a fee." (footnote omitted)). Further, because the ultimate question under

6    *Polaroid Corporation* is the likelihood of consumer confusion, the district court

7    properly analyzed Appellants' recognizability. *See id.*

8          For substantially the same reasons as those set out in the district court's

9    opinion, we also conclude that the district court did not abuse its discretion in

10   striking Appellants' expert report (the "Buncher Report") about a survey

11   conducted of individuals who frequented strip clubs on their perceptions of the

12   advertisements. Among other defects, the survey on which the Buncher Report

13   was based asked respondents about only a small fraction of the images at issue,

14   and it failed to provide respondents with an opportunity to indicate lack of

15   knowledge about how to interpret the use of Appellants' images in the

65

1    advertisements. Appellants' arguments on appeal—that asking about more

2    images would have been more expensive, and that the Buncher Report was

3    based on "a communications study, not a consumer confusion study,"

4    Appellants' Br. at 55-56—are insufficient to set aside the district court's

5    conclusion that the Buncher Report was fatally flawed. Lastly, we agree that

6    Appellants failed to establish any actual consumer confusion or bad faith.

7    Appellants point to no evidence of actual consumer confusion. And while

8    Appellants urge this Court to conclude that Appellees acted in bad faith, the

9    record merely shows that Appellees failed to investigate whether the third-party

10   contractor responsible for the advertisements secured legal rights to use

11   Appellants' pictures in the promotional images—not that Appellees intended to

12   use the pictures without legal right to do so.

13        We next turn to Appellants' appeal from the dismissal of their claim under

14   New York General Business Law Section 349, which prohibits "[d]eceptive acts

15   or practices in the conduct of any business, trade or commerce or in the

66

1   furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). "To state a

2   claim under § 349, a plaintiff must allege: (1) the act or practice was consumer-

3   oriented; (2) the act or practice was misleading in a material respect; and (3) the

4   plaintiff was injured as a result." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir.

5   2009). Section 349 authorizes suit by "any person who has been injured by reason

6   of any violation of this section," N.Y. Gen. Bus. Law § 349(h), and we have held

7   that Section 349 allows recovery by non-consumers if there is "some harm to the

8   public at large," *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir.

9   1995) (internal quotation marks and citation omitted). Nevertheless, to

10  successfully state a claim under Section 349 "the gravamen of the complaint must

11  be consumer injury or harm to the public interest." *Id.* (internal quotation marks

12  omitted).

13      We agree with the district court that the misconduct alleged here was not

14  consumer-oriented. The gravamen of Appellants' complaint is that Appellees

15  used their modeling images without their consent, a private dispute over a

67

1   private injury visited on the individuals portrayed in the photographs. The

2   alleged misconduct was therefore not "consumer-oriented in the sense that [it]

3   potentially affect[s] similarly situated consumers." *Oswego Laborers' Local 214*

4   *Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 27 (1995).

5        Lastly, we consider Appellants' libel claim. "Under New York law, a

6   plaintiff must establish five elements to recover in libel: 1) a written defamatory

7   statement of fact concerning the plaintiff; 2) publication to a third party; 3) fault

8   (either negligence or actual malice depending on the status of the libeled party);

9   4) falsity of the defamatory statement; and 5) special damages or per se

10  actionability (defamatory on its face)." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d

11  163, 176 (2d Cir. 2000). Actual malice "must be supported by clear and

12  convincing proof" that the publisher of the statements "had a subjective

13  awareness of either falsity or probable falsity of the defamatory statement, or

14  acted with reckless disregard of . . . its truth or falsity." *Id.* at 182-83. Appellants

15  primarily argue that the advertisements were false defamatory statements

68

1   because their "most obvious interpretation" was that Appellants would be

2   "stripping at the strip clubs," Appellants' Br. at 50, and that Appellants

3   established that Appellees acted with actual malice.

4          These arguments are without merit. First, we agree with the district court

5   that it was a reasonable interpretation of the use of Appellants' images in the

6   advertisements that Appellants were not employed in Appellees' clubs, but

7   merely modeled in the clubs' advertisements. Insofar as the advertisements were

8   therefore "reasonably susceptible of multiple meanings, some of which [were]

9   not defamatory, it [was] then for the trier of fact, not for the court acting on the

10  issue solely as a matter of law, to determine in what sense the words were used

11  and understood." *Celle*, 209 F.3d at 178 (internal quotation marks omitted).

12  Accordingly, the district court correctly denied Appellants' motion for summary

13  judgment. Second, we agree with the district court that Appellants failed to

14  adduce clear and convincing proof of actual malice. As previously discussed,

15  Appellants at most have shown that Appellees failed to investigate whether the

69

1    third-party contractor responsible for the advertisements secured legal rights to

2    use Appellants' pictures in the promotional images. As this Court has explained,

3    however, "mere failure to investigate, while relevant, is also not itself sufficient

4    to show actual malice." *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 141 (2d Cir.

5    1984). We conclude that the district court correctly granted Appellees' cross-

6    motion for summary judgment dismissing Appellants' libel claims.

7         Accordingly, the order of the district court hereby is affirmed as to

8    Appellants' claims under the Lanham Act, New York General Business Law

9    Section 349, and New York libel law.

10                             **CONCLUSION**

11         For the foregoing reasons, we affirm the July 26, 2017 order of the district

12    court, vacate so much of the January 3, 2019 judgment of the district court as

13    applies to the Section 51 claims of Lee, Mayes, Koren, Shake, Hinton, and

14    Golden, affirm the remainder of the January 3, 2019 judgment, and remand for

15    further proceedings consistent with this opinion.

A True Copy

Catherine O'Hagan Wolfe, Clerk

United States Court of Appeals, Second Circuit

1                  **APPENDIX TO THE OPINION OF THE COURT**

2    **App'x at 115 (Exhibit E to the SAC)**



3

1    **App'x at 123 (Exhibit H to the SAC)**



2